

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

THE SHELDON ABEND REVOCABLE
TRUST,

          Plaintiff,

vs.

STEVEN SPIELBERG; DREAMWORKS,
LLC; PARAMOUNT PICTURES
CORPORATION; VIACOM, INC.;
NBC UNIVERSAL, INC.;  UNIVERSAL
PICTURES CORPORATION; and UNITED
INTERNATIONAL PICTURES, B.V.,

          Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Index No.:

_____, Part
Justice:

**COMPLAINT FOR:**
**[1] COPYRIGHT INFRINGEMENT**
    (17 U.S.C. §§ 101 ET SEQ.);
**[2] CONTRIBUTORY COPYRIGHT**
    **INFRINGEMENT**
**[3] VICARIOUS COPYRIGHT**
    **INFRINGEMENT**
**[4] BREACH OF CONTRACT**
**[5] VIOLATION OF NEW YORK GENERAL**
    **BUSINESS LAW**
    ARTICLE 22A §§ 349, 350(A);
    ARTICLE 24 § 360(L)
**[6] BREACH OF IMPLIED DUTY OF**
    **CONFIDENTIALITY/**
    **CONSTRUCTIVE TRUST**

**DEMAND FOR JURY TRIAL**

    Plaintiff, The Sheldon Abend Revocable Trust (hereinafter "Plaintiff"), by and through

its attorney of record, hereby alleges as follows:

## NATURE OF THIS ACTION

    1.    Plaintiff brings this action to enforce Plaintiff's exclusive copyright and contract

rights.  This case arises out of Defendants' exploitation of a motion picture entitled "Disturbia"

(hereinafter the "Disturbia Film" and/or the "infringing work"), which is derived from Plaintiff's

copyrighted work, an original short story by Cornell Woolrich entitled "Rear Window"

(hereinafter the "Rear Window Story").  The Disturbia Film is also derived from the film work

"Rear Window" (hereinafter the "Rear Window Film"), a work derivative of the Rear Window

Story and licensed by Plaintiff.  Plaintiff is a beneficial owner of the copyrights in the Rear

Window Film. Defendants do not possess any derivative motion picture rights to the "Rear Window Story" or, upon information and belief, to the "Rear Window Film."

2.      What the Defendants have been unwilling to do openly, legitimately, and legally, the Defendants have done surreptitiously, by their back-door use of the Rear Window Story without paying compensation. The production of the infringing Disturbia Film is the latest in an on-going pattern of behavior by the Universal Defendants (as further defined herein) and their predecessors, who on numerous occasions in the past utilized the Rear Window Story without securing rights and paying compensation. In multiple rounds of litigation during the 1970's, 1980's and 1990's extending all the way to the United States Supreme Court (*See* Stewart v. Abend, 495 U. S. 207, 110 S. Ct. 1750 (1990)), the predecessors of Universal Defendants have been required to acknowledge Plaintiff's rights in and to the Rear Window Story and the Rear Window Film resulting in, *inter alia*, the payment of compensation in order to obtain grants of rights in and to the Rear Window Story (Id., pp. 1753-1755).

3.      The Disturbia Film was widely reported in the media as having "ripped off" the Rear Window Story and the Rear Window Film, including the following spontaneous reactions of both film critics and lay observers:

| | | |
|---|---|---|
| (1) | "Writers Christopher Landon and Carl Ellsworth receive sole credit for the movie Disturbia, which is surprising, as the film clearly is based on both a previously published work (a 1942 short story by Cornell Woolrich titled It Had to Be Murder) and the John Michael Hayes-penned, Alfred Hitchcock-directed, Academy Award-nominated screenplay of Woolrich's tale." | Robert Wilonsky<br>*River Front Times* |
| (2) | "For the record, Rear Window, and effectively, Disturbia, were written by Cornell Woolrich and John Michael Hayes." | Forrest Hartman<br>*Army Times* |

| | |
|---|---|
| (3) "Here's Hollywood thinking: 'Rear Window was a good movie but it was about an old guy... Let's remake it with teenagers, but we don't have to pay royalties to the Cornell Woolrich estate.'" | Steven Warren *CinemATL* |
| (4) "Cinematic plagiarism" and "intellectual robbery." | Mark Dujsik *Tripod* |
| (5) "Disturbia draws heavily on the Hitchcock classic." | John DeFore *Hollywood Reporter* |
| (6) "… shameless rip of Alfred Hitchcock's classic thriller *Rear Window* ..." | Peter Howell, *Toronto Star* |
| (7) "Disturbia is a rip off with wit." | Owen Gleiberman *EW.com of CNN* |
| (8) "Disturbia is a Rear Window rip off for the Myspace generation." | Joel Meares *Filmcritic.com* |
| (9) "Disturbia rips off the entire plot of Rear Window." | Stuart Heritage *Hecklerspray.com* |

*See also* Exhibit A – Composite of Media Quotes regarding the Disturbia Film's "rip-off" of the Rear Window Story, and Exhibit B – Composite of Media Quotes regarding the Disturbia Film's "rip-off" of the Rear Window Film.

## JURISDICTION AND VENUE

4.    This is an action for copyright infringement and permanent injunctive relief under the United States Copyright Act, 17 U.S.C. §§ 101 et seq. (hereinafter, "the Copyright Act"), and for related state law claims of breach of contract and violation of New York General Business Laws Article 22A §§ 349, 350(A) and Article 24 § 360(L).

5.    This Court has original subject matter jurisdiction pursuant to the Copyright Act, 17 U.S.C. §101 et seq., 28 U.S.C. §1331 (federal question jurisdiction), and § 1338(a) and (b) (jurisdiction over copyright actions), and § 1332 as an action between citizens of different states with an amount in dispute exceeding $75,000.00, and the Declaratory Judgment Act, 28 U.S.C.

§2201.

6.      Pursuant to 28 U.S.C. §1367(a), this Court has supplemental jurisdiction over the state claims herein in that these claims are related to, and form part of, the same case and controversy as the federal claims herein.

7.      This Court has personal jurisdiction over the Defendants in that Defendants are conducting business in the State of New York and in this District.  *See* N.Y. C.P.L.R. § 301.  All Defendants have transacted business within New York and contracted to supply goods or services in New York in connection with the matters giving rise to this suit.  Id. § 302(a)(1). Defendants have also committed infringing acts outside of New York causing injury to the Plaintiff in New York, and Defendants regularly do or solicit business in New York, and/or expect or reasonably should expect their infringing conduct to have consequences in New York and derive substantial revenue from interstate commerce.  Id. § 302(a)(3); N.Y.U.D.C. § 404.

8.      Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. §§ 1391(b) and (c) and/or 1400(a).  Upon information and belief, each Defendant may be found in this District and/or has principal places of business in this District and/or a substantial part of the acts of infringement complained of herein occurs or has occurred in this District.

## **PARTIES**

9.      Plaintiff, The Sheldon Abend Revocable Trust (hereinafter "Plaintiff" and/or the "Trust"), owns property in the State of New York, conducts its primary business within this District in the State of New York, and has its principal places of business in the State of New York and the State of Florida.  The Trust is the successor copyright proprietor of the Rear Window Story pursuant to an order by the Circuit Court of Palm Beach County, Florida Probate

Division dated November 7, 2005.

## I.  The DreamWorks Defendants

10.    Upon information and belief, Defendant Steven Spielberg (hereinafter "Spielberg" or with others collectively "Defendants" and/or "DreamWorks Defendants") is a resident of and/or owns real property in this District in the State of New York, and is upon information and belief an owner and president of DreamWorks, LLC, which is a wholly owned subsidiary of Defendants Paramount Pictures Corporation and Viacom, Inc., and which is registered to do business in, and conducts business in, this District in the State of New York. Upon information and belief, Spielberg controlled, directed and benefited from the infringing behavior of the other Defendants, and is an agent and/or employee of DreamWorks, LLC, Paramount Pictures Corporation, and Viacom, Inc.

11.    Upon information and belief, Defendant DreamWorks, LLC (hereinafter "DreamWorks" or with others collectively "Defendants" and/or "DreamWorks Defendants") is a corporation organized and existing under the laws of the State of Delaware, is owned and controlled by Spielberg, and is registered to do business in the State of New York as a foreign limited liability company; and DreamWorks is a wholly owned subsidiary of Defendants Paramount Pictures Corporation and Viacom, Inc, and operates, owns and controls other DreamWorks entities, including DreamWorks Films LLC, DreamWorks SKG, DreamWorks Pictures, DreamWorks Studios, and DreamWorks Home Entertainment; and DreamWorks has an office in, and conducts business in, this District in the State of New York.

12.    Upon information and belief, Defendant Paramount Pictures Corporation (hereinafter "Paramount" or with others collectively "Defendants" and/or "DreamWorks Defendants") is a corporation organized and existing under the laws of the State of Delaware,

that Paramount owns, controls, and/or has equity interest in DreamWorks, that it is registered to do business in, conducts business in and maintains a business office in, this District in the State of New York; and that Paramount is a wholly owned subsidiary of Defendant Viacom, Inc.

13.    Upon information and belief, Defendant Viacom, Inc. (hereinafter "Viacom" or with others collectively "Defendants" and/or "DreamWorks Defendants") is a corporation organized and existing under the laws of the State of Delaware, and it owns, controls, and/or has equity interest in DreamWorks, Paramount, and other distribution servicing and/or third party entities such as Viacom Overseas Holdings, C.V.; and Viacom has its principal place of business in this District in the State of New York.

## II.  The Universal Defendants

14.    Upon information and belief, Defendant NBC Universal, Inc. (hereinafter "Universal" or with others collectively "Defendants" and/or "Universal Defendants") is owned by the publicly held General Electric Company (hereinafter "General Electric"), and is a New York corporation organized and existing under the laws of the State of New York, and has its principal place of business in this District in the State of New York.  General Electric is a New York Corporation with its principal place of business in this District in the State of New York. Upon information and belief, Defendant Universal also owns, controls, and conducts business as Universal Pictures Company, Inc., and as Universal Pictures International (hereinafter "UPI"), and as Universal Pictures International Entertainment (hereinafter "UPI Entertainment").

15.    Upon information and belief, Defendant Universal Pictures Company, Inc. (hereinafter "Universal" or with others collectively "Defendants" and/or "Universal Defendants") is a wholly owned subsidiary of NBC Universal, Inc. and General Electric, and it is organized and existing under the laws of the State of Delaware, and it conducts business in and

maintains distribution and corporate offices in this District in the State of New York, and is the successor to MCA, Inc. (a Delaware corporation) and Universal Film Exchange, Inc. (a Delaware corporation), and it owns, controls, and conducts business as UPI and UPI Entertainment.

16.    Upon information and belief, Defendant United International Pictures, B.V. (hereinafter "UIP" or with others collectively "Defendants" and/or "Universal Defendants"), a company incorporated in the Netherlands with its corporate headquarters in London, England, is a joint venture owned and controlled by Universal and its partner, Viacom, and its subsidiary Paramount. UIP was formed for the purpose of producing, financing, and distributing selected theatrical motion pictures in international territories.  Further, upon information and belief, UIP conducts business in this District in the State of New York directly and through UIP's owners and principals, Paramount and Universal, and it has distributed motion pictures produced by DreamWorks since 1997.

17.    Upon information and belief, Defendants Spielberg, DreamWorks, Paramount, Universal, Viacom, and UIP are, and at all times material hereto were, residents of the State of New York and/or conducting business in the State of New York and this District for the purposes of N.Y. C.P.L.R. § 301, and/or have transacted business within the State of New York and/or contracted to supply goods or services in the State of New York in connection with the matters giving rise to this suit.  Id. § 302(a)(1).  These Defendants have also committed infringing acts outside of the State of New York causing injury to Plaintiff in the State of New York, and Defendants regularly do or solicit business in the State of New York, and/or derive substantial revenue from goods used or services rendered in the State of New York, and/or expect or reasonably should expect their infringing conduct to have consequences in the State of New

York and derive substantial revenue from interstate commerce. Id. § 302(a)(2) and N.Y. U.D.C. § 404.

18.    Upon information and belief, Defendants Spielberg, DreamWorks, Paramount, Viacom, and UIP are, and at all times material hereto were, the alter-egos of each other and a unity of interest and ownership among such Defendants exists such that any separateness has ceased to exist; and these Defendants, and/or each of them, used assets of the other Defendants, and/or each of them, for its and/or their separate, individual purposes, and they transferred valuable assets, property rights and/or interests to each other without adequate consideration.

19.    Upon information and belief, Defendants Universal, NBC Universal, General Electric, and UIP are, and at all times material hereto were, the alter-egos of each other and a unity of interest and ownership among these Defendants exists such that any separateness has ceased to exist; and these Defendants, and/or each of them, used assets of the other Defendants, and/or each of them, for its and/or their separate, individual purposes, and they transferred valuable assets, property rights and/or interests to each other without adequate consideration.

20.    Upon information and belief, each and all of the Defendants jointly and severally participated in the infringing activity as set forth below and each Defendant was acting within the course and scope of employment, partnership and/or agency with the other, and each of the Defendants is jointly and severally liable for the injuries to Plaintiff.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

### I.  Plaintiff's Work: The Rear Window Story

21.    In 1942, author Cornell Woolrich (hereinafter "Woolrich" or "Author") under the pseudonym of William Irish wrote an original short story entitled "Murder from a Fixed Viewpoint," also known as "It Had To Be Murder," which is generally recognizable by the

public as "Rear Window" (hereinafter collectively "Rear Window Story").

22.    Plaintiff is the successor copyright proprietor and the sole exclusive owner of the Rear Window Story through the following chain of title:

(a)    In or about January 1942, the Rear Window Story copyright registration was issued to Popular Publications on behalf of the Author under number B-528177 (Ex. C – 1942 Copyright Registration).

(b)    In or about April 1943, Popular Publications assigned all right, title, and interest in the Rear Window Story back to the Author (Ex. D – 1943 Copyright Assignment).

(c)    In or about May 1945, Woolrich assigned exclusive worldwide motion picture rights in the Rear Window Story and five other short stories to B.G. DeSylva Productions, Inc. for the initial and renewal copyright terms.

(d)    In or about 1953, actor James Stewart ("Stewart") and film director Alfred Hitchcock ("Hitchcock") formed a production company, Patron, Inc., which obtained the motion picture rights in the Rear Window Story and in the treatment by Joshua Logan from DeSylva's successors in interest.

(e)    In or about 1954, Patron, Inc., together with Paramount Pictures, produced, distributed, and exploited the motion picture "Rear Window" (hereinafter the "Rear Window Film"), which is based upon the Rear Window Story.

(f)    Woolrich died in September 1968 before he obtained the rights in the renewal term. Woolrich died without a surviving spouse or issue.

(g)    Woolrich left his literary properties (including the Rear Window Story) to the Claire Woolrich Memorial Scholarship Fund, a trust administered by the Trustee, Chase Manhattan Bank ("Chase"), now J.P. Morgan Chase Bank, N.A., for the benefit of Columbia

University.

(h)     On or about December 29, 1969, Chase, as Executor of the Estate of Cornell Woolrich, renewed the copyright under number R475565 (Ex. E – 1969 Chase Copyright Renewal).

(i)     As a result of an assignment in about October 1971 and other supplemental agreements in or about October 1971 and April 1983, Chase sold and assigned to Sheldon Abend, doing business as Author's Research Company (hereinafter collectively "Abend"), the exclusive rights in and to the Rear Window Story.

(j)     On or about April 12, 1972, the Assignment from Chase to Abend was registered in the United States Copyright Office, Volume 1446, pages 364-371 (Ex. F – 1972 Chase Assignment Registration to Abend).

(k)     In about 1971, Stewart and Hitchcock authorized a nationwide television broadcast on the ABC network of the Rear Window Film.

(l)     In about 1974, Abend brought a copyright infringement action against Universal's predecessors, Stewart, Hitchcock, and MCA, Inc. in the Southern District of New York.  The case was settled in 1976.

(m)     Upon information and belief, in about 1982, the copyright in the Rear Window Film was renewed.

(n)     Upon information and belief, in about 1983, Stewart and the Hitchcock co-trustees authorized Universal Pictures, a division of Universal City Studios, Inc. (Universal), to re-release the Rear Window Film throughout the world.

(o)     On or about April 10, 1984, Abend instituted an action for copyright infringement which resulted in a United States Supreme Court opinion dated April 24, 1990,

which held that the continued exploitation of the Rear Window Film without Abend's consent was infringement and not a fair use. Stewart v. Abend, 495 U. S. 207, 110 S. Ct. 1750, 1753, 1755 (1990). The parties thereafter entered a settlement and licensing agreement.

(p)    Abend died in August 2003, and on November 7, 2005, the Rear Window Story was transferred by the Estate of Sheldon Abend to Plaintiff. The Plaintiff is the successor copyright proprietor of the Rear Window Story pursuant to an order by the Circuit Court of Palm Beach County, Florida Probate Division dated November 7, 2005 (Ex. G – Probate Court Order).

(q)    A Certificate of Recordation was issued by the U.S. Copyright Office on December 13, 2005, number V3532 D706 P1-2 (Ex. H – Assignment to The Sheldon Abend Revocable Trust).

(r)    Woolrich is a widely recognized author having written in excess of 200 short stories and 24 novels. He has been called "the greatest writer of suspense fiction that ever lived" by Professor Francis M. Nevins, author and Woolrich biographer. Woolrich died in New York City in about September 1968. The Author's stature rivals and he is considered equal to writers like Dashiell Hammett and Raymond Chandler. Woolrich's literary works have been the subject of more than 30 motion pictures (including 6 which were made before the Rear Window Film) and 100 television shows.

(s)    The Rear Window Story contains significant characters, scenes, themes, concepts, expressions, separately and in combination, which in absolute terms and in particular in the film industry, are specific, original, unique, novel, and were never commercially available or exploited in the film industry, except upon written permission from the Plaintiff.

(t)    The Rear Window Story contains elements that are combined and arranged in an original and copyright protectible manner.

23.    The Rear Window Story and, upon information and belief, the Rear Window Film were registered in conformity with the provisions of the United States Copyright Act and all other applicable laws in the United States governing copyright.

## II.  Plaintiff's Licensee's Derivative Work: The Rear Window Film

24.    In or about 1953, Hitchcock obtained motion picture rights to the Rear Window Story from the successor to B.G. DeSylva Productions, Inc.  Hitchcock produced and/or directed films based on various other ideas and works created and written by Woolrich, including: "The Big Switch" (1956), "Momentum" (1956), "Post Mortem" (1958), "The Black Curtain" (1962), and "4 o'clock" (1986).

25.    The Rear Window Film was directed by Hitchcock from a treatment and final screenplay written in or about 1953 by screenwriter John Michael Hayes (hereinafter "Hayes") (hereinafter "Rear Window Screenplay") which was based upon the Rear Window Story.

26.    The Rear Window Story, its structural spine, organization, format, back story, primary characters, plot, setting, theme, scenes, and total concept and feel are embodied in the Rear Window Film.  Professor Francis M. Nevins, in his biography of Woolrich entitled First You Dream, Then You Die (1988), states that the Rear Window Film is "simply a translation of the story's material into visual terms," (Id., p. 474) and in Nevins' introduction to the Woolrich collection Night and Fear (2004), he states that Woolrich was "the supreme master of the art, the Hitchcock of the written word" (Id., p. v).

27.    The United States Supreme Court stated that the Rear Window Film expressly uses the Rear Window Story's "unique setting, characters, plot, and sequence of events," and further that "the Court of Appeals determined that the story was a substantial portion of the motion picture."  Stewart v. Abend, 495 U. S. 207, 110 S. Ct. 1750, 1754-1755 (1990).

28.    Upon information and belief, the Rear Window Film screenwriter Hayes stated that 45% of the Rear Window Screenplay and 50% of the value of the Rear Window Film are attributable to the Rear Window Story.  The U.S. Supreme Court stated that, even if arguably less of the Rear Window Story was used, "that does not mean that a substantial portion of the story was not used in the film." (Id.)  On August 8, 1991, Hayes stated under oath:

> (a)    "I copied the background, the atmosphere [of the Rear Window Story].  As much of every element of the story that I could was put into my treatment and screenplay."

> (b)    "And when I wrote it, wrote the screenplay that is, I had the story on my desk at all times and constantly referred to it."

> (c)    "I took a mystery that another man wrote and dressed it up, the way you'd dress up a Christmas tree when you bring it home… The mystery content of Rear Window [Film] came from Cornell Woolrich."

> (d)    "I used everything I could from the story.  After all, that's what we had bought and paid for, and I picked the bones of it as clean as I could."

29.    Upon information and belief, the Rear Window Screenplay constitutes a registered work recorded in 1953 pursuant to the terms of the United States Copyright Act, and registration was renewed in 1988, number PAU: 2-306-980; and the Rear Window Film's copyright was renewed in 1982, number RE0000137344/1954-01-01.

30.    The Rear Window Film premiered on August 4, 1954 at the Rivoli Theater in New York City and was distributed by Paramount through 1983.  The Rear Window Screenplay was nominated for an Academy Award and the Writer's Guild nominated it for Best Drama of 1954.  The Rear Window Film was the fifth highest grossing film of 1954 and has been selected for the National Film Registry's and the American Film Industry's list of one hundred greatest movies.

31.     In 1974, Plaintiff's predecessor, Abend, filed suit in the Southern District of New York against Universal's predecessors (Universal City Studios, Inc., MCA, Inc., General Electric, Hitchcock, and Stewart) when the Rear Window Film was televised without Abend's consent.  A settlement was subsequently reached.

32.     On or about March 10, 1983, Stewart's and Hitchcock's successors entered into a distribution agreement with Universal's predecessor, Universal Pictures, a division of Universal City Studios, Inc. (a wholly owned subsidiary of MCA, Inc.), to distribute the Rear Window Film.

33.     In 1984, Plaintiff's predecessor, Abend, again filed suit against Universal's predecessors (Hitchcock, Stewart, MCA, Inc., and Universal Film Exchange, Inc.) after they re-released the Rear Window Film to theaters, television, and video.  Litigation ensued which resulted in the United States Supreme Court decision, <u>Stewart v. Abend</u>, 495 U.S. 207, 110 S. Ct. 1750 (1990), which held that the continued exploitation of the Rear Window Film was infringement of the rights of Abend and such exploitation was not a fair use  (Id. at pp. 1753, 1755).

34.     In 1984, Plaintiff's predecessor, Abend, communicated with Spielberg and Universal (the producer and distributor of Spielberg's films at that time) regarding licensing the Rear Window Story for a remake of the Rear Window Film for a television program Spielberg was producing entitled "Amazing Tales."  Spielberg and Universal declined to remake the Rear Window Story at that time.

35.     In 1991, Plaintiff, via Plaintiff's predecessor, Abend, entered a settlement and license agreement with Universal's predecessor in interest, MCA, Inc., Stewart, and the trustees of the Hitchcock estate (hereinafter respectively referred to as "Settlement Agreement" and

"License Agreement"), which, among other things, imposed conditions upon the license granted to Universal, and expressly preserved, reserved, and/or granted Plaintiff various exclusive rights in the Rear Window Story and in the Rear Window Film, including Plaintiff's right to license the copyright in the Rear Window Story (License Agreement, pp. 2-3).

36.    The License Agreement provides for Plaintiff's copyright ownership interest in the Rear Window Film, and for Plaintiff's exclusive beneficial interest in the Rear Window Film, and merely conveys to the Licensee (Universal) the non-exclusive right to exploit those elements of the Rear Window Story that are embodied in the Rear Window Film, whether or not copyright protectible (Id., p. 5).

37.    The License Agreement provides, inter alia, material inducements to Plaintiff and is subject to conditions imposed upon Universal as follows:

(a)    Plaintiff owns the exclusive right to adapt or copy the Rear Window Story;

(b)    Plaintiff reserves all rights not specifically granted to the Licensee (License Agreement, p. 5);

(c)    Plaintiff owns theatrical rights to the Rear Window Story subject to the Licensee's (Universal's) right to continued distribution and exploitation of the Rear Window Story only to the extent as specifically expressed and embodied in the Rear Window Film (Id., pp. 3, 4);

(d)    Licensee (Universal) is prohibited from modifying, or from producing a sequel to, or from making other works derivative of the Rear Window Film under the License Agreement (Id., p. 4);

(e)    Licensee (Universal) may "continue to use said work (i.e. the Rear Window Story) as embodied in said Film," but "no matter not included in the 1954 theatrical

version may be added to the body of the Film" (Id., p. 5);

(f)     Conditions to, and restrictions and reservations upon Universal's use of ideas, elements, and expressions embodied in the Rear Window Film are exclusive to Plaintiff, and the ideas contained in the Rear Window Story and as embodied in the Rear Window Film are contractually protected by the terms of the License Agreement, whether or not the ideas are copyright protectable;

(g)     The License Agreement provides that such document would be made "a matter of record in the United States Copyright Office," and attached a "Short Form License Agreement" (Ex. I – Short Form License Agreement) which was recorded in the United States Copyright Office on March 12, 1992;

(h)     The License Agreement is binding upon "all persons or entities authorized by Licensee to exploit or assist in exploiting the Film" and requires that the Rear Window Film continue to display the credit "Based on the Short Story by Cornell Woolrich" (License Agreement, p. 5); and

(i)     Universal expressly agreed that the Rear Window Film would not be "distributed, exhibited, performed, or otherwise exploited any where during the three year period commencing November 1, 1996 and ending on October 31, 1999" to permit Plaintiff to exploit film adaptations of the Rear Window Story (License Agreement, p. 6).

(j)     Licensee's (Universal's) use of "certain dramatic and literary material" (the Rear Window Story) is expressly made "subject to the terms and provisions of said License Agreement" (Ex. I, Short Form License Agreement, p. 2).

38.     Each public display of the Rear Window Film and every DVD manufactured of the Rear Window Film displays, or should display, a copyright notice advising the viewer that

the motion picture is protected by copyright laws, and additionally, pursuant to the License Agreement, a notice that it is "Based on the Short Story by Cornell Woolrich."

39.     On May 12, 1992, Plaintiff and Universal entered an "Agreement for Settlement of Claim and Release" (hereinafter "2[nd] Settlement Agreement") which granted to Universal the right to use excerpts from the Rear Window Story and Rear Window Film for display in the Hitchcock Exhibit at Universal Studio's Florida theme park (2nd Settlement Agreement, ¶ 2.5).

40.     In or about 1996, Abend, again communicated with Spielberg and DreamWorks regarding licensing the Rear Window Story for a remake of the Rear Window Film. Abend met with Spielberg's agent of the Creative Artists Agency and discussed casting Christopher Reeve in a remake of the Rear Window Film.

41.     Spielberg declined overtures at that time to remake the Rear Window Film, and on November 22, 1997, Plaintiff licensed the Rear Window Story to RHI Entertainment, Inc. (Hallmark Entertainment) for a made for television movie entitled "Rear Window" for broadcast on ABC television, which starred Christopher Reeve and Darryl Hannah. The television movie was originally broadcast on November 22, 1998.

42.     Plaintiff continues to license the Rear Window Story. Plaintiff has permitted the use of excerpts from the Rear Window Story and, to the extent of its interest, in the Rear Window Film at the recent Academy Awards ceremonies and for use in television awards and in television productions under the auspices of the American Film Institute which celebrates various noteworthy and acclaimed motion pictures.

43.     Universal prepared and distributed a re-release of the Rear Window Film in 2000 (the "Collector's Edition DVD")(DVD Jacket – Ex. J), with new subtitles, interviews, and re-release trailer narrated by Stewart.

44.    Upon information and belief, Universal is producing another re-release of the Rear Window Film for distribution in 2008.

### III.  The Infringing Disturbia Film

45.    Upon information and belief, in or about 2006, Spielberg conceived and developed an idea for a film now known as "Disturbia" which was in fact based upon the same expression and combination of concepts, ideas and expressions contained in the Rear Window Story and as such is embodied in the Rear Window Film.

46.    Upon information and belief, the Disturbia Film came from the desire by Spielberg to re-make the Rear Window Film for a younger audience.

47.    The Rear Window Story and Rear Window Film are widely disseminated, and have been the subject of academic critiques and analyses, and have received great recognition in the literary and film industries.  The title (the name) "Rear Window" has achieved a significance and identification with the public and in the entertainment industry attaining a secondary meaning.  Upon information and belief, all named Defendants had access to the Rear Window Story and Rear Window Film, and there is a reasonable possibility that all Defendants had an opportunity to view and/or copy the Rear Window Story and Rear Window Film.

48.    Upon information and belief, it is widely known and acknowledged that the Disturbia Film is based upon the Rear Window Story and the Rear Window Film and this derivation is evidenced by film critiques, reviews, and interviews with persons involved in the Disturbia Film (*See* Ex. K – The Times interview of April 13, 2007 with Shia La Boeuf posted on nwi.com wherein he states that "Spielberg wanted to revamp Rear Window").

49.    Upon information and belief, in or about 2006, Spielberg (a principal of DreamWorks), acting as Executive Producer of the Disturbia Film, entered agreements with

Paramount, Viacom, Universal, and others in connection with the financing, domestic theatrical distribution, exploitation and marketing of the Disturbia Film.

50.     Upon information and belief, with respect to the use, international theatrical distribution and exploitation rights in and to the Disturbia Film in territories other than the United States, Spielberg and the DreamWorks Defendants entered into license agreements, and/or distribution servicing agreements, and/or other third party agreements with UIP and other controlled affiliates, licensee affiliates, sub-distributors, and other entities including, but not limited to, Taramount Film (hereinafter "Taramount"), Kadokawa Herald Pictures, and/or Kadokawa Entertainment, Inc., and/or Kadokawa Holdings, Inc. (hereinafter collectively "Kadokawa"), UPI, UPI Entertainment, and Viacom Overseas Holdings, C.V. (hereinafter "VOH").

51.     Upon information and belief, during all times relevant to the claims herein, Universal, pursuant to Plaintiff's grants under the License Agreement, also distributed and exploited the Rear Window Film, which embodies the Rear Window Story, domestically and internationally via UIP, Universal's joint venture with Paramount.

52.     Upon information and belief, DreamWorks' films were produced and distributed by Universal prior to DreamWorks being purchased by Paramount and Viacom.

53.     Upon information and belief, the DreamWorks Defendants and Spielberg conducted approximately 800 test-screenings of the Rear Window Film to measure its familiarity with members of the general public aged 25 years and younger for the purpose of strategic planning for the development and marketing of the Disturbia Film.

54.     Upon information and belief, all Defendants knew, or should have known had they conducted reasonable, adequate or good faith investigation that, pursuant to the License

Agreement and the Short License Agreement, evidencing Plaintiff's copyright interests regarding the Rear Window Story and the Rear Window Film which was publicly recorded in the United States Copyright office, the rights to produce a film derived from the Rear Window Story, or the Rear Window Film were clearly owned and controlled by Plaintiff and that use thereof required approval thereof.

55.    Upon information and belief, Universal by various means, expressly or tacitly, did tolerate and permit all the Defendants, and other third parties, to produce, distribute, and exploit the Rear Window Story and as embodied in the Rear Window Film, in a manner which was contrary to the License Agreement.

56.    In or about March 2006, a revised screenplay was written (hereinafter "Disturbia Screenplay").

57.    Upon information and belief, in or about 2006 the DreamWorks Defendants commenced principal photography of the Disturbia Film.

58.    Upon information and belief, the filming of the Disturbia Film was conducted by the DreamWorks Defendants utilizing Paramount's Stage 18, the same stage utilized in 1954 for the filming of the Rear Window Film.

59.    Upon information and belief, all Defendants with knowledge and intent, financed, developed, produced, manufactured, distributed, and exploited the Disturbia Film which was a derivative product of the Rear Window Story and Rear Window Film without properly securing consent, approval of, a grant, or license from the Plaintiff.

60.    Upon information and belief, none of the named Defendants made any effort to remove from the Disturbia Screenplay or the Disturbia Film copyrighted elements and material embodied in the Rear Window Film derived from the Rear Window Story, and as embodied in

the Rear Window Film, the acts, failures, and omissions constitute a reckless disregard of Plaintiff's rights and interests.

61.    In or about April 2007, a Universal lawyer spoke with a Plaintiff's representative to discuss the production of the Disturbia Film and, upon information and belief, the Universal lawyer also contacted Paramount and requested that Paramount provide trailers and/or a screening prior to the release of the Disturbia Film.

62.    Upon information and belief, confidential discussions were conducted between Universal's lawyer and Plaintiff's representative regarding the infringement of the copyright in the Rear Window Story and the Rear Window Film, and what joint legal action to take.

63.    The attorney for Universal also informed Plaintiff's representative that Universal executives were interested in discussing alternatives to joint legal action, including an agreement to license the Rear Window Story to the DreamWorks Defendants, but that no legal action should be taken until after the Disturbia Film was released to the public, with the result that Plaintiff's forbearance to protect its rights was induced.  Soon thereafter the Universal lawyer suddenly ceased communications with Plaintiff's representative.

64.    Upon information and belief, in or about April 2007 the DreamWorks Defendants began distribution of the Disturbia Film, and began DVD distribution in August 2008, with the film credits in all advertising stating "Story by Chris Landon."

65.    Upon information and belief, gross revenue (box office, DVD, domestic and foreign sales, etc.) for the Disturbia Film exceeds $150,000,000.00.

66.    The DreamWorks Defendants commercially advertised the Disturbia Film utilizing ads and posters similar to the advertising for the Rear Window Film which depicts the protagonist spying on neighbors through binoculars (Ex. L - Promotional Posters and

Promotional Stills for the Disturbia Film and the Rear Window Film).

67.    The immediate and spontaneous reaction of film critics and lay observers was that the Disturbia Film "ripped-off" the Rear Window Story and the Rear Window Film *(See ¶ 3 incorporated herein and Exhibits A & B attached herewith).*

68.    Upon information and belief, on April 13, 2007, a Certificate of Registration was issued for "Disturbia," with the "copyright claimant" and the "name of the author" listed as "DreamWorks, LLC" (number PA0001367903); and such registration of the Disturbia Film is wrongful and illegal as it violates and infringes upon the rights and interests of the Plaintiff in connection with the Rear Window Story as embodied in the Rear Window Film without Plaintiff's consent.

69.    Upon information and belief, Spielberg, DreamWorks, Paramount, Viacom, and the Universal Defendants, including General Electric, their executives and their representatives, were in possession of, and shared with each other, knowledge of Plaintiff's rights under the License Agreement and acted in concert with all Defendants regarding the infringement; and in or about 2007 and 2008 DreamWorks, while still owned by Paramount and Viacom, Spielberg and representatives of the Universal Defendants, including General Electric, held confidential meetings in New York City to negotiate a purchase of DreamWorks by Universal for the purpose of resuming their business endeavor of financing, producing and distributing films, at which time all Defendants were further informed about the Disturbia Film and the License Agreement.

70.    Upon information and belief, Universal, because of its self-interest, tolerated and contributed to the infringement, and permitted, tacitly or otherwise, the use of the Rear Window Film by Spielberg and the DreamWorks Defendants while concealing their involvement from the Plaintiff.  Universal's participation in the exploitation of a work (the Disturbia Film) derivative

of the Rear Window Story and the Rear Window Film exceeds the scope of, and is a material breach of conditions of, Universal's license from Plaintiff.

71.      Upon information and belief, each and all of the Defendants directly infringed the Rear Window Story and the Rear Window Film, and they knew, or should have known, of the infringing acts of each of the other Defendants, and they materially contributed to the infringement.

72.      Spielberg, DreamWorks, Universal, Paramount, and Viacom are liable for contributory infringement in that they knowingly caused and/or materially contributed to the infringing acts of parties with whom they had a direct connection, and/or distribution servicing agreements, and/or third party service agreements including, but not limited to, DreamWorks, Paramount, Viacom, Universal, UIP, Kadokawa, Taramount, UPI, UPI Entertainment, and VOH.

73.      Spielberg, DreamWorks, Universal, Paramount, and Viacom are vicariously liable for copyright infringement as they had the right and the power to control both directly and pursuant to distribution servicing agreements and/or third party service agreements the activities of each and all Defendants, as well as the infringing activities of UIP, Taramount, Kadokawa, UPI, UPI Entertainment, VOH, DreamWorks SKG, DreamWorks Home Entertainment, DreamWorks Films, LLC, DreamWorks Pictures and DreamWorks Studios, and these Defendants received a direct financial benefit, financial advantages, and/or other economic consideration from the infringing activities.

74.      Upon information and belief, Universal took affirmative steps to induce infringement by negotiating and entering agreements with the DreamWorks Defendants regarding the use of, and implied sub-licensing of, ideas and elements contained in the Rear Window Story and embodied in the Rear Window Film.

75.    Upon information and belief, Universal failed to curtail, stop, or enjoin Defendants and others from infringing upon Plaintiff's rights and interests in the Rear Window Story as embodied in the Rear Window Film or take any legal action, but instead induced Plaintiff's inaction to protect their rights.

76.    The acts of copyright infringement and unfair competition complained of herein occurred in whole or in part within the United States.

77.    All Defendants, by their actions, failures, and omissions, constitute competitors with Plaintiff for the exploitation of remakes, sequels, or adaptations of the Rear Window Story and/or the Rear Window Film.

78.    The Disturbia Film and the Rear Window Story are essentially the same story as both emerge from a situation conceived and created by Woolrich which constitutes the "spring board" for the Disturbia Film.

79.    An analysis of the Disturbia Screenplay and the Disturbia Film reveals expressions of ideas, the compilation of ideas, a concrete pattern or sequence of events, and scenes that are substantially similar to those contained in the Rear Window Story and as embodied in the Rear Window Film.  Some of the similarities between the Rear Window Story, the Rear Window Film, and the Disturbia Film include:

**PLOT**

| Rear Window Story (1942)[1] | Rear Window Film (1954)[2] | Disturbia (2007)[3] |
|---|---|---|
| 1.  Protagonist (Hal Jeffries "Jeff") is a single male confined to apartment after an accident. | Protagonist (L.B. Jefferies "Jeff") is a single male confined to apartment after an accident. | Protagonist (Kale Brecht) is a single male confined to house arrest after fight with teacher. |

[1] Page citations are to the Rear Window Story as it appears in The Best American Mystery Stories published by Houghton, Mifflen Co. © 2000.
[2] Page citations are to the Rear Window Screenplay.
[3] Page citations are to the Disturbia Screenplay.

| Rear Window Story (1942)[1] | Rear Window Film (1954)[2] | Disturbia (2007)[3] |
|---|---|---|
| | | |
| 2. Boredom induces him to voyeuristic behavior from his window using spyglass. | Boredom induces him to voyeuristic behavior from his window using binoculars & telephoto lens. | Boredom induces him to voyeuristic behavior from his window using binoculars & video camera. |
| 3. From his upstairs room, he can view the windows of his neighbors and he becomes a peeping Tom obsessed with the seemingly mundane daily activities of his immediate neighbors. | From his upstairs room, he can view the windows of his neighbors and he becomes a peeping Tom obsessed with the seemingly mundane daily activities of his immediate neighbors. | From his upstairs room, he can view the windows of his neighbors and he becomes a peeping Tom obsessed with the seemingly mundane daily activities of his immediate neighbors. |
| 4. He suspects one neighbor/the Antagonist (Thorwald) has killed a woman and hidden her body in his apartment. | He suspects one neighbor/the Antagonist (Thorwald) has killed a woman and hidden her body in his apartment. | He suspects one neighbor/the Antagonist (Turner) has killed women and hidden their bodies in his home. |
| 5. Antagonist is seen dragging heavy item presumed to be a body behind him. | Antagonist is seen dragging heavy item presumed to be a body behind him. | Antagonist is seen dragging heavy item (bag) presumed to be a body behind him. |
| 6. N/A | Antagonist is seen gardening. | Antagonist is seen gardening. |
| 7. Protagonist watches the Antagonist's windows and ducks out of the way to avoid being seen. | Protagonist watches the Antagonist's windows and ducks out of the way to avoid being seen. | Protagonist watches the Antagonist's windows and ducks out of the way to avoid being seen. |
| 8. The Antagonist pulls down the shades. | The Antagonist pulls down the shades. | The Antagonist has metal shades installed. |
| 9. The Antagonist learns he is being watched. | The Antagonist learns he is being watched. | The Antagonist learns he is being watched. |
| 10. N/A | Antagonist kills a small dog snooping around the garden. | Antagonist kills a rabbit hopping around the garden. |
| 11. Protagonist investigates the Antagonist using another character (houseman). | Protagonist investigates the Antagonist using another character (girlfriend & nurse). | Protagonist investigates the Antagonist using another character (girlfriend & friend). |

| Rear Window Story (1942)[1] | Rear Window Film (1954)[2] | Disturbia (2007)[3] |
|---|---|---|
| | | |
| 12. Antagonist's gun flashes and lights up dark room. | Protagonist uses camera flashes on Antagonist as a signal and lights up dark room. | Protagonist's video camera flashes while watching Antagonist and lights up dark room. |
| 13. Protagonist's investigative assistant (Sam) invades the Antagonist's apartment & almost gets caught by Antagonist. | Protagonist's investigative assistant (Lisa) invades the Antagonist's apartment to search for evidence and gets caught by Antagonist. | Protagonist's investigative assistant (Ronnie) invades the Antagonist's car and home to search for evidence and appears to get caught by Antagonist. |
| 14. Danger and suspense build as the Antagonist confronts the assistant and the confined Protagonist. | Danger and suspense build as the Antagonist confronts the assistant and the confined Protagonist. | Danger and suspense build as the Antagonist confronts the assistant and the confined Protagonist. |
| 15. The police are called but find nothing when they search the Antagonist's apartment. They do not believe the Protagonist's suspicions. | The police are called but find nothing when they search the Antagonist's apartment and trunk. They do not believe the Protagonist's suspicions. | The police are called but find nothing when they search the Antagonist's home. They do not believe the Protagonist's suspicions. |
| 16. The Antagonist violently confronts the Protagonist and attempts to kill him. | The Antagonist violently confronts the Protagonist and attempts to kill him. | The Antagonist violently confronts the Protagonist and attempts to kill him. |
| 17. The police arrive in time to save the Protagonist and determine that the Antagonist is indeed a killer (body buried in cement in his apartment). | The police arrive in time to save the Protagonist and determine that the Antagonist is indeed a killer (body parts buried in the garden behind his apartment). | The police arrive in time to save the Protagonist and determine that the Antagonist is indeed a killer (bodies are buried in the basement in his home). |
| 18. The Antagonist is killed after a fall (he is shot). | The Antagonist is apprehended after the Protagonist's fall (he is almost shot). | The Antagonist is killed after a fall (he is shot in the Disturbia Screenplay and stabbed in the Disturbia Film). |
| 19. Protagonist vindicated. | Protagonist vindicated. | Protagonist vindicated. |

## MOOD

| Rear Window Story (1942) | Rear Window Film (1954) | Disturbia (2007) |
|---|---|---|
| 20. Suspense Thriller/ Murder Mystery | Suspense Thriller/ Murder Mystery | Suspense Thriller/ Murder Mystery |

## CHARACTERIZATION

| Rear Window Story (1942) | Rear Window Film (1954) | Disturbia (2007) |
|---|---|---|
| 21. Protagonist, Hal Jeffries ("Jeff"), is a confined single male | Protagonist, L.B. Jefferies ("Jeff" a photo journalist), is a confined single male<br>*James Stewart* | Protagonist, Kale Brecht (young student), is a confined single male<br>*Shia LaBeouf* |
| 22. Protagonist's assistant in the investigation: Sam (houseman) | Protagonist's assistants in the investigation: Lisa Carol Fremont (girlfriend) and Stella (nurse)<br>*Grace Kelly*<br>*Thelma Ritter* | Protagonist's assistants in the investigation: Ashley (girlfriend) and Ronnie (best friend)<br>*Sarah Roener*<br>*Aaron Yoo* |
| 23. Antagonist is a neighbor suspected of killing a woman: Lars Thorwald | Antagonist is a neighbor suspected of killing a woman: Lars Thorwald<br>*Raymond Burr* | Antagonist is a neighbor suspected of killing women: Giles Turner<br>*David Morse* |
| 24. Protagonist has a close relationship with the police: Inspector Boyne (detective) | Protagonist has a close relationship with the police: Tom Doyle (detective)<br>*Wendell Corey* | Protagonist has a close relationship with the police: Parker (detective)<br>*Viola Davis* |
| 25. The rear window neighbors<br>• newlywed couple ("jitter couple")<br>• sunbathers | The rear window neighbors<br>• newlywed couple<br>• sunbathers<br>• Miss Torso (ballet exercises)<br>• Neighbors with small dog | The rear window neighbors<br>• married couple<br>• sunbathers (Ashley)<br>• Ashley (yoga exercises)<br>• Neighbor with small dog on electric collar |

## PACE

| **Rear Window Story (1942)** | **Rear Window Film (1954)** | **Disturbia (2007)** |
| --- | --- | --- |
| 26. Action over several days. | Action over several days. | Action over several days. |

## SETTING

| **Rear Window Story (1942)** | **Rear Window Film (1954)** | **Disturbia (2007)** |
| --- | --- | --- |
| 27. Apartment<br><br>        New York City | Apartment<br><br>        Greenwich Village | Suburban home<br><br>        Springdale, WI<br><br>*Variety* magazine interview of March 27, 2007: [Disturbia is] "Pointedly relocated from Rear Window's Greenwich Village apartments to Anytown, U.S.A." (Ex. B, #15) |
| 28. Upstairs window is the primary viewpoint<br><br>"The bay window was about the best feature my rear bedroom had in the warm weather" (p. 288) | Upstairs window is the primary viewpoint<br><br>"The summer air is motionless and heavy with humid heat." The opened windows "brought the neighborhood into sweltering intimacy" (p. 1) | Upstairs window is the primary viewpoint<br><br>"Ah... the sights and sounds of summer" (p. 17)<br><br>Kale: "I mean there's so much structure to it, so many layers, but it's invisible if you're not looking close enough."<br>Ronnie: "What are you talking about?"<br>Kale: "The world right outside that window." (p. 24) |

## SEQUENCE OF EVENTS
(List of underlined scenes taken from Rear Window Collector's Edition DVD of the Rear Window Film, scenes released by Universal 2006.)

| **Rear Window Story (1942)** | **Rear Window Film (1954)\*** | **Disturbia (2007)** |
| --- | --- | --- |
| 29. The Plaster Cocoon<br><br>        Protagonist confined in cast | The Plaster Cocoon<br><br>        Protagonist confined in cast | The Plaster Cocoon<br><br>        Protagonist confined to house arrest by monitoring device |

| Rear Window Story (1942) | Rear Window Film (1954)* | Disturbia (2007) |
|---|---|---|
| | | |
| 30. Stella's Advice<br><br>Sam's advice about spying on neighbors | Stella's Advice<br><br>Nurse's advice about spying on neighbors | Stella's Advice<br><br>Mother/ Julie's advice about spying on neighbors |
| 31. Lisa (Sam)<br><br>Protagonist's houseman equivalent to Lisa | Lisa<br><br>Protagonist's girlfriend | Lisa (Ashley )<br><br>Protagonist's girlfriend |
| 32. Meet the Neighbors<br><br>Spying on daily activities of immediate neighbors | Meet the Neighbors<br><br>Spying on daily activities of immediate neighbors | Meet the Neighbors<br><br>Spying on daily activities of immediate neighbors |
| 33. Mismatched Lives<br><br>Viewer "meets" different neighbors | Mismatched Lives<br><br>Viewer "meets" different neighbors | Mismatched Lives<br><br>Viewer "meets" different neighbors |
| 34. All Through the Night<br><br>Jeff witnesses Thorwald's strange behavior at night. Jeff becomes suspicious. | All Through the Night<br><br>Jeff witnesses Thorwald's strange behavior at night watching him leave and enter the apartment several times. Jeff becomes suspicious.  He hears Thorwald leaving his apartment carrying a sample case in the middle of the night.<br><br>Jeff  : "He went out several times last night in the rain carrying his sample case. He was taking something out the apartment.  I'm certain." (p. 56) | All Through the Night<br><br>Kale witnesses Turner's strange behavior at night and then sees the dented fender. Kale becomes suspicious.  He hears Turner drive his vintage Mustang into the driveway and connects it to the news of the missing women. |
| 35. The Watcher | The Watcher | The Watcher |

| **Rear Window Story (1942)** | **Rear Window Film (1954)\*** | **Disturbia (2007)** |
|---|---|---|
| The naked eye, then a spyglass<br><br>"… with the first brightening of day… I saw him standing there looking out." (p. 290) | The naked eye, then binoculars & telephoto lens<br><br>The morning after the surveillance, Jeff first suspects Mrs. Thorwald is missing. He sees Thorwald in his garden and watches Thorwald shoo away a small dog sniffing in his garden.<br><br>Jeff draws Stella into the mystery as they watch the next morning and talk about Thorwald. | The naked eye, then binoculars & video camera<br><br>The morning after the surveillance, Kale sees a newspaper report of another missing woman. He sees Turner in his garden and watches Turner strangle a rabbit he catches in his garden.<br><br>Kale draws Ronnie into the mystery as they watch the next morning and talk about Turner. |
| 36. <u>Something's Wrong</u><br><br>Suspicion of woman's murder by neighbor<br><br>Jeff tells the police he believes Thorwald to be a murderer. He tells the Police the details he has seen so far. The police are skeptical, but agree to investigate. | <u>Something's Wrong</u><br><br>Suspicion of woman's murder by neighbor<br><br>Jeff tells Lisa he believes Thorwald to be a murderer. He tells her the details he has seen so far. Lisa is skeptical at first, but then becomes intrigued. In the very next scene, Lisa has joined the investigation and is digging up information on Thorwald. | <u>Something's Wrong</u><br><br>Suspicion of woman's murder by neighbor<br><br>Kale and Ronnie tell Ashley they believe Turner to be a murderer. Kale tells her the details that he has seen so far. Ashley is skeptical at first, but then becomes intrigued. In the very next scene, Ashley has joined the investigation and is digging up information on Turner. |
| 37. <u>Doyle Investigates</u> (Boyne)<br><br>Skeptical cops called in | <u>Doyle Investigates</u><br><br>Skeptical cops called in | <u>Doyle Investigates</u> (Cops)<br><br>Skeptical cops called in |
| 38. <u>Eyes on Thorwald</u><br><br>Protagonist persists with suspicions | <u>Eyes on Thorwald</u><br><br>Protagonist persists with suspicions | <u>Eyes on Thorwald</u> (Turner)<br><br>Protagonist persists with suspicions |
| 39. <u>There's No Case</u><br><br>Cops check trunk & find | <u>There's No Case</u><br><br>Cops check trunk & find | <u>There's No Case</u><br><br>Cops check bag & find |

| Rear Window Story (1942) | Rear Window Film (1954)* | Disturbia (2007) |
|---|---|---|
| nothing | nothing | nothing |
| 40. Rear Window Ethics<br><br>Dialogue about the evils of voyeurism | Rear Window Ethics<br><br>Dialogue about the evils of voyeurism | Rear Window Ethics<br><br>Dialogue about the evils of voyeurism |
| 41. Message to a Murderer<br><br>Note to Antagonist: "What have you done with her?" | Message to a Murderer<br><br>Note to Antagonist: "What have you done with her?" | Message to a Murderer<br><br>Protagonist accuses Antagonist directly in presence of cops: "So where's my friend then?" (p. 90) |
| 42. Lisa's Risk (Sam's)<br><br>Sent by Protagonist to investigate killer<br><br>Jeff sends Sam over to Thorwald's apartment to disturb the room and get Thorwald to reveal something incriminating. | Lisa's Risk<br><br>Sent by Protagonist to investigate killer<br><br>Jeff sends Stella and Lisa over Thorwald's fence so they can see what is buried in the flower bed. Lisa gets into Thorwald's apartment and gets Mrs. Thorwald's wedding ring. | Lisa's Risk (Ronnie's)<br><br>Sent by Protagonist to investigate killer<br><br>Kale sends Ronnie over Turner's fence so he can retrieve the code for his garage door opener. Ronnie gets into Turner's other car and gets the garage door opener. |
| 43. Killer in the Dark<br><br>Phone lines cut & Thorwald invades dark apartment & shoots at Jeffries. Lars revealed as killer of wife who buried her in cement. | Killer in the Dark<br><br>Thorwald invades dark apartment and pushes Jeff over rail & Lars revealed as killer of wife who buried her in the yard. | Killer in the Dark<br><br>Phone lines cut, Turner invades dark house with a baseball bat. Turner revealed as the woman's killer who buried her in the basement. |
| 44. A Few Changes<br><br>Protagonist is vindicated and has cast removed. | A Few Changes<br><br>Protagonist is vindicated but he has 2 broken legs. | A Few Changes<br><br>Protagonist is vindicated & ankle bracelet removed. |

**SCENES & DIALOGUE**

| Rear Window Story (1942) | Rear Window Film (1954) | Disturbia (2007) |
|---|---|---|
| 45. Protagonist obsessed with mundane daily activities of neighbors<br><br>Jeff: "I could have constructed a timetable of their comings and goings, their daily habits and activities." (p. 288) | Protagonist obsessed with mundane daily activities of neighbors<br><br>Jeff: "Six weeks sitting in a two-room apartment with nothing to do except look out the window at the neighbors." (p. 9) | Protagonist obsessed with mundane daily activities of neighbors<br><br>Kale (counting down time table of neighbor's habits): "Three…two…one…dog…." "Four o'clock every Thursday, she goes to the country club…" (p. 24)<br><br>Kale: "I mean there's so much structure to it, so many layers, but it's invisible if you're not looking close enough."<br>Ronnie: "What are you talking about?"<br>Kale: "The world right outside that window." (p. 24) |
| 46. Protagonist's confinement leads to boredom & desperation<br><br>Jeff: "The idea was, my movements were strictly limited just around this time... stewing in a vacuum of total idleness..." (p. 291)<br><br>"I had never acquired the habit of reading books to ward off boredom..." (p. 288) | Protagonist's confinement leads to boredom & desperation<br><br>Jeff: "Listen – if you don't pull me out of this swamp of boredom – I'll do something drastic." (p. 10) | Protagonist's confinement leads to boredom & desperation<br><br>Kale: "These are just simple observations... natural side of chronic boredom..." (p. 26) |

| Rear Window Story (1942) | Rear Window Film (1954) | Disturbia (2007) |
|---|---|---|
| 47. <u>Protagonist is almost caught spying & retreats into darkness</u><br><br>Jeff: "I withdrew several yards inside my room. There was still enough blue night shade in my room to keep my slight withdrawal from catching his eye." (p. 290).<br><br>"I knew he couldn't see me within the darkness of the bay window." (p. 292)<br>"I remained carefully immobile until the distant glance had passed me safely by." (p. 292)<br><br>"Leave the light out in here." (p. 309) | <u>Protagonist is almost caught spying & retreats into darkness</u><br><br>His eyes move closer toward Jeff's apartment. Jeff is in his chair, facing the window. Stella is beside him. Jeff nearly knocks the startled Stella off her feet with his arm.<br><br>Jeff: "Get back! Out of sight! Quick!" (p. 53)<br><br>Jeff: "Get back there! He'll see you!" (p. 54) | <u>Protagonist is almost caught spying & retreats into darkness</u><br><br>Ronnie: "Dude, he's gonna see."<br>Kale: "He can't. We don't have any lights on." (p. 25) |
| 48. <u>Protagonist's window is the "eye" of the film</u><br><br>Jeff: "The bay window was about the best feature my rear bedroom had in the warm weather." (p. 288)<br><br>"Here and there a wall played back, like a sounding board, a snatch of radio program that was coming in too loud. If you listened carefully, you could hear an occasional click of dishes mixed in, faint, far off. The chain of little habits that were their lives unreeled themselves." (p. 291). | <u>Protagonist's window is the "eye" of the film</u><br><br>"The summer air is motionless and heavy with humid heat." The opened windows "brought the neighborhood into sweltering intimacy" (p. 1) | <u>Protagonist's window is the "eye" of the film</u><br><br>We hear kids playing in the street O.S.<br>Kale glances out the window.<br><br>HIS POV: Kids on bikes. Neighbors out on walks.<br>Kale: "ahh.... the sights and sounds of summer." (p. 17) |
| 49. <u>Protagonist spies on female neighbors in various sexy poses & while exercising</u> | <u>Protagonist spies on female neighbors in various sexy poses & while exercising</u> | <u>Protagonist spies on female neighbors in various sexy poses & while exercising</u> |

| Rear Window Story (1942) | Rear Window Film (1954) | Disturbia (2007) |
|---|---|---|
| N/A | The girl, now dressed in dark and revealing leotard, and ballet slippers, has just turned away from a portable record player. She begins her first graceful movement of a modern ballet interpretation (pp. 7 - 8) | Ashley turns around, goes back to her yoga mat. She takes a breath, getting back into the "zone" then – she slowly raises her arms and bends into a ridiculously sexy pose (p. 31)<br><br>Ashley is working out to a yoga DVD (p. 30).<br><br>As if eerily on cue, Ashley suddenly stops. She goes to her window and peers out – Kale ducks – He looks back up, sees Ashley gazing in his direction – Kale's breathing intensifies – could she actually be seeing him? (p. 31) |
| 50. Protagonist spies on female neighbors in various stages of undress<br><br>N/A | Protagonist spies on female neighbors in various stages of undress<br><br>Two pretty girls... They take off their robes, slipping them down over their shoulders slowly. Then, seductively they turn – revealing the full beauty of their tanned and bathing suited bodies. It is almost as if they want to be noticed, the center of the neighborhoods attention. They at least have all of Jeff's attention. Then they spread the robes in front of them, and lie down on the roof, and out of sight. Jeff seems a little disappointed. (p. 6) | Protagonist spies on female neighbors in various stages of undress<br><br>Ashley swims underwater the length of the pool. She finally surfaces in all her two piece glory. They watch as Ashley steps out of the pool, towels off. She pulls her bikini from her butt, lies in the lounge chair (p. 27).<br><br>Ashley flips here sandals off one at a time, pulls her tank off revealing her bronzed back and bikini top. Ashley slinks out of her shorts revealing a "near-thong" bikini this time (p. 34).<br><br>She... shifts her gaze up toward Kale and Ronnie! Kale (pulling Ronnie down) "I think she saw me." (p. 35). |

| Rear Window Story (1942) | Rear Window Film (1954) | Disturbia (2007) |
|---|---|---|
| | | |
| 51. Protagonist's restriction is uncomfortable<br><br>Jeff: "I couldn't sleep, because I was used to getting plenty of exercise." (p. 288) | Protagonist's restriction is uncomfortable<br><br>His leg, under the cast, begins itching.  He reaches for a long, Chinese back scratcher lying on the window sill... He works it under the cast... He scratches, and a look of sublime relief comes over his face (p. 12). | Protagonist's restriction is uncomfortable<br><br>Kale's ankle begins itching at the ankle monitor.  He works a stick under the ankle monitor and scratches, and a look of sublime relief comes over his face (in Disturbia Film but not in Disturbia Screenplay). |
| 52. Protagonist's boredom leads to overactive imagination<br><br>Jeff: "...me, stewing in a vacuum of total idleness" (p. 291)<br><br>"...when a man ain't got nothing to do but just sit all day, he sure can think up the lamest things..." (p. 297)<br><br>"Then suddenly, just as idle speculation about this whole matter was about to alight on some fixed point in my mind, crystallize into something like suspicion, the shade came up again…" (p. 293)<br><br>"… a disembodied suspicion… had been flitting and volplaning around in my mind…" (p. 296) | Protagonist's boredom leads to overactive imagination<br><br>Jeff: "You've got to get me out of here! Six weeks – sitting in a two room apartment with nothing to do but look out the window at the neighbors!" (p. 9)<br><br>"I want to get this thing off and get moving" (p. 28)<br><br>Lisa: "-- with binoculars, and with wild opinions of every little movement you see – is, is diseased!" (p. 63) | Protagonist's boredom leads to overactive imagination<br><br>Parker to Kale: "House arrest might sound like a breeze, but trust me, I've seen all kinds of folks get a bit loopy before too long, some after just a day or two." (p. 291)<br><br>"Dammit, Ronnie, I'm losing my mind." (p. 17) |

| **Rear Window Story (1942)** | **Rear Window Film (1954)** | **Disturbia (2007)** |
|---|---|---|
| 53. Protagonist accused of spying & becoming delusional<br><br>Sam: "You're going to be a wreck, Mr. Jeff" (p. 295)<br><br>Only someone like me, stewing in a vacuum of idleness, would have noticed it at all. ( p. 291) | Protagonist accused of spying & becoming delusional<br><br>Stella: "The New York State sentence for a peeping Tom is six months in the workhouse" (p. 14)<br><br>Lisa: "...sitting around, looking out a window to kill time, is one thing – but doing it the way you are (she gestures) – with binoculars, and with wild opinions about every little movement you see – is, is diseased!" (p. 63) | Protagonist accused of spying & becoming delusional<br><br>Ronnie: "...you become a stalker?"<br>Kale: "No, stalking's for psychos" (p. 26)<br><br>Ashley: "Are you spying on the neighbors Kale?"<br>Ronnie: "Actually, he is." (Id., p. 38)<br><br>Ashley: "...like you're determined to turn Giles in to who you think he is... I just didn't realize – you were this"<br>Kale: "What, crazy? Maybe I am. But maybe I'm right" (p. 79) |
| 54. Protagonist implores skeptical cops to help<br><br>Jeff to cop: "I've got a firm belief you'll uncover a murder there if you start digging at it...There's been a man and a wife living there until now. Now there is just the man. Her trunk went out early this morning." (p. 299)<br><br>"...then you located the trunk?... And you opened it?" (p. 303) | Protagonist implores skeptical cops to help<br><br>Jeff to cop: "It's probably nothing important – just a little neighborhood murder.  That's all -- As a matter of fact, I did say murder." (p. 69)<br><br>"...because everything the man's done has been suspicious.  Trips at night in the rain, saws, knives, trunks with rope, and a wife that isn't there anymore." (p. 75) | Protagonist implores skeptical cops to help<br><br>Kale to cop: "Please, my friend's been kidnapped, he's in this house – he's inside, I think the owner's trying to kill him..."(p. 86)<br><br>"... he killed maybe three others, all redheads, they could be in a bag – a big blue plastic bag – in his garage." (p. 88) |
| 55. Protagonist is not believed<br><br>Inspector Boyne to Jeff: "We haven't turned up anything that seems to bear out your impression so far" (p. 300) | Protagonist is not believed<br><br>Jeff to cop: "You think I made this all up?" (p. 76)<br><br>Jeff to cop: "All right. You don't believe me." (p. 77) | Protagonist is not believed<br><br>Kale to cop: "Does anyone believe me?!" (p. 90)<br><br>Ashley: "This is obviously not a cute little game anymore. |

| Rear Window Story (1942) | Rear Window Film (1954) | Disturbia (2007) |
|---|---|---|
| "Give up Jeff, he said. There's such a thing as going too far" (p. 302)<br><br>"You're not yourself" (p. 304) | | This has gone way too far." (Disturbia Film)<br><br>Kale: "I just… didn't think you'd believe me…" (p. 91) |
| 56. Antagonist catches Protagonist spying on him<br><br>Jeff: "As he turned to do so, I saw him give a glance out the window... It was certainly anything but vacant or random, it had a bright spark of fixity in it. It wasn't one of those precautionary sweeps I'd seen him give, either.  It hadn't started over on the other side and worked its way around to my side, the right.  It had hit dead-center at my bay window, for just a split second while it lasted, and then it was gone again." (p. 311)<br><br>"Suddenly, death was somewhere in the house here with me." (p. 313)<br><br>"He withdrew into the room, and it blacked out." (p. 295) | Antagonist catches Protagonist spying on him<br><br>The lens pans upward and across until it brings Thorwald's profile into the picture.  He is looking down directly at Lisa's hands.  His head slowly turns, and he looks right up--directly into the lens.<br><br>Jeff: "Stella! The lights! He'd seen us!" Stella hurries from the window, turning off the lights, as Jeff backs his chair into the room.  (p. 143) | Antagonist catches Protagonist spying on him<br><br>Binocular POV - Over the above, Kale slowly pans back across the same windows, comes to the last one and see Giles staring right back at him. Kale spins and dives to the floor, knocking the other camera tri-pod over. Kale shoves himself against the wall, frozen in terror.  (p. 53) |
| 57. Antagonist cuts the phone lines<br><br>Jeff: "I dialed the precinct house." (p. 312)<br><br>"Operator, I've been cut off...I hadn't been cut off... | Antagonist cuts the phone lines<br><br>Jeff: "Hello, Doyle? Tom? Tom, I think Thorwald's left.  I don't see anything of-- He looks at receiver, then -- "Hello."  Slowly he looks up toward Thorwald's apartment. | Antagonist cuts the phone lines<br><br>Kale grabs the cordless phone off his bed, clicks it on: DEAD.  (p. 97)<br><br>Ashley heads for the desk phone. Kale: "It's dead." (p. |

| Rear Window Story (1942) | Rear Window Film (1954) | Disturbia (2007) |
|---|---|---|
| My wire had been cut." (p. 313) | Then, back to the receiver. (p. 149) | 101) |
| 58. Protagonist accuses killer<br><br>The note (to Thorwald) reads: "What have you done with her?" (p. 304) | Protagonist accuses killer<br><br>The message (to Thorwald) reads, simply, "What have you done with her?" (p. 124) | Protagonist accuses killer<br><br>Kale: "So where's my friend then?" (p. 90) |
| 59. Protagonist asks Assistant (Sam) to break in & Assistant almost gets caught (has 25 minutes)<br><br>"He must have been tense, doing it. I was twice as tense, watching him do it." (p. 309)<br><br>"Chase around the corner a minute and get me the exact number on it will you?... And try not to let anyone catch you at it" (p. 297)<br><br>"Let's see if you're fast enough to keep from being caught at it." (p. 304)<br><br>"I want you to do something for me that's a little risky… You've got twenty five minutes starting from now" (p. 308)<br><br>"I'm just an easy mark for you, he said ruefully, but he | Protagonist asks Assistant (Lisa) to break in & Assistant almost gets caught [4]<br><br>Lisa: "Okay, chief. What's my next assignment?" (p. 68)<br><br>Jeff: "Lisa! Look out! He's coming!"<br>There is a sigh of relief from both of them.<br>Stella: "Thank heaven that's over!<br>Jeff: "I have a feeling we've just begun" (p. 126)<br><br>Jeff: "C'mon. C'mon! Get out of there!" (p. 137)<br><br>Stella: "—What can we do?" (p. 125) | Protagonist asks Assistant (Ronnie) to break in & Assistant almost gets caught (has 21 minutes) [5]<br><br>Ronnie invades Turner's home looking for evidence creating a tense situation watched by Kale (pp. 71-77) [6]<br><br>Kale sighs in relief.<br>Waves Ashley the "all clear."<br>Ashley heads back over to Kale, breathless.<br>Ashley (oddly exhilarated): "That was intense!" (p. 51)<br><br>Ronnie (prelap): "You want me to do what"… "For the later purpose of doing what? Breaking into his house?"<br>Kale: "No, not breaking in. We're just talking about having access to his garage so we can go in on our own time – when he's not there- to just…to get a closer look at the car, the bag—" (p. 71) |

---

[4] The Rear Window screenplay (pp. 124-129) has Lisa invading Thorwald's apartment looking for evidence creating a tense situation watched by Jeff through binoculars.
[5] The Disturbia screenplay (pp. 73 – 75 and pp. 82 – 85) has Kale watching Ronnie's break-in and investigation through binoculars while almost getting caught.
[6] Similar to the Rear Window Film, the police interrupt the situation.

| Rear Window Story (1942) | Rear Window Film (1954) | Disturbia (2007) |
|---|---|---|
| went." (p. 308)<br><br>"He got in, lit the light, looked over at me. I motioned him to go ahead, not weaken " (p. 308) | | Kale: "Look, if we're going to do this, it's gotta be now. He takes 21 minutes average to mow his front yard…You'll be hearing him the whole time…" Ashley grabs the remote. Ashley: "I'll do it." (p. 72)<br><br>Kale: "I just need you to do one thing."<br>Ronnie (shaking his head): "Phase 2. I knew it." (p. 82)<br><br>Ronnie (… suddenly sounding not so macho) "I can't believe I'm doing this." (p. 72)<br><br>Ronnie (keeping low as he darts to the fence) turns peers back up to Kale, give him the thumbs up or down.<br><br>Kale:<br>"You're all good." ( p. 73) |
| 60. <u>Protagonist falls asleep often while on duty</u><br><br>"I'd missed a few hours, been asleep" (p. 298)<br><br>"… I finally succumbed in the flaming light of the early sun." (p. 303) | <u>Protagonist falls asleep often while on duty</u><br><br>His head nods sleepily as he doses. Jeff wakens a little more fully as his attention is drawn to. (p. 46)<br><br>Jeff sits in his wheelchair, looking quietly out at the neighborhood, sleep beginning to take hold on him again. He is still in his wheelchair, sound asleep. The camera pans back into Jeff's sleeping face. (p. 50) | <u>Protagonist falls asleep often while on duty</u><br><br>We pan to reveal Kale asleep in the leather chair. (p. 51)<br><br>Kale snaps awake. Breathing hard. Bad dream. He sits up, peers across to Ashley's windows. (p. 31) |

| **Rear Window Story (1942)** | **Rear Window Film (1954)** | **Disturbia (2007)** |
|---|---|---|
| 61. Protagonist's Assistant(s) think he is going crazy<br><br>"You ain't touched a thing. And your face looks like a sheet" (p. 297) | Protagonist's Assistant(s) think he is going crazy<br><br>Lisa (insistent): "What is it you're looking for?"<br>Jeff: "I want to find out what's wrong with the salesman's wife. Does that make me sound like a madman?"(p. 64) | Protagonist's Assistant(s) think he is going crazy<br><br>Ashley: "Kale, what are you doing"<br>Kale: "Trying to get to the bottom of this." (p. 79)<br><br>Ashley (beat; thin): "I just didn't realize—you were this—"<br>Kale: "What, crazy?  Maybe I am.  But maybe I'm right." (p. 79) |
| 62. Protagonist angrily recites his evidence<br><br>"… I say that man has done away with his wife!  Trace that trunk he shipped out. Open it up when you've located it – and I think you'll find her!" (p. 302) | Protagonist angrily recites his evidence<br><br>Jeff: "…Not a sight or sound of his wife!  Now you tell me where she is and what she's doing!" (p. 65).<br><br>The police interrupt the situation. | Protagonist angrily recites his evidence<br><br>Kale (heading out): "Fine, but what about the bumper sticker, there's still a girl missing, just…What's in the bag? (Then from O.S.) Can anyone tell me that?" (p. 78) |
| 63. Jeff catches a small visual clue<br><br>Jeff sees Thorwald and the rental agent moving from the living room to the kitchen in separate apartments and realizes that the new cement floor in the kitchen above Thorwald's is raised.  He believes that's where the body is hidden. | Jeff catches a small visual clue<br><br>Jeff notices that the zinnias in Thorwald's garden are shorter than they were before.  Jeff examines the slide frames from the photos he took of the zinnias previously and is right. He believes that's where the body is hidden.<br><br>Jeff: "There is a dip at this end. Since when do flowers grow shorter in two weeks?" (p. 121) | Kale catches a small visual clue<br><br>Kale watches the video on the camera that Ronnie brings back and catches a detail.  He examines the video frame by frame.  A video frame reveals the face of a murder victim hidden in the wall of Turner's house. |

| **Rear Window Story (1942)** | **Rear Window Film (1954)** | **Disturbia (2007)** |
|---|---|---|
| 64. <u>Gunshot lights up the room</u><br><br>The flash of the shot lit up the room for a second, it was so dark… it was like looking at sunrise in the face." (p. 314)<br><br>Something sparked in the darkness of one of his own windows. (p. 315) | <u>Protagonist's camera flashes to light up the room</u><br><br>Jeff: "One of you watch this window.  If I see him coming back, I'll signal with a flashbulb." (p. 133)<br><br>Jeff lifts the flash holder to face level and closes his eyes.  He explodes the flash. (p. 151) | <u>Protagonist's camera flashes to light up the room</u><br><br>… the camera's lamp suddenly IGNITES, MOMENTARILY LIGHTING UP KALE'S ROOM! (p. 52) |
| 65. <u>Antagonist Hides the Body</u><br><br>Thorwald buried his wife's body in the new cement floor kitchen floor. (p. 316) | <u>Antagonist Hides the Body</u><br><br>Detective:  "Thorwald's ready to take us on a tour of the East River."<br><br>Doyle:  "Did he say what was buried in the flower bed?"  Detective: "Yeah.  It's over in his apartment.  In a hat box.  Wanna look?" (p. 157) | <u>Antagonist Hides the Body</u><br><br>Kale has researched Turner's house and learns that the garage and house were not originally connected, but now are.  He believes something may be hidden in the new wall. (Disturbia Film) |

80.     The Rear Window Story's significant character, Hal Jeffries, constitutes protectible expression as the character was developed by Woolrich, the character constitutes the story being told in the Rear Window Story, the plot unfolds from the character's visual perspective, and because the Rear Window Story and Rear Window Film focus on this character.

81.     The Disturbia Film utilizes numerous points of view of the protagonist (i.e. Kale, binocular and video camera "POV" in the Disturbia Screenplay) which are substantially similar to the same points of view utilized in the Rear Window Story and Rear Window Film.

82.     Upon information and belief, in the Disturbia Film the Defendants purposefully employed immaterial variations or transparent re-phrasing to produce essentially the same story as the Rear Window Story, and Defendants' additions, alterations, and editing choices provide

evidence of copying rather than independent creation.

## FIRST CLAIM FOR RELIEF

### (Copyright Infringement, 17 U.S.C. §§ 101 et seq. – Against All Defendants)

83.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 82 inclusive, as though fully set forth herein.

84.    Plaintiff owns copyright interests in the Rear Window Story, and beneficial copyright interests in the Rear Window Film, which are original copyrighted works under the laws of the United States.

85.    Plaintiff has the exclusive right to prepare derivative works based upon the copyrighted work the Rear Window Story pursuant to 17 U.S.C. § 106 (2).

86.    The Defendants' copying, downloading, use, modification, reproduction, display and distribution of elements of the Rear Window Story standing alone, and as embodied in the Rear Window Film, including without limitation, the ideas, expression of concepts, theme, text and plot contained therein and all derivatives thereof, constitutes a violation of the United States Copyright Act, Title 17 U.S.C. §§ 501(a), 106(1), 106(2) and 106(3), and all Defendants were acting as infringers within the meaning of 17 U.S.C. § 105(a).

87.    By all the Defendants' participation in the production, distribution, use, and exploitation of the Disturbia Film, Defendants knowingly and willfully infringed, authorized others to infringe, and will continue to infringe Plaintiff's copyright in the Rear Window Story and Plaintiff's beneficial interest in the Rear Window Film.

88.    As a proximate result of Defendants' copyright infringement, Plaintiff has suffered and will continue to suffer irreparable injury, some of which cannot be compensated in money damages if such wrongful conduct continues.

WHEREFORE, Plaintiff is entitled to and prays for relief as follows:

89.     A permanent injunction, pursuant to 17 U.S.C. § 502, enjoining all Defendants, their officers, agents, employees, licensees, assigns, distributors, sub-distributors, and all persons acting in concert with them, from engaging in such further violations of the Copyright Act;

90.     A permanent injunction enjoining all Defendants, their officers, agents, employees, licensees and assigns, distributors, sub-distributors, and all persons acting in concert with them, from engaging in or authorizing the production, copying, distribution and/or exploitation of the Disturbia Film;

91.     Recovery from all Defendants of the damages, including pre-judgment interest it sustained and will sustain, and any income, gains, profits, and advantages obtained by Defendants as a result of their wrongful acts alleged hereinabove pursuant to 17 U.S.C. § 504(b), in an amount which cannot yet be fully ascertained, but which shall be assessed at the time of trial;

92.     The maximum statutory damages in the amount of $30,000.00 per infringement, and/or $150,000.00 per willful infringement pursuant to 17 U.S.C. § 504(c), or for such other amount as may be proper under 17 U.S.C. § 504(c). Plaintiff is further entitled to their attorney's fees and full costs pursuant to 17 U.S.C. § 505; and

93.     For such other and further relief and remedies available under the Copyright Act, 17 U.S.C. §§ 101 et seq., and/or for which the Court may deem just and proper, including punitive damages.

## SECOND CLAIM FOR RELIEF

### (Contributory Infringement – Against Universal, Viacom, and UIP)

94.     Plaintiff re-alleges and incorporates herein by reference the allegations set forth in

paragraphs 1 through 82 inclusive, as though fully set forth herein.

95.     Upon information and belief, Universal, Viacom, and UIP, individually and in concert with the other named Defendants, encouraged, induced, or materially contributed to, the infringement of Plaintiff's copyrightable work, and of Plaintiff's beneficial interest in the Rear Window Film, in that:

(a)     Universal used, distributed, and/or exploited the Disturbia Film;

(b)     Viacom and its wholly owned subsidiaries, Paramount and DreamWorks, produced, filmed, distributed, and edited the Disturbia Film;

(c)     Universal's and Paramount's joint venture, UIP, distributed, promoted, and advertised the Disturbia Film and, upon information and belief, provided financing for the Disturbia Film; and

(d)     Universal and Paramount have further participated in the international distribution of the Disturbia film pursuant to license agreements, and/or distribution servicing agreements, and/or third party service agreements with or utilizing UIP, Taramount, Kadokawa, UPI, UPI Entertainment, and VOH.

96.     Upon information and belief, Universal's, Viacom's, and UIP's actions were performed with actual and constructive knowledge of Plaintiff's rights and interests.

97.     Universal, Viacom, and UIP are jointly and severally liable for contributory copyright infringement.

WHEREFORE, Plaintiff is entitled to and prays for relief as follows:

98.     A permanent injunction, pursuant to 17 U.S.C. § 502, enjoining Universal, Viacom, and UIP, their officers, agents, employees, licensees, assigns, distributors, and all persons acting in concert with them, from engaging in such further violations of the Copyright

Act;

99.     A permanent injunction enjoining Universal, Viacom, and UIP, their officers, agents, employees, licensees, assigns, distributors, sub-distributors, and all persons acting in concert with them, from engaging in or authorizing the production, reproduction, copying, use, distribution, exploitation, advertising, and promotion of the Disturbia Film;

100.     Recovery from Universal, Viacom, and UIP of the damages, including pre-judgment interest it sustained and will sustain, and any income, gains, profits, and advantages obtained by Universal, Viacom, and UIP as a result of their wrongful acts alleged hereinabove pursuant to 17 U.S.C. § 504(b), in an amount which cannot yet be fully ascertained, but which shall be assessed at the time of trial;

101.     The maximum statutory damages in the amount of $30,000.00 per infringement, and/or $150,000.00 per willful infringement pursuant to 17 U.S.C. § 504(c), or for such other amount as may be proper under 17 U.S.C. § 504(c). Plaintiff is further entitled to their attorney's fees and full costs pursuant to 17 U.S.C. § 505; and

102.     For such other and further relief and remedies available under the Copyright Act, 17 U.S.C. §§ 101 et seq., and/or for which the Court may deem just and proper, including punitive damages.

## THIRD CLAIM FOR RELIEF

**(Vicarious Copyright Infringement - Against Paramount, Viacom, Universal and UIP)**

103.     Plaintiff re-alleges and incorporates herein by reference the allegations set forth in paragraphs 1 through 82 inclusive, as though fully set forth herein.

104.     Defendants Paramount, Viacom, Universal, and UIP had the right, authority, and the ability to control or supervise Defendants' actions, failures, and omissions which violated

Plaintiff's copyright in the Rear Window Story and Plaintiff's rights and beneficial interest in the Rear Window Story as embodied in the Rear Window Film, namely Spielberg, DreamWorks, Taramount, Kadokawa, UPI, UPI Entertainment, and VOH.

105.    Defendants Paramount, Viacom, Universal, and UIP had knowledge of Plaintiff's rights and interests in the Rear Window Story as embodied in the Rear Window Film during the development, production, distribution, and exploitation of the Disturbia Film.

106.    Defendants Paramount, Viacom, Universal, and UIP obtained a direct financial interest, financial advantage, and/or economic consideration from the infringement.

WHEREFORE, Plaintiff is entitled to and prays for relief as follows:

107.    A permanent injunction, pursuant to 17 U.S.C. § 502, enjoining Paramount, Viacom, Universal, and UIP, their officers, agents, employees, licensees, assigns, distributors, and all persons acting in concert with them, from engaging in such further violations of the Copyright Act;

108.    A permanent injunction enjoining Paramount, Viacom, Universal, and UIP, their officers, agents, employees, licensees and assigns, distributors, sub-distributors, and all persons acting in concert with them, from engaging in or authorizing the production, copying, distribution and/or exploitation of the Disturbia Film;

109.    Recovery from Paramount, Viacom, Universal, and UIP of the damages, including pre-judgment interest it sustained and will sustain, and any income, gains, profits, and advantages obtained by Paramount, Viacom, Universal, and UIP as a result of their wrongful acts alleged hereinabove pursuant to 17 U.S.C. § 504(b), in an amount which cannot yet be fully ascertained, but which shall be assessed at the time of trial;

110.    The maximum statutory damages in the amount of $30,000.00 per infringement,

and/or $150,000.00 per willful infringement pursuant to 17 U.S.C. § 504(c), or for such other amount as may be proper under 17 U.S.C. § 504(c). Plaintiff is further entitled to their attorney's fees and full costs pursuant to 17 U.S.C. § 505; and

111.    For such other and further relief and remedies available under the Copyright Act, 17 U.S.C. §§ 101 et seq., and/or for which the Court may deem just and proper.

## FOURTH CLAIM FOR RELIEF

### (Breach of Contract/ The License Agreement – Against Defendant Universal)

112.    Plaintiff re-alleges and incorporates herein by reference the allegations set forth in paragraphs 1 through 82 inclusive, as though fully set forth herein.

113.    The License Agreement is an enforceable contract between the Plaintiff and Universal and it grants certain non-exclusive contractual, non-property, rights to the Licensee Universal which are expressly conditioned and limited in scope.

114.    Plaintiff owns all the rights in and to the Rear Window Story.  Additionally, Plaintiff retains important rights and exclusive copyright interests in the Rear Window Film, including control over uses and the preparation of derivative works, which constitute equitable and/or beneficial ownership in the Rear Window Film.

115.    The License Agreement merely authorizes Universal, subject to express conditions, the "continued use of said Work [the Rear Window Story] in the distribution of said Film [the Rear Window Film] throughout the entire universe" (License Agreement, p. 3), with Plaintiff "reserving all other rights held by Licensor [Plaintiff] throughout the entire universe" (Id).  The "Work" is the "literary and dramatic written material" published as "Rear Window" (Id., p. 1).  The License Agreement expressly reserves to Plaintiff all rights not granted to its Licensee Universal (Id., p. 5), which includes the right to prevent adaptation of the Rear Window

Film.

116.    Pursuant to the Settlement Agreement (¶ 13) the representations of the parties, including those made in the License Agreement, "are material and have been or will be relied on by the parties."  The License Agreement further includes an implied duty of good faith and fair dealing, which was breached by actions, failures, and omissions which are contrary to the expectations of the contracting parties and which frustrate the purpose of the License Agreement.

117.    The License Agreement includes, as a matter of law, any promise which a reasonable person in the position of the Plaintiff would be justified in believing was included. Such promises include:

(a)    Universal's promise to protect Plaintiff's rights in the Rear Window Story as embodied in the Rear Window Film;

(b)    Universal's promise to Plaintiff to adhere to the expressly agreed to limitations and restriction upon Universal which constitute an ongoing beneficial interest in the Rear Window Film;

(c)    Universal's promise to not conceal facts and actions which affect Plaintiff's rights, interests and opportunities related to the License Agreement; and

(d)    Universal's promise that any opportunity, benefit, or compensation derived from the adaptation, re-make, or sub-licensing of the Rear Window Film would necessarily include Plaintiff.

118.    Universal is the assignee of, or successor to, the parties to the License Agreement (i.e. MCA, Inc.), and by assignment is bound by the terms of the License Agreement.

119.    The Rear Window Film is defined in the License Agreement as "the 1954 Theatrical release print of the Film" (License Agreement, p. 5).

120.    Plaintiff provided valuable consideration to Universal in order to secure Universal's promises and obligations, including a license for continued use of the Rear Window Film, the forbearance by Plaintiff from enforcement of its rights, or proceeding with trial against, Universal after Plaintiff prevailed in appellate court rulings against Universal's predecessors (*See* Stewart v. Abend, 495 U.S. 207, 110 S. Ct. 1750 (1990)), and including the forbearance by Plaintiff from enjoining Universal's further use and distribution of the Rear Window Film.

121.    The resulting License Agreement does not grant any adaptation rights or other similar rights to Universal, nor does it permit the exploitation of the story, concepts, themes, any characters, ideas and expressions contained in the Rear Window Film, whether or not copyright protectable, if such exploitation involves any actions which exceed the scope of express contractual conditions, to wit:

(a)    A work embodying (i.e. based upon, inspired by, or derivative of) the Rear Window Story or the Rear Window Film (Id., p. 4).

(b)    Alteration, or adding any matter to, the Rear Window Film, except to shorten or lengthen the Film or add subtitles for foreign languages or for the hearing impaired (Id., p. 5);

(c)    Any use of the Rear Window Story in a manner other than as specifically embodied in the Rear Window Film (Id., p. 4); and

(d)    Any use of the Rear Window Film that fails to include the credit "Based on the Short Story by Cornell Woolrich" (Id., p. 5).

122.    Plaintiff has the right pursuant to the License Agreement to enforce Universal's compliance with its contractual promise given in consideration for its license to continue to utilize the Rear Window Story as embodied in the Rear Window Film and to refrain from any act

which would adapt, alter, or permit its assigns or distributors to adapt or alter the Rear Window Film in any manner.

123.     Upon information and belief, Universal has violated and breached the License Agreement, both under its express terms and the implied duty of good faith and fair dealing, in the following manner:

(a)     the distribution of an adaptation, re-make, sequel and/or derivative work which contains the Rear Window Story and elements thereof in violation of its express obligation to Plaintiff that Plaintiff retain the right to restrict and control the manner in which the Rear Window Story and the Rear Window Film were and are presented to the public;

(b)     the failure to account to Plaintiff for financial benefits which Universal derived from its implied sub-licensing, consent and permission granted to third parties to utilize elements of the Rear Window Story which are embodied in the Rear Window Film;

(c)     the failure to protect Plaintiff's equitable and/or beneficial interest in the Rear Window Film, and the toleration of, and contribution to, the infringement by other Defendants authorized, expressly or tacitly, by Universal to assist in exploiting both copyright protectible as well as non-protectible ideas and elements in the Rear Window Story and the Rear Window Film in violation of the License Agreement (Id., p. 6).

(d)     exceeding the contractual rights to exploit the Rear Window Film, which embodies the Rear Window Story and elements thereof, by the production, distribution, and exploitation of an unauthorized adaptation and editing of the Rear Window Film (i.e. the Disturbia Film), which is based upon, inspired by, and embodies the Rear Window Story, and which unfairly competes with Plaintiff's licensed property;

(e)     distributing and exploiting, along with joint venture partner Paramount via

UIP, and with others including, but not limited to, Taramount, Kadokawa, UPI, UPI Entertainment, and VOH, the Disturbia Film which is based upon, inspired by, and embodies the expression of ideas and elements contained in the Rear Window Story (the "Work" referenced in Id., p. 4);

(f)    distributing and exploiting, along with joint venture partner Paramount via UIP, and others including, but not limited to, Taramount, Kadokawa, UPI, UPI Entertainment, and VOH the Disturbia Film which embodies elements of the Rear Window Film (the "Film" referenced in Id., p. 5), which breaches the provision in the License Agreement that "no matter (other than dubbing or subtitles for foreign language versions or the hearing impaired) not included in the 1954 theatrical version may be added to the Film" (Id., p. 5);

(g)    receiving profits, unauthorized financial benefits and/or royalties which Plaintiff was otherwise entitled to from the implied sub-licensing for the use, the adaptation, and the preparation of a work derivative of the Rear Window Film by all Defendants and others which breaches Universal's obligation in the License Agreement to limit its use to the "1954 theatrical release print of the Film" (Id., p. 5), as well as Universal's duty of good faith and fair dealing;

(h)    impliedly sub-licensing to the other Defendants characters, scenes, and sequences contained in the Rear Window Story, although Universal has no right to do so under the License Agreement, depriving Plaintiff of its right to receive profits from the use of the Rear Window Story;

(i)    tolerating, aiding, contributing to, and/or licensing "others acting on their authority to reproduce, sell, perform, display, distribute, market, advertise, promote, and otherwise exploit the Film" (Id., p. 4) in a manner exceeding the authority under the License

Agreement; and

(j)     breaching its obligation to state "Based on a Short Story by Cornell Woolrich" (Id., p. 5) on all releases of the Rear Window Film, and instead distributing the derivative Disturbia Film with the false attribution "Story by Christopher Landon."

124.    Universal's actions constitute a breach of the covenant of good faith and fair dealing which requires Universal to refrain from taking any action to injure, or to interfere with, the right of Plaintiff to receive the benefit or consideration provided for by the License Agreement.

125.    The breaches of the License Agreement and the duty of good faith and fair dealing constitute a failure of consideration on the part of Universal, as well as wrongful actions and breaches which are material and go to the root of the License Agreement, and which are in addition to, and independent of, Universal's infringement in violation of the Copyright Act.

126.    All conditions precedent have occurred or have been performed, waived or otherwise satisfied.

127.    As a consequence of the foregoing, Plaintiff has been required to retain the undersigned counsel and is obligated to pay said counsel a reasonable fee for their services.

128.    Universal is liable for its breaches of the License Agreement, as well as for the actions by all the Defendants and other persons or entities which constitute "persons or entities authorized by Licensee to exploit or assist in exploiting the Film" (Id., p. 6), including, but not limited to, licensees, distributors, third party service providers, and sub-distributors.

WHEREFORE, Plaintiff is entitled to and prays for relief as follows:

129.    For compensatory and consequential damages, according to proof in an amount determined at trial, together with interest thereon as provided by law;

130.    For an accounting and restitution to Plaintiff of all gains, profits and consideration in any form Universal, as well as other persons or entities authorized by Universal, have derived from their implied sub-licensing, production, distribution and exploitation of the Disturbia Film, and of the allied and ancillary rights related thereto from Universal's breaches of the License Agreement and their duty of good faith and fair dealing; and

131.    For termination of the License Agreement, including specifically the termination of Plaintiff's grant to Universal of any and all rights in, license to, or use of, the Rear Window Story; and

132.    For such other and further relief and remedies available which the Court may deem just and proper, including attorney's fees and costs as provided by the Settlement and License Agreements, and for punitive damages.

## FIFTH CLAIM FOR RELIEF

### (Violation of New York General Business Law Article 22A §§ 349, 350(A) and Article 24 § 360(L) against All Defendants)

133.    Plaintiff re-alleges and incorporates herein by reference the allegations set for the in paragraphs 1 through 82, inclusive as though fully set forth herein.

134.    Upon information and belief, Defendants have intentionally omitted from public advertising that the Disturbia Film is based on the Rear Window Story and as it is embodied in the Rear Window Film, and that they have not licensed from Plaintiff the right to distribute the Disturbia Film, and these misrepresentations to the public are deceptive and contrary to the public interest.

135.    Defendants falsely advertised and disseminated in multi-media print and electronic dissemination in the State of New York, throughout the United States, and internationally, materially misleading information, namely that the Disturbia Film was a "Story

by Chris Landon," and omitted from such multi-media dissemination any attribution to Woolrich.

136.    Upon information and belief, all Defendants' misrepresentations to the general public are calculated to deceive Plaintiff's potential Licensees, customers, consumers, and members of the public.

137.    Defendants' wrongful conduct, acts, and omissions alleged hereinabove constitute violations of New York law, to wit:

(1) unlawful, unfair business practices and unfair competition under New York General Business Law Article 22(A) §§ 349 and 350(A) which provides in pertinent part:

§ 349: Deceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in the State are hereby unlawful.

§ 350(A): False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this State is hereby declared unlawful.

(2) Dilution of Plaintiff's name under New York General Business Law Article 24 § 360(L), which provides in pertinent part:

Injury to business reputation; dilution. Likelihood of injury to do business reputation or of dilution of the distinctive quality of a trade name shall be a ground for injunctive relief in cases of infringement or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

138.    As a proximate result of Defendant's conduct, acts and omissions, Defendants have been unjustly enriched and Plaintiff is entitled to recover any income, gains, compensation, profits and advantages obtained, received or to be received by Defendants, resulting from the

exploitation of Plaintiff's rights in and to elements used in the Disturbia Film; and Plaintiff prays for an order requiring Defendants to render an accounting.

139.    As a proximate result of Defendants' wrongful conduct, acts and omissions alleged hereinabove, Plaintiff has been injured, and Defendants will be unjustly enriched, in an amount that shall be assessed at trial for which damages and/or restitution and disgorgement is appropriate, including a declaration by the Court that Defendants are the constructive trustee for the benefit of Plaintiff and an order that Defendants convey to Plaintiff all proceeds received by Defendants as a result of their wrongful exploitation of the Disturbia Film.

140.    Defendants' wrongful conduct, acts and omissions have proximately caused and will continue to cause Plaintiff substantial injury and damage including, without limitation, loss of customers, dilution of goodwill, injury to Plaintiff's reputation, and diminution of the value of Plaintiff's rights.  The harm this wrongful conduct will cause to Plaintiff is both imminent and irreparable, and the amount of damage sustained by Plaintiff will be difficult to ascertain if such wrongful conduct is allowed to continue without restraint.

WHEREFORE, Plaintiff is entitled to and prays for relief as follows:

141.    Permanently enjoin Defendants, their officers, agents and employees, licensees, assigns, distributors, and sub-distributors, and all persons acting in concert with them, from engaging in such further unfair business practices and unfair competition under New York General Business Law Article 22A §§ 349 and 350(A) and Article 24 § 360(L);

142.    Punitive damages in an amount sufficient to punish Defendants, to be assessed at trial. Plaintiff has no adequate remedy at law with respect to Defendants' unlawful conduct, acts and omissions which were conducted in an intentional, malicious, calculated and oppressive manner in conscious disregard for Plaintiff's rights, and knowingly injured Plaintiff;

143.    For the imposition of a constructive trust for the benefit of Plaintiff on any and all proceeds received and to be received by Defendants, their licensees, assigns, employees, distributors, or sub-distributors;

144.    For restitution to Plaintiff of all proceeds received and to be received by Defendants, their licensees, assigns, employees, distributors, or sub-distributors;

145.    For compensatory and consequential damages according to proof in an amount to be determined at trial; and

146.    For such other and further relief and remedies available under New York General Business Law Article 22A §§ 349, 349(h), and 350 and Article 24 § 360(L) which the Court may deem just and proper.

## SIXTH CLAIM FOR RELIEF

**(Breach of Implied Duty of Confidentiality/ Constructive Trust – Against Universal)**

147.    Plaintiff re-alleges and incorporates herein by reference the allegations set forth in paragraphs 1 through 82 inclusive, as though fully set forth herein.

148.    Plaintiff and Universal are parties to an enforceable agreement (the License Agreement) pursuant to which Plaintiff transferred valuable rights in consideration for Universal's promises.

149.    Plaintiff owns, as a result of its reservation of substantial rights in the Rear Window Film, a beneficial and/or equitable interest in the Rear Window Film even though legal title to the copyright registration is held by Plaintiff's Licensee, Universal.

150.    Plaintiff and Universal are parties to an enforceable agreement that governs Universal's rights relative to Plaintiff's literary property, copyright, as well as to non-copyrightable ideas and elements in the Rear Window Story and as it is embodied in the Rear

Window Film, and that due to the special circumstances described herein, a trusting and confidential relationship arose between Plaintiff and Universal.

151. A special relationship arose between Plaintiff and Universal from:

(a) Plaintiff's forbearance, after the U.S. Supreme Court's resolution in 1991 of litigation in favor of Plaintiff (*See* <u>Stewart v. Abend</u>, 495 U.S. 207, 110 S. Ct. 1750 (1990)), to further exploit its exclusive rights in the Rear Window Story, or to enjoin Universal's use and distribution of the Rear Window Film, as consideration for its beneficial rights and interests obtained in the License Agreement to, among other things, control and restrict the use of the Rear Window Film;

(b) Universal's express and implied promises to not modify or adapt the Rear Window Film which embodies the Rear Window Story;

(c) Plaintiff's reservation of ownership rights, creative control, and a beneficial interest in the Rear Window Film;

(d) Plaintiff's transfer of valuable licensing rights in the Rear Window Story in reliance upon Universal's promises;

(e) Plaintiff's disclosure to Universal in or around early 2007 of confidential ideas and strategies related to the legal protection of, as well as further exploitation of, the Rear Window Story, specifically the production of a remake of the Rear Window Film, and the effect of the Disturbia Film on Plaintiff's rights under the License Agreement;

(f) Universal's superior position and knowledge regarding Universal's and the other Defendants' exploitation of the Disturbia Film's use of the Rear Window Story and the Rear Window Film, which knowledge being not readily available to, or concealed by Universal from, Plaintiff;

(g)    Plaintiff's and Universal's ongoing mutual interest and potential benefit from any adaptation of the Rear Window Film;

(h)    Plaintiff's reposing trust in Universal, who occupied a superior position to Plaintiff, during confidential communications between their respective attorneys regarding what actions to take to protect Plaintiff's rights;

(i)    Universal's making partial and ambiguous statements to Plaintiff suggesting mutual interest and joint action, with the consequent assumption by Universal of the duty to fully disclose its actions and information in its possession to Plaintiff;

(j)    Universal's purportedly strategizing legal options and actions with Plaintiff while, instead, concealing the fact that it had already exploited Plaintiff's ideas, property, and future business opportunities for competing adaptations or remakes for its own benefit by impliedly sub-licensing the Rear Window Story and the Rear Window Film, tolerating use and infringement by the other Defendants, concealing its distribution of the Disturbia Film via UIP, and refraining from taking any action to protect the rights and interests of Plaintiff;

(k)    Upon information and belief, Universal's abuse of Plaintiff's confidence by financially benefiting from the distribution of the Disturbia Film by UIP, Kadokawa, Taramount, UPI, UPI Entertainment, and VOH; and

(l)    Upon information and belief, Universal's breaching Plaintiff's trust when Universal failed to maintain a suit for infringement upon the Rear Window Film against the other Defendants and other persons or entities and, instead, Universal's tolerating and participating in the infringement by an unauthorized derivative work, which directly competed with Plaintiff.

152.    Upon information and belief, Universal engaged in the deliberate and unjustified harm to, and/or destruction of, Plaintiff's property rights which Plaintiff had entrusted to

Universal in the License Agreement.

153.    Upon information and belief, Universal's actions and breaches of confidence resulted in Plaintiff's delay in protecting its rights and further damaged and appropriated for themselves the value of adaption rights in the Rear Window Story and/or the Rear Window Film without any compensation to Plaintiff for any remake, sequel or spin-off of the Rear Window Film.

154.    As a direct and proximate result of Universal's wrongful conduct, acts and omissions alleged hereinabove, Plaintiff has been damaged, and Universal will be unjustly enriched during the pendency of this action, in an amount that shall be assessed at trial for which damages and/or restitution and disgorgement is appropriate.

155.    Such damages and/or restitution and disgorgement should include a declaration by the Court that Universal is the constructive trustee for the benefit of Plaintiff and an order that Universal convey to Plaintiff all proceeds received by Universal that are attributable to their wrongful exploitation of the Disturbia Film.

WHEREFORE, Plaintiff is entitled to and prays for relief as follows:

156.    For an order granting compensatory and consequential damages, according to proof in an amount determined at trial, together with interest thereon as provided by law;

157.    For the imposition of a constructive trust, and for an accounting and restitution to Plaintiff of all gains, profits and advantages Universal has derived from their production, distribution and exploitation of the Disturbia Film, and/or from their adaptation of licensed elements of the Rear Window Story as embodied in the Rear Window Film pursuant to the License Agreement between Plaintiff and Universal; and

158.    For such other and further relief and remedies available which the Court may

deem just and proper, including punitive damages.

## ON ALL CLAIMS FOR RELIEF

159.    For Plaintiff's reasonable costs and attorneys fees;

160.    For interest on all sums awarded Plaintiff; and

161.    For reasonable prevailing party's attorney's fees pursuant to ¶ 9 of the Settlement

Agreement.

## JURY TRIAL DEMANDED

Plaintiff hereby requests a trial by jury on each claim for relief alleged in the Complaint.

DATED this ___ day of September, 2008.    Respectfully Submitted,

Clay M. Townsend, Esq.
Florida Bar No.:  363375
MORGAN & MORGAN, P. A.
*Appearing Pro Hac Vice (pending order)*
20 N. Orange Avenue, Suite 1600
Orlando, FL 32802
Ph: (407) 418-2075
Fx: (407) 425-8171
Email: ctownsend@forthepeople.com

Steven M. Hayes, Esq.
New York Bar No.: 2926
HANLY, CONROY, BIERSTEIN, SHERIDAN,
FISHER, HAYES, LLP
112 Madison Avenue
New York, NY 10016-7416
Ph: (212) 784-6414
Fx: (212) 784-6420
Email: shayes@hanlyconroy.com

*Attorneys for Plaintiff*
*The Sheldon Abend Revocable Trust*