**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE SHELDON ABEND REVOCABLE TRUST,<br><br>          Plaintiff,<br><br>    v.<br><br>STEVEN SPIELBERG; DREAMWORKS, LLC; PARAMOUNT PICTURES CORPORATION; VIACOM, INC.; NBC UNIVERSAL, INC.; UNIVERSAL PICTURES CORPORATION; and UNITED INTERNATIONAL PICTURES, B.V.,<br><br>          Defendants. | CASE NO. 08-CIV-7810 (LTS)(JCF)<br>ECF Case |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR**

**PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ..................................................................................1

II.     STATEMENT OF FACTS ......................................................................................1

        A.    Plaintiff's Claim For Copyright Infringement ..........................................1

        B.    H.G. Wells' Short Story *Through A Window* (1895), And Other Pre-
              Existing Works...............................................................................................2

        C.    Plaintiff's Short Story ..................................................................................3

        D.    Defendants' Motion Picture, *Disturbia*....................................................6

III.    ARGUMENT .........................................................................................................10

        A.    Standards For Copyright Infringement ....................................................10

        B.    The Court May Find A Lack Of Substantial Similarity As A Matter Of
              Law ...............................................................................................................12

        C.    There Is No Substantial Similarity Between Any Protectable Elements In
              Plaintiff's Short Story and Defendant's *Disturbia*...............................14

              1.    There Is No Actionable Similarity In Plot .................................14

                    (a)    The Basic Plot Idea Is Not Protectable ...........................14

                    (b)    The Plots Of The Short Story And *Disturbia* Are Different
                           In Expression ....................................................................16

              2.    There Is No Similarity In Theme ................................................17

              3.    There Is No Similarity In Characters ........................................18

              4.    There Is No Similarity Of Dialogue...........................................21

              5.    There Is No Actionable Similarity In Pace ...............................21

              6.    There Is No Actionable Similarity In Mood ..............................22

              7.    There Is No Similarity Of Setting...............................................23

              8.    The Total Concept And Feel Of The Two Works Is Substantially
                    Dissimilar..................................................................................23

D. Plaintiff's List Of Alleged Random Similarities Scattered Throughout The Works Is Inaccurate, Exaggerated And Cannot Support A Finding Of Substantial Similarity..............................................................................................24

IV. CONCLUSION...............................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Alexander v. Haley,*
    460 F. Supp. 40 (S.D.N.Y. 1978) ................................................................... 13

*Arden v. Columbia Pictures Indus., Inc.,*
    908 F. Supp. 1248 (S.D.N.Y. 1995) ...................................................... passim

*Bell v. Blaze Magazine,*
    2001 WL 262718 (S.D.N.Y. 2001) ............................................................... 13

*Berkic v. Crichton,*
    761 F.2d 1289 (9th Cir. 1985) ...................................................................... 15

*Boyle v. Stephens, Inc.,*
    1998 WL 80175 (S.D.N.Y. 1998) ..................................................... 11, 13, 15

*Brown v. Perdue,*
    2005 WL 1863673 (S.D.N.Y. 2005) ........................................................ 17, 23

*Davis v. United Artists, Inc.,*
    547 F. Supp. 722 (S.D.N.Y. 1982) ........................................................... 13, 14

*Denker v. Uhry,*
    820 F. Supp. 722 (S.D.N.Y. 1992) ............................................. 10, 13, 16, 18

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,*
    499 U.S. 340 (1991) ................................................................................. 10, 23

*Flaherty v. Filardi,*
    388 F. Supp. 2d 274 (S.D.N.Y. 2005) ................................................. 12, 13, 15

*Fuld v. National Broad. Co.,*
    390 F. Supp. 877 (S.D.N.Y. 1975) ......................................................... 13, 15

*Gal v. Viacom Intl, Inc.,*
    518 F. Supp. 2d 526 (S.D.N.Y. 2007) ........................................................... 15

*Giangrasso v. CBS, Inc.,*
    534 F. Supp. 472 (E.D.N.Y. 1982) ............................................................... 15

*Historical Truth Prods., Inc. v. Sony Pictures Entm't, Inc.,*
    1995 WL 693189 (S.D.N.Y. 1995) .................................................. 11, 12, 25

*Hoehling v. Universal City Studios, Inc.,*
    618 F.2d 972 (2d Cir. 1980) ......................................................................... 12

*Hogan v. DC Comics,*
    48 F. Supp. 2d 298 (S.D.N.Y. 1999) ................................................. 11, 18, 19

*Hudson v. Universal Pictures Corp.*,
   2004 WL 1205762 (E.D.N.Y. 2004)...............................................................13

*Idema v. DreamWorks, Inc.*,
   162 F. Supp. 2d 1129 (C.D. Cal. 2001) ..........................................................12

*Jones v. CBS, Inc.*,
   733 F. Supp. 748 (S.D.N.Y. 1990) .................................................................18

*Kretschmer v. Warner Brothers*,
   1994 WL 259814 (S.D.N.Y. 1994)..................................................................13

*Laureyssens v. Idea Group, Inc.*,
   964 F.2d 131 (2d Cir. 1992).....................................................................10, 11

*Litchfield v. Speilberg*,
   736 F.2d 1352 (9th Cir. 1984) .......................................................................24

*Midwood v. Paramount Picture Corp.*,
   1981 WL 1373 (S.D.N.Y. 1981)......................................................................15

*Morris v. Wilson*,
   189 F. Supp. 565 (S.D.N.Y. 1960) ................................................................25

*Nichols v. Universal Pictures Corp.*,
   45 F.2d 119 (2d Cir. 1930)............................................................................14

*Reyher v. Children's Television Workshop*,
   533 F.2d 87 (2d Cir. 1976).............................................................................23

*Risdon v. Walt Disney Prods.*,
   1984 WL 1181 (S.D.N.Y. 1984) ...........................................................11, 13, 21

*Smith v. Weinstein*,
   578 F. Supp. 1297 (S.D.N.Y. 1984)............................................................13, 17

*Walker v. Time Life Films, Inc.*,
   784 F.2d 44 (2d Cir. 1986)....................................................................10, 11, 12

*Warner Bros., Inc. v. Am. Broad. Co.*,
   720 F.2d 231 (2d Cir. 1983)......................................................................12, 19

*Well-Made Toy Mfg. Corp. v. Goffa Int'l Corp.*,
   210 F. Supp. 2d 147 (E.D.N.Y. 2002) ............................................................11

*Williams v. Chrichton*,
   860 F. Supp. 158 (S.D.N.Y. 1994) .................................................................11

*Williams v. Crichton*,
   84 F.3d 581 (2d Cir. 1996).............................................................10, 11, 12, 24

*Zambito v. Paramount Pictures Corp.*,
   613 F. Supp. 1107 (E.D.N.Y. 1985), *aff'd*, 788 F.2d 2 (2d Cir. 1985)..............13

## STATUTES

17 U.S.C. § 102(b) ....................................................................................................................... 14

# I.    PRELIMINARY STATEMENT

Defendants Paramount Pictures Corporation, Steven Spielberg, DW Studios L.L.C.,

Viacom Inc. and United International Pictures, B.V. (the "Paramount Defendants") bring this

motion for partial summary judgment on the copyright infringement claims of plaintiff The

Sheldon Abend Revocable Trust ("Plaintiff") on the ground that there is no substantial similarity

of *protectable* elements between Plaintiff's short story and the motion picture *Disturbia*.[1]

Plaintiff's primary basis for alleging that *Disturbia* infringes upon the short story – that

Plaintiff owns a "situation" allegedly conceived by Cornell Woolrich – is belied by the fact that

general plot ideas are not protected by the Copyright Act.  Moreover, the plot of the short story is

not original to that work, but appears in prior works, including a story by H.G. Wells.  Equally

important, the Court need only look at the two works themselves to determine that Plaintiff's

claims are defective – Plaintiff's short story *It Had To Be Murder* (a.k.a. *Murder From A Fixed*

*Viewpoint;* a.k.a. *Rear Window*) (the "Short Story") and the movie *Disturbia* are so different in

expression that there is no basis for a finding of substantial similarity as a matter of law.

# II.    STATEMENT OF FACTS

## A.    Plaintiff's Claim For Copyright Infringement

Plaintiff's alleges the Paramount Defendants' movie *Disturbia* infringes Plaintiff's

copyright in the Short Story by Cornell Woolrich.  *See* First Amended Complaint ("FAC") ¶¶ 1,

23, 86-95.  Woolrich wrote the Short Story in 1942.  *Id.* at ¶ 23.  Plaintiff claims that *Disturbia*

and the Short Story "are essentially the same story as both emerge from a situation conceived

and created by Woolrich which constitutes the 'spring board' for the Disturbia Film."  *Id.* ¶ 86.

---

[1] This motion is directed only at Plaintiff's claims to the extent they are premised upon its short story, as opposed to the motion picture *Rear Window*.  *Compare* Brenner Decl., Ex. A, *with Id.*, Ex. B.  If necessary, the motion picture *Rear Window* will be the subject of a separate motion.

**B.**     **H.G. Wells' Short Story *Through A Window* (1895), And Other Pre-Existing Works**

The basic situation of a man, who is confined in some manner to his residence and while watching through his window, sees what he believes to be murder-related activity and is then jeopardized in his residence by the murderer (*i.e.*, the entire premise of the Short Story), pre-dates Plaintiff's 1942 Short Story. In H.G. Wells' short story *Through A Window*, published in 1895, the protagonist, Bailey, is confined to his home because something is wrong with his legs, which are bandaged, and he remains in an "idle capacity." Brenner Decl., Ex. C at 59, 65, 70 & 72. Because he "simply can't work," and although it can be "dull," he watches the world "in front of [his] window." *Id.* at 59-61. Bailey has developed "a wonderful eye for details," and he describes the many people he watches from his window, stating "I should never have thought I could take such an interest in things that did not concern me". *Id.* at 59-61.

One morning, while watching from his window, Bailey sees a murderer and then becomes threatened by that murderer. *Id.* at 64-65, 68, 70-73. As Bailey's housekeeper, "Mrs. Green," reports to him (she had been outside when she learned the news), a mad man has killed someone and stabbed others with a big knife, and is on the loose. *Id.* at 61-69. Shortly thereafter, the murderer climbs onto Bailey's balcony, but Bailey cannot flee because his legs are incapacitated. *Id.* at 70-71. Having no weapon with which to defend himself, Bailey grabs a medicine bottle. *Id.* at 71. As the murderer approaches with his knife, outsiders shoot the murderer. *Id.* at 72. Mortally wounded, the murderer still attempts to attack Bailey, who hits the murderer with the medicine bottle. *Id.* at 72-73. The murderer then dies. *Id.*

Other works pre-dating Plaintiff's Short Story also feature the juxtaposition of watching through a window and criminal activity. In Arthur Conan Doyle's 1903 *Sherlock Holmes* story "The Adventure of the Empty House," Sherlock Holmes and his assistant, Watson, conduct a stake-out of a building on the opposite side of the street. Brenner Decl., Ex. D at 456. From the

stake-out room, they watch through a window, trying to capture a dangerous criminal. *Id.*
Holmes advises Watson to get a better view and "draw a little nearer to the window, taking every precaution not to show yourself". *Id.* Ultimately, the criminal sneaks into the stake-out room (to Holmes' surprise), Holmes and the criminal struggle, Watson subdues the criminal by hitting him on the head with the butt of a gun, and the police arrive. *Id.* at 458.

In addition, the 1924 version of the *Arabian Nights* tale "The Story of Ali Baba and The Forty Thieves" involves a sequence where the heroine, a slave, surreptitiously watches out of a window in order to prevent a murder: "[S]he blew out the light and remained silent at the kitchen window to see what would happen" in the yard. Brenner Decl., Ex. E at 24 & 26.

Finally, the idea of voyeuristic watching through windows is not original to the Plaintiff's Short Story. For example, in *The Sand-Man*, a short story written by E.T.A. Hoffman (1776-1822), a young student voyeuristically watches his female neighbor through his window.[2]

## C.    Plaintiff's Short Story

The Short Story takes place over the course of four days, with adult Hal Jeffries telling the reader, in a first person narrative, the details of his thoughts and how he processed the clues to a murder. As he collects clues, Jeffries relates his entire thought process to the reader.

Hal Jeffries is incapacitated by a leg cast and is restricted to either a chair by his window or the bed in his bedroom. Brenner Decl., Ex. A at 1, 27. As the story begins, he has had the cast for a long time (the reader meets him less than 4 days from its removal). *Id.* Jeffries lives alone in an urban second-floor apartment room, which is miserably hot. *Id.* at 1, 22. His rear window faces a quadrangle of buildings and, bored, he watches a selection of neighbors. *Id.* at

---

[2] He could "by looking out of his window, see straight into the room where Olimpia often sat alone." Brenner Decl., Ex. F at 202-03. To get a clearer look at her, the young man used "a glass . . . that brought out things so clearly", and he "remained standing at the window [with] his gaze riveted unchangeably upon the divinely beautiful Olimpia." *Id.* at 203.

1-2. He interacts with none of them until he becomes curious about the activities of Lars

Thorwald, whose chronically ill wife appears to have disappeared. *Id.* 2-8. Jeffries

surreptitiously watches Thorwald from a fixed viewpoint – his bedroom window (notably, the

Short Story was titled *Murder From A Fixed Viewpoint*). *Id.* at 2-8, 13; *see also* FAC ¶ 23.

Thinking about the clues, Jeffries suspects that Thorwald has murdered his wife. Brenner

Decl., Ex. A at 2-9. Jeffries phones Inspector Boyne, an "old friend" and detective whom he has

not seen for years, and tells Boyne about his suspicions. *Id.* at 10-11, 15. Because Boyne has

"always valued [Jeffries'] opinion highly," Boyne "didn't question [his] reliability" and

immediately began a police investigation of Thorwald. *Id.* at 11-12. Boyne authorizes secretive

police approaches to Thorwald's apartment which turn up nothing incriminating. *Id.* at 11-13.

After a policeman locates a woman in the countryside who identifies herself as Mrs. Thorwald,

Boyne no longer believes that a murder has occurred. *Id.* at 14-15.

Undaunted in his belief, Jeffries embarks on a scheme to draw Thorwald out and obtain

more evidence of a murder. *Id.* at 15. First, Jeffries has his obedient servant of ten (10) years,

Sam, slip a provocative note under Thorwald's apartment door: "*What have you done with her?*"

*Id.* at 3, 15, 18. As Jeffries watches, Thorwald becomes visibly upset by the note and paces his

fourth floor apartment – a reaction which confirms to Jeffries that Thorwald is, in fact, "Guilty!"

*Id.* at 16. Thorwald's pacing coincidentally mimics those of a rental agent showing a renovated

place on the sixth floor of Thorwald's apartment building, suggesting a difference in the two

units Jeffries cannot quite pinpoint in his mind. *Id.* at 16-17 & 20.

In order to lure Thorwald out of his apartment, Jeffries telephones Thorwald and, under

the pretense of a blackmail scheme, agrees to meet him at a local park to discuss hush money.

*Id.* at 17-18. After Thorwald leaves for the meeting, Jeffries has Sam break into Thorwald's

apartment, not to investigate anything, but to make it look as though the place has been searched,

hoping that Thorwald would conclude that the blackmailer had searched the apartment and located evidence. *Id.* at 18-20. Sam obediently does as he is told, and then leaves Thorwald's apartment before Thorwald returns. *Id.* at 18-19. Thorwald returns, speaks to his blackmailer (Jeffries) on the telephone, and realizes that his blackmailer has found nothing. *Id.* at 20.

Trying to identify his blackmailer, Thorwald phones Jeffries and, apparently recognizing Jeffries' voice, seems to realize that Jeffries has been spying on him. *Id.* at 20-21. Shortly thereafter, Jeffries finally figures out that the difference between Thorwald's 4th floor apartment and the renovated apartment on the 6th floor was an "upward jump" in the 6th floor kitchen, because the floor had been raised for decorative effect. *Id.* at 2, 22, 25-26. Jeffries deduces that Thorwald had buried his wife's body in newly-poured cement in the kitchen floor of the 5th floor apartment, which was still being renovated. *Id.* at 25-26.

Jeffries attempts to telephone Inspector Boyne, but the line goes dead; Thorwald had entered Jeffries' building and cut the telephone line. *Id.* at 23. Jeffries realizes that Thorwald has come to kill him, but he is so incapacitated by his cast that he cannot "get up out of [his] chair." *Id.* Jeffries sets a clay bust on his shoulder and wraps himself in a rug to give the intruder a false target in the darkened room. *Id.* at 23-24. Falling for the ruse, Thorwald shoots the bust just as Boyne arrives. *Id.* at 24-25. Thorwald escapes through the window, drops two stories to the ground, climbs to the top of his own building, and shoots at Jeffries' window where Boyles and Jeffries are watching. *Id.* Boyne returns fire, striking Thorwald, who drops 6 stories to the ground, dead. *Id.* at 25. Just as Jeffries had deduced, Anna's remains are found interred in the kitchen floor of the renovated apartment on the fifth floor. *Id.* at 25-26.

Wrapping things up with Boyne, Jeffries speculates that Thorwald may have been poisoning his wife for some time, but hastily killed her after she caught him in the act. *Id.* at 26. Jeffries concludes that Thorwald caught a "break" – the cement on the renovated kitchen floor in

the fifth floor apartment had not yet hardened, providing an opportunity to hide the body. *Id.*
Next, Thorwald may have concocted a scheme to suggest that his wife had gone upstate. *Id.* at
26-27. Jeffries surmises that Thorwald was in love with another woman, who impersonated his
wife Anna when the police were investigating upstate. *Id.* at 26. Thorwald probably intended to
collect insurance on his wife, whose clothes would have been found, but not her body, in an
apparent suicide in an upstate lake. *Id.* at 26-27. In the end, a doctor arrives to remove Jeffries'
cast, ironically stating to Jeffries, "You must be tired of sitting there all day doing nothing." *Id.*

### D.     Defendants' Motion Picture, *Disturbia*

    *Disturbia* begins with a sequence set a year before the main events of the film. Teenager
Kale Brecht is enjoying a fishing trip with his father. The scene is idyllic – their relationship is
playful, and they genuinely appreciate each other. On the drive home, Kale is at the wheel when
a horrific accident takes his father's life. Brenner Decl., Ex. B, *Disturbia* at 00:01:00 – 00:05:33.
A year later, Kale is now a troubled and depressed teen. His Spanish teacher attempts to shame
Kale for not doing his homework by invoking Kale's father, and the 17-year old punches him in
the face. Days later, Kale is in court and, because this incident is his third run-in with the law, he
is sentenced to 3 months house arrest in his spacious suburban home in California. Kale is fitted
with an ankle bracelet that will summon the police if Kale moves beyond a 100-foot radius
around a monitor plugged inside his house. *Id.* at 00:05:45 – 00:09:33.

    Kale makes full use of his restricted world, moving from room to room and window to
window, going outside to the lawn, to the patio and to stand by the hedges. He initially takes to
the couch potato existence, occupying himself with videogames, iTunes, and TV in his room
until his mother – frustrated by his sloth – cuts them off. *Id.* at 00:10:23–14:20:20. Kale
grudgingly does chores and makes a sculpture made of Twinkies. *Id.* at 00:15:00–00: 15:48. He
is then drawn to the window by the arrival of new neighbors, specifically an attractive teenage

girl named Ashley. Concurrently, Kale makes his first neighborhood enemies when he finds a burning bag of excrement at the front door and runs down the street to chase after the younger kids who left it. This triggers Kale's ankle alarm; Officer Gutierrez – already hostile to Kale, since he is a cousin of the Spanish teacher Kale punched – arrives and cuffs him. Kale is warned that the next infraction will land him back in court. As a safeguard, Kale gives himself a visual cue by roping off the boundaries of his spacious yard with string. *Id.* at 00:16:20 – 00:21:17.

Back inside, Kale watches his various neighbors with binoculars – including the kids who left the burning excrement and a near-middle-age married couple, the husband of which is having an affair with the maid. Kale observes, dismissively and in passing, his neighbor Robert Turner, a man old enough to be his father. Kale and his Korean best friend Ronnie (a girl-crazy goofball character) also gaze at the attractive new neighbor, Ashley, swimming in her pool next door. *Id.* at 00:22:16 – 00:25:26. Kale then devises a scheme to meet Ashley by his outdoor mailbox, and their nascent romance begins. *Id.* at 00:25:30 – 00:27:13.

After seeing news reports about missing women in Texas and other towns, Kale notices that Turner's car fits the description of the car owned by the Texas serial killer. *Id.* at 00:13:15 – 00:14:00, 00:27:26- 00:27:47, 00:30:40 - 00:31:20. While outside, Kale hides and watches Turner through the fence that separates their properties. Kale and Ronnie spy on Ashley as she swims in her pool; she catches them and goes to Kale's room. Ronnie tells her that they are spying on Turner who may be the serial killer, and she agrees to join in a "stake out." Using surveillance equipment that Ronnie has taken from his uncle, the 3 teens begin to investigate Turner, albeit in a casual manner that involves eating pizza and a near romantic kiss between Kale and Ashley. *Id.* at 00:32:20 – 00:46:20. After the stake out, as Kale sees a redheaded woman struggling to leave Turner's house, the flash on Kale's video camera goes off inadvertently and Turner apparently sees him spying. Kale then sees what he believes to be the

redhead leaving Turner's house (which, we later learn, was Turner in a redhead wig). *Id.* at 00:47:50 – 00:50:20 & 1:32:05 – 1:32:07.

Later, Ashley has a pool party, which Kale jealously tries to ruin by blaring dated music out of his window. Ashley confronts him, and they kiss. While making out, they miss a scream and blood splattering across the inside of Turner's window. However, Ashley then sees Turner dragging a blue bag with blood on it to his garage. *Id.* at 00:55:05 – 1:02:50. The teenagers decide to investigate Turner's garage. As Ashley covertly follows Turner on a shopping trip, Ronnie enters Turner's other car to get the password for his garage door opener. Aware that he is being followed, Turner confronts Ashley in the store's parking garage, and frightens her with chilling sexual innuendo. Thereafter, Ronnie realizes that he left his cell phone in Turner's car. Wearing a video camera linked to Kale's computer, Ronnie then breaks into Turner's garage to retrieve his cell phone and look for the bloody blue bag. *Id.* at 1:02:05 – 1:11:20.

While inside the garage, Ronnie sees a blue bag: there is something decomposing inside. When Ronnie appears to panic that someone else is there and his video feed goes dead, Kale runs over to Turner's house with a baseball bat, and his ankle bracelet again summons Officer Gutierrez, who handcuffs Kale outside Turner's garage. Fearing for Ronnie, Kale desperately shouts that Turner is a "lying son of a bitch" and tells Gutierrez about the blue bag. Gutierrez reluctantly asks Turner for permission to look in the bag and inside the house. Turner agrees; the bag turns out to contain the remains of deer which Turner was disposing of, and Ronnie is not found in the house. *Id.* at 1:11:29 – 1:17:30.

Kale's mother goes to Turner's home to smooth things over and explains how Kale blames himself for his father's death. Meanwhile, Ronnie returns to Kale's home to play a practical joke on Kale, pretending to be dead in Kale's closet. Ronnie had just been hiding to avoid the police. Kale then watches the video Ronnie shot inside Turner's house, and notices the

face of a dead woman inside a grate. Concurrently, Turner attacks Kale's mother by slamming her head against the wall. Turner then arrives at Kale's house and hits Ronnie with Kale's bat (*i.e.*, Turner does not bring his own weapon). Turner then attacks Kale with the bat, but Kale narrowly evades the blow. Turner and Kale struggle throughout the house and in the front yard; Turner knocks Kale unconscious and drags him back into Kale's house. *Id.* at 1:18:00 – 1:24:12.

When Kale awakens, he is bound with duct tape, and Turner methodically tells him about his plan to set Kale up for slitting his mother's throat, and then make it look like Kale committed suicide. Ashley's just-in-time arrival at Kale's house results in a struggle which allows the teens to get to the roof and jump into Ashley's pool to escape Turner. *Id.* at 1:24:13 - 1:27:57.

Armed with hedge clippers, Kale hurries to Turner's house to find his mother. Inside, he discovers a dead woman in a vent, a pristine operating room and a macabre wall of mementoes from Turner's victims. Meanwhile, because Kale's ankle bracelet had summoned the police, Officer Gutierrez arrives and Turner breaks the officer's neck with his bare hands. As Kale searches the basement of the house, he falls about five feet into a subterranean pool filled with dead, bloated bodies. Hearing her muffled cries, Kale locates his mother, who is still alive but is tied up. He begins to free her as Turner arrives. A fight ensues, ending with Turner stabbed in the leg by Kale's mother and in the chest by Kale with the shears. Turner drops through old floorboards into the subterranean pool approximately five feet below that is filled with the bodies of Turner's victims. Although he does not move, it is unclear whether or not Turner is dead (or might return in a sequel). Kale and his mother walk out of Turner's house as the sound of police car sirens can be heard finally approaching from a distance. *Id.* at 1:27:58 – 1:36:39.

The next day, the police free Kale from his ankle bracelet early "for good behavior." Kale then exacts revenge on the young neighborhood pranksters by posing on the telephone as a satellite company employee, and alerting their mother that they are watching pornographic

content on television. Kale and Ashley then make out as Ronnie starts to videotape them. Kale gives Ronnie "the finger," and the movie ends. *Id.* at 1:36:40 – 1:39:11.

## III.    ARGUMENT

### A.    Standards For Copyright Infringement

In order to establish copyright infringement, a plaintiff must show that (1) it is the owner of a valid copyright, and (2) defendants copied elements of the copyrighted work which are both original and subject to copyright protection. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *Williams v. Crichton*, 84 F.3d 581, 587 (2d Cir. 1996); *Denker v. Uhry*, 820 F. Supp. 722, 728 (S.D.N.Y. 1992). The second prong of the test (copying) is itself separated into two elements – a plaintiff must show *both* that: (1) the defendant actually copied the plaintiff's work; and (2) the copying is illegal because a *substantial similarity* exists between the defendant's work and the protectable elements of the plaintiff's work. *Laureyssens v. Idea Group, Inc.*, 964 F.2d 131, 140 (2d Cir. 1992). Thus, even assuming that a plaintiff could show that the defendant actually copied its work, the plaintiff still must also show that the defendant's work bears *substantial similarity* to those elements in Plaintiff's work which are original and otherwise protected by the Copyright Act. *Id.* at 140-41; *Denker*, 820 F. Supp. at 728-29; *Williams*, 84 F.3d at 587; *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 48 (2d Cir. 1986).[3]

---

[3] The rationale for this rule is that "[n]ot all copying . . . is copyright infringement." *Feist Publ'ns, Inc.*, 499 U.S. at 361. Thus, even where the defendants do not contest access and actual copying, courts reject claims for copyright infringement on the basis of lack of substantial similarity. *Walker*, 784 F.2d at 52 (summary judgment based upon finding of no substantial similarity; assumed access and actual copying); *Arden v. Columbia Pictures Indus., Inc.*, 908 F. Supp. 1248, 1258 (S.D.N.Y. 1995) (finding no substantial similarity; defendants conceded access and actual copying); *Denker*, 820 F. Supp. at 728 (same); *Williams*, 84 F.3d at 587 (same).

In order to assess substantial similarity, courts employ the "ordinary observer" test,[4] and focus on the plot, theme, characters, dialogue, pace, mood, sequence, setting and total concept and feel of the two works. *Williams*, 84 F.3d at 588; *Arden*, 908 F. Supp. at 1260; *Risdon v. Walt Disney Prods.*, 1984 WL 1181 *3 (S.D.N.Y. 1984). This assessment "requires a side-by-side comparison of the relevant works." *Historical Truth Prods., Inc. v. Sony Pictures Entm't, Inc.*, 1995 WL 693189 *7 (S.D.N.Y. 1995). Simply because a work is copyrighted does not mean that every element of that work is protectable. *Well-Made Toy Mfg. Corp. v. Goffa Int'l Corp.*, 210 F. Supp. 2d 147, 160 (E.D.N.Y. 2002). Thus, before comparing the two works, the Court must filter out and disregard unprotectable elements, such as general plot ideas, "scenes a faire" (situations and incidents which flow naturally from a basic plot premise or which are standard in the treatment of a given topic)[5] and elements otherwise not original to the plaintiff's work. *Williams*, 84 F.3d at 588; *Walker*, 784 F.2d at 48; *Williams v. Chrichton*, 860 F. Supp. 158, 167 (S.D.N.Y. 1994); *Historical Truth.*, 1995 WL 693189 at * 7; *Boyle v. Stephens, Inc.*, 1998 WL 80175 *2 (S.D.N.Y. 1998); *Hogan v. DC Comics*, 48 F. Supp. 2d 298, 310-11 (S.D.N.Y. 1999) (concepts that flow predictably from the general plot idea are not protectable).

---

[4] When comparing a written work to a movie, the "ordinary observer" test considers "whether, in the eyes of the average lay observer, the [defendants'] works are substantially similar to the protectible expression in the [plaintiff's] works." *Williams*, 84 F.3d at 587. Where the work contains unprotectable elements, the ordinary observer's inspection "must be more 'discerning,' ignoring those aspects of a work that are unprotectible in making the comparison." *Laureyssens*, 964 F.2d at 141.

[5] Moreover, incidents, characters and settings which are standard in the treatment of a given topic are not protected. *Historical Truth Prods., Inc.*, 1995 WL 693189 at *7. Likewise, "'[s]tock' elements of a particular genre of fiction" are not protectable. *Id.* There are numerous examples of *scenes a faire*. *Williams*, 84 F.3d at 589 (electrified fences, automated tours, dinosaur nurseries and uniformed workers are "classic *scenes a faire* that flow from the uncopyrightable concept of a dinosaur zoo"); *Walker*, 784 F.2d at 50 ("[e]lements such as drunks, prostitutes, vermin and derelict cars would appear in any realistic work about . . . policemen in the South Bronx," and thus are unprotectable *scenes a faire*).

11

Once the unprotectable elements are filtered out, the court "must take care to inquire only whether the *protectible elements, standing alone,* are substantially similar." *Williams*, 84 F.3d at 588 (quotation omitted). The comparison of protectable elements must show "not just 'similarity,' but a 'substantial similarity,' and it must be measured at the level of the concrete 'elements' of each work, rather than at the level of the basic 'idea,' or 'story' that it conveys." *Idema v. DreamWorks, Inc.*, 162 F. Supp. 2d 1129, 1179 (C.D. Cal. 2001).

## B.     The Court May Find A Lack Of Substantial Similarity As A Matter Of Law

It is well-established that "a court may determine non-infringement as a matter of law on a motion for summary judgment, either because the similarity between two works concerns only '*non*-copyrightable elements of the plaintiff's work' . . . or because no reasonable jury, properly instructed, could find that the two works are substantially similar[.]" *Warner Bros., Inc. v. Am. Broad. Co.*, 720 F.2d 231, 240 (2d Cir. 1983); *Flaherty v. Filardi*, 388 F. Supp. 2d 274, 286 (S.D.N.Y. 2005). Courts within the Second Circuit have frequently dismissed copyright infringement claims at the summary judgment stage, and at the pleading stage, after comparing the works at issue and determining that there is no substantial similarity between them. *Williams*, 84 F.3d at 590-91 (affirming summary judgment; children's book featuring a dinosaur zoo was not substantially similar to the movie *Jurassic Park*); *Walker*, 784 F.2d at 46-47, 51 (affirming summary judgment based on lack of substantial similarity between book *Fort Apache* and movie *Fort Apache: The Bronx*); *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 977 (2d Cir. 1980) (affirming summary judgment based on lack of substantial similarity of protected material); *Flaherty*, 388 F. Supp. 2d at 279, 286 (finding no substantial similarity between plaintiff's screenplay and defendants' movie *Bringing Down the House*).[6]

---

[6] *See also Historical Truth*, 1995 WL 693189 at *7 & *13 (no substantial similarity between (footnote continued)

Summary judgment is particularly appropriate where, as here, the court has the respective literary and motion picture works before it, and can easily compare them and determine that the works are not substantially similar in protected expression. As courts have explained,

> In determining copyright infringement, the works themselves supersede and control contrary allegations and conclusions, or descriptions of the works as contained in the pleadings. . . . If after examining the works themselves, this Court determines that there is no substantial similarity, then the plaintiff here can prove no facts in support of his claim which would entitle him to relief[.]

*Boyle*, 1998 WL 80175 at *4 (quotation omitted); *Flaherty*, 388 F. Supp. at 283-84 ("The Court must resolve the copyright infringement question posed in the instant motion practice solely by comparing Plaintiff's screenplay and Defendants' finished movie."); *Kretschmer*, 1994 WL 259814 at *8 (stating "I have read plaintiff's work and viewed defendant's film, which is the best evidence of whether the two works are substantially similar"; finding no substantial similarity).

The instant case presents precisely the sort of situation where summary judgment has been repeatedly granted. As set forth below, a comparison of the elements of the Short Story and *Disturbia* makes clear that the works share no similarities which are protected by the Copyright Act, and are fundamentally dissimilar in expression.

---

plaintiff's script and defendant's movie *Universal Soldier*); *Arden*, 908 F. Supp. at 1249-50 (no substantial similarity between novel and film); *Hudson v. Universal Pictures Corp.*, 2004 WL 1205762 *4 (E.D.N.Y. 2004)(no reasonable jury could find a substantial similarity between the protected elements of the works); *Risdon*, 1984 WL 1181 at *3 (screenplay and movie *Tron* not substantially similar); *Kretschmer v. Warner Brothers*, 1994 WL 259814 *11 (S.D.N.Y. 1994); *Denker*, 820 F. Supp. at 736; *Zambito v. Paramount Pictures Corp.*, 613 F. Supp. 1107, 1112 (E.D.N.Y. 1985), *aff'd*, 788 F.2d 2 (2d Cir. 1985); *Smith v. Weinstein*, 578 F. Supp. 1297, 1303-04 (S.D.N.Y. 1984); *Davis v. United Artists, Inc.*, 547 F. Supp. 722, 727 (S.D.N.Y. 1982) (same); *Alexander v. Haley*, 460 F. Supp. 40, 44, 46 (S.D.N.Y. 1978) (same); *Fuld v. National Broad. Co.*, 390 F. Supp. 877, 883 (S.D.N.Y. 1975) (same); *see also Bell v. Blaze Magazine*, 2001 WL 262718 *4 (S.D.N.Y. 2001) (granting motion to dismiss copyright infringement claim based on lack of substantial similarity); *Boyle*, 1998 WL 80175 *4 & *6 (same).

**C.** **There Is No Substantial Similarity Between Any Protectable Elements In Plaintiff's Short Story and Defendant's *Disturbia***

    **1.** **There Is No Actionable Similarity In Plot**

        (a)    The Basic Plot Idea Is Not Protectable

"It is well settled that copyright law protects only plaintiff's particular expression of his ideas, not the ideas themselves." *Arden*, 908 F. Supp. at 1258; 17 U.S.C. § 102(b).[7]  As this principle is applied to literary works, general plot ideas of a work are not protected under the Copyright Act. *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 122 (2d Cir. 1930)(a plaintiff can have no "monopoly" over a general plot idea); *Arden*, 908 F. Supp. at 1259-60 (generalized plot ideas are not protected, "even if first conceived by plaintiff").

Courts in the Second Circuit have followed this principle of law for at least 78 years. In *Nichols*, the Second Circuit reviewed a copyright action in which the plaintiff alleged that the defendants' movie infringed the plaintiff's play. 45 F.2d at 120. The plots of each work featured "a quarrel between a Jewish and an Irish father, the marriage of their children, the birth of grandchildren and a reconciliation." *Id.* at 122. Writing for the court, Judge Learned Hand held that this similarity in plot constituted a mere general idea, not subject to copyright protection: "A comedy based upon conflicts between Irish and Jews, into which the marriage of their children enters, is no more susceptible of copyright than the outline of Romeo and Juliet." *Id.*

Simply put, no one can own a general plot idea for a story. *Davis*, 547 F. Supp. at 726 (no protection for plot "about the Vietnam War and its effects on people's lives, and . . . love triangles in which the betrayed member of the triangle commits suicide"); *Giangrasso v. CBS*,

---

[7] "The rationale for this rule [is]: 'To grant property status to a mere idea would permit withdrawing the idea from the stock of materials that would otherwise be open to other authors, thereby narrowing the field of thought open for development and exploitation.'" *Arden*, 908 F. Supp. at 1258 n.3 (citation omitted).

*Inc.*, 534 F. Supp. 472, 476 (E.D.N.Y. 1982) (plot of a live radio broadcast from a remote location being interrupted by a man with a gun – not protectable); *Midwood v. Paramount Picture Corp.*, 1981 WL 1373 at *1, *3 & *5 (S.D.N.Y. 1981) (plot idea of sheriff whose own posse and townspeople desert him and capitulate to outlaws, and sheriff's search for the outlaws – unprotectable); *Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1985) (plot of "criminal organizations that murder healthy young people, then remove and sell their vital organs to wealthy people in need of organ transplants" and "the adventures of a young professional who courageously investigates, and finally exposes, the criminal organization" – not protected because "[n]o one can own the basic idea for a story").

In light of *Nichols*, *Davis*, *Giagrasso*, *Midwood* and *Berkic*, the basic plot idea of a protagonist who, while confined in some manner to his residence, watches through his window and sees what he believes to be murder-related activity and who ends up being threatened by the murderer in his residence, is nothing more than a general plot idea. Such an idea cannot support Plaintiff's copyright infringement claim because Plaintiff can own no monopoly over this basic plot premise. When this basic plot premise is filtered out of the comparison between the Short Story and *Disturbia*, it is evident that Plaintiff's copyright claim fails as a matter of law. This motion should be granted on this ground alone.

Separately, Plaintiff's claim fails for the independent ground that copyright protection "extends only to those components of a work that are original to the author." *Boyle*, 1998 WL 80175 at *2. Thus, elements of a work are not protectable where they exist in "previously published fictional material." *Fuld*, 390 F. Supp. at 881-82; *Flaherty*, 388 F. Supp. 2d at 289 (alleged similarities were unoriginal and thus not protected); *Gal v. Viacom Intl, Inc.*, 518 F. Supp. 2d 526, 546-47 (S.D.N.Y. 2007) (allegedly similar story elements held unprotectable where they had appeared in third party works).

15

Here, the general plot idea in the Short Story is not original to Plaintiff's work. Indeed, 48 years *before* Plaintiff's Short Story was written, H.G. Wells employed the exact same premise in *Through A Window*, which featured the plot idea of a character, confined in some manner (leg injury) to his residence, watching through his window what he believes to be murder-related activity and being threatened in his residence by the murderer. Accordingly, under *Boyle*, *Fuld*, *Flaherty* and *Gal*, the Short Story's general plot premise is not protectable.

Moreover, elements of surreptitious, voyeuristic and investigative watching through a window are also not original to Plaintiff's work. These elements were featured in pre-existing works, including *Through A Window*, the Sherlock Holmes story "The Adventure of the Empty House," the ancient *Arabian Nights* tale "The Story of Ali Baba and The Forty Thieves and *The Sand-Man. See Supra* Part II, B. These elements are not protectable.

(b)     The Plots Of The Short Story And *Disturbia* Are Different In Expression

Where a general plot premise is given different expression in the works at issue, courts have found the works not to be substantially similar. In *Denker v. Uhry*, the court found no substantial similarity between plaintiff's novel and defendants' film *Driving Miss Daisy*, even though each work was "about an elderly, white Jewish person, who, in the face of advancing age and resulting loss of independence, requires the assistance of a black helper, and after initial resistance, develops a friendship with the helper." 820 F. Supp. at 730. Despite using the same generalized plot idea, the court found that the works were not substantially similar because "[b]eyond this level of abstraction, . . . the works are markedly dissimilar." *Id.*

Likewise, in *Arden v. Columbia Pictures Indus., Inc.*, the plaintiff claimed that the defendants' movie *Groundhog Day* infringed plaintiff's novel. 908 F. Supp. at 1249. Both works were "based on the same idea, a man trapped in a day that repeats itself over and over[.]" *Id.* The court ruled that "it is clear that the idea of a repeating day" is not protectable. *Id.* at

1259. The court also found that, even though both works told "the story of a man who experiences a repeating day," there was no substantial similarity between the works because they each "express[ed] that idea in very different ways" and the "differences in plot and structure far outweigh[ed] this general likeness." *Id.* at 1249-50, 1253, 1260 (quotation omitted).

Here, as set forth in Part II, C & D, above, the plots of the Short Story and *Disturbia* are radically dissimilar in expression. Beyond the skeletal idea of a character, confined in some manner to his residence, watching through his window what he believes to be murder-related activity and being jeopardized by the murderer, the expression and development of the plot idea in *Disturbia* bears little to no resemblance to the Short Story. Unlike the Short Story, among the *numerous* other differences in the storylines and sequences of events, Kale is not incapacitated by a leg injury, is not restricted to a bed or chair, is not physically confined to an apartment, is not constrained in his mobility, is not restricted to a single window, does not suspect that a wife has been murdered by her husband, does not have a detective friend, does not blackmail the suspected murderer, and is not saved by a police detective. Other differences include the fact that there is a romantic subplot in *Disturbia* (but not the short story), and Turner has ongoing, direct contact with Kale, his mom and Ashley throughout *Disturbia* (unlike the Short Story).

## 2. There Is No Similarity In Theme

General thematic concepts, and themes which follow from a basic plot situation, are not protectable. *Arden*, 908 F. Supp. at 1258; *Smith*, 578 F. Supp. at 1302; *Brown v. Perdue*, 2005 WL 1863673, *9 (S.D.N.Y. 2005). Here, there is no particular theme in the Short Story that is protectable. Indeed, to the extent any theme can be extracted from the Short Story – such as murdering one's wife for insurance money is bad – it is too general to be protectable and does not appear in *Disturbia*.

Unlike the Short Story, several themes appear in *Disturbia*. First, the theme of generational rift and youthful rebellion runs throughout the film. In a metaphor for aging Baby Boomers, a cautious, calm, older man who keeps a low profile, mows his lawn and speaks softly is undermined by a trio of loud Generation Y-ers, who are irresponsible (Kale's mother calls him irresponsible, Ronnie loses his phone and Ashley throws a pool party while her parents are away). Other examples of this theme include Kale's sarcasm to his mother, punching his teacher, making fun of older music, and using new technology to stymie the older Turner.[8]

Second, *Disturbia* is also a story about guilt, longing and redemption. Kale feels responsible for his father's death, and the movie follows his transformation from helpless self-pity to guardian angel. The troubled Kale longingly watches a father and son play baseball, and he is emotionally disconnected from his mother. Brenner Decl., Ex. B, *Disturbia* at 13:18-14:22, 15:59-16:17 & 20:44-20:52. He is redeemed only when he saves his mother's life.

### 3. There Is No Similarity In Characters

"Copyright law provides very limited protection to the characters presented in a creative work." *Jones v. CBS, Inc.*, 733 F. Supp. 748, 753 (S.D.N.Y. 1990); *Denker*, 820 F. Supp. at 734. "[O]nly a uniquely developed character with some degree of novelty is copyrightable." *Jones*, 733 F. Supp. at 753. Indeed, "[a] stock character or basic character type . . . is not entitled to copyright protection." *Hogan*, 48 F. Supp. 2d at 310; *Jones*, 733 F. Supp. at 753.

In addition, shared general traits between characters do not give rise to a viable infringement claim, especially where those "traits are expressed through dissimilar details."

---

[8] There is a rebellious, sarcastic quality in the exchanges between Kale and adults, such as when Detective Parker warns Kale not to go beyond his electronic fence and he replies, "Or else what? The execution squad shows up?" or Kale's mother asks him to clean up and he replies, "Let me just check my schedule." Brenner Decl., Ex. B, *Disturbia* at 00:09:23 & 00:13:52.

*Arden*, 908 F. Supp. at 1261 & 1261 n.4. For example, in *Warner Bros. Inc. v. American Broad. Cos., Inc.*, the Second Circuit held that defendants' superhero character was not substantially similar to "Superman" as a matter of law, even though the defendant's character had superhuman speed and strength, the ability to fly, was impervious to bullets, used his superpowers to fight villains, wore a costume that was a tight-fitting leotard with a chest insignia and a cape, and used well-known lines of dialogue that were associated with Superman. 720 F.2d at 237 & 243. The court reasoned that the defendants' superhero character "looks and acts" different from Superman as a matter of "overall perception". *Id.* at 243. The court explained that "[s]tirring one's memory of a copyrighted character is not the same as appearing to be substantially similar to that character, and only the latter is infringement." *Id.* at 242.

Likewise, in *Arden*, the court found that two main characters were not substantially similar even though both men were trapped in a day that kept repeating itself, were bachelors in their thirties, both pursued love interests and both were chauvinistic and self-centered. 908 F. Supp. at 1249 & 1261. First, the court held that such "superficial similarities" do not reach the level of copyrightable expression. *Id.* Second, the court explained that "[d]espite these shared general traits," the characters were fundamentally different personalities. *Id.* at 1261.[9]

In the Short Story, the characters are described only by the written word and bear virtually no resemblance to the characters of *Disturbia*. First, the protagonists are different. The Short Story's Hal Jeffries is an enigma; the reader does not know his profession, and although he can move only from bed to chair in his bedroom because he is in a leg cast, the story does not say

---

[9] Moreover, in *Hogan*, the court found no substantial similarity between two main characters who were each a half-human, half-vampire named "Nicholas Gaunt," and each appeared to be in his early 20's, had thin-to-medium builds, pale skin, dark messy hair and a slovenly appearance. 48 F. Supp. 2d at 300, 311-13. The court reasoned that, when examined in detail, each character looked different in appearance and interacted with other characters differently. *Id.* at 312.

how he came to be that way. Jeffries is an adult, and has an old friend who is a homicide detective. Jeffries has an obedient servant of 10 years, Sam, who does as he is told without requiring an explanation. Jeffries lives in a place that still has the belongings of others.

In sharp contrast, Kale is a troubled teenager, who has had problems with the law several times in the year since his father died, and is placed under house (and yard) arrest for punching a high school teacher. Kale has a temper and is reckless, shown not only in punching a teacher, but also chasing young pranksters down the street, having confrontational run-ins with the police, openly yelling accusations at a serial killer, and charging into the killer's basement. The story follows Kale's transformation from helpless self-pity (he feels responsible for his father's death) to redeemed hero who saves his mother's life and stops a serial killer. Kale enjoys videogames and iTunes, liked to fish with his father, and watches reality television. Even though under house arrest, Kale freely moves from room to room, goes outside, runs down the street and even goes into the serial killer's house.

Second, the antagonists of the works are starkly dissimilar characters. The Short Story's Lars Thorwald is an unemployed adult who has an unhappy marriage. Dark-haired, and of Scandinavian ancestry, he schemes to poison his wife (apparently for insurance money). Judging from his heavy drinking, chain smoking, pacing, and constantly checking the windows of neighbors, his wife is likely the only person he has ever killed.

*Disturbia's* Robert Turner is the portrait of cool confidence. The light-haired Turner is a serial killer who murders redheads and preserves their bodies. Turner had resided in Austin, Texas, and killed women there. He drives 2 cars, including a 1960's era Ford Mustang, wears an ear stud – a visual hint that he's not exactly the quiet square he seems to be – and is unmarried. He is strong; he breaks a police officer's neck with his bare hands. He is the kind of serial killer who has become a popular movie staple thanks to films like *Silence of the Lambs*.

Third, the supporting characters are markedly different in the two works. The Short Story features Sam, who has been Jeffries' servant for many years. He is obedient and deferential, using the formal "Mr. Jeff" with his boss, and accepting "none of your business" as an explanation to a question. Sam is apparently superstitious, worried that a chirping cricket means "death." No similar character appears in *Disturbia*.

The supporting characters of *Disturbia* include Kale's parents and teenagers Ashley and Ronnie. Ashley is an attractive teen girl who is not happy to be relocated to suburbia. She has dysfunctional parents, and becomes romantically involved with Kale. Ashley knows the party scene (she recognizes club wristbands worn by one of Turner's victims), and she crawls onto her roof to read books. Ronnie is Kale's friend of Korean ancestry, a social equal and girl-crazed goofball. He is obsessed with the "Maui chicks" he met on vacation, and is a practical joker. Kale's mother is a widow and realtor. She is unable to draw her son from his self-imposed shell. Kale's father is a writer, a gentle and thoughtful man who dies tragically at the beginning of the film. The Short Story has no counter-parts remotely similar to these supporting characters.

### 4. There Is No Similarity Of Dialogue

"Aside from the substance of the stories of the two works, the dialogue is an important basis of comparison." *Risdon*, 1984 WL 1181 at *3 (finding no infringement as a matter of law where there was "no similarity whatever between the dialogue" in the two works at issue).

Neither the language of the Short Story nor the dialogue spoken by the characters therein contains any language of an original nature that appears in *Disturbia*.

### 5. There Is No Actionable Similarity In Pace

The Short Story takes place in just under 4 days. The streamlined narrative moves with no subplots. The Thorwalds are introduced as early as the second page. In contrast, the time span covered by *Disturbia* is over a year. Apart from the prologue set a year earlier, there is no

indication of how many weeks are covered by the main part of the movie. For example, between the time we meet Ronnie and he shows up again, he has been to Hawaii on vacation. Brenner Decl., Ex. B, *Disturbia* at 00:22:54. The movie takes its time developing the characters in the neighborhood, thus creating a multi-tiered narrative. Unlike the Short Story, antagonist Turner is not even mentioned, and then only in passing, until the 25-minute mark, and it is nearly a third of the way into the film before Kale suspects that Turner might be a killer. Unlike the Short Story, *Disturbia* contains subplots, including Kale's new romance with Ashley, Kale's crushing sadness over the loss of his beloved father, Ashley's troubled existence with her parents, and Kale's feud with young prankster neighbors. In sum, the pace of the two works is different.

### 6.     There Is No Actionable Similarity In Mood

The general elements of suspense, thrills and murder are not original to the Short Story, and are not protectable. *See*, *supra*, Part II B (identifying prior art involving these moods).

Moreover, the moods are expressed quite differently in the Short Story and *Disturbia*. The mood of the Short Story is claustrophobic and impersonal. Hal Jeffries is stuck in an oppressive, sweltering apartment, within which he can move only a few feet (between his bed and a chair). Little is revealed about the characters themselves, and the Short Story presents a world effectively unplugged. There are no newspapers, magazines or radios in Jeffries' apartment, media which were present in 1942.

*Disturbia* is a blend of a traditional "teen-angst" melodrama (driven by the crushing sadness of a teenager who has lost his father), along with the genres of a thriller, teen romance and teen comedy. The events of the film become deeply disturbing and menacing. Kale is deeply wounded by the loss of his father, and the audience is deeply disturbed by the graphic nature of the film (*e.g.*, bloated bodies of Turner's victims). In contrast to the Short Story's unplugged and claustrophobic world, television, computers, video cameras, videogames,

videophones, cell phones, a garage door opener, the ankle bracelet and digital technology are indispensable elements in *Disturbia*. Moreover, Kale often moves about his house and outdoors.

### 7.    **There Is No Similarity Of Setting**

The Short Story is located in a city. Hal Jeffries never physically interacts with the exterior world so we know little about it beyond the quadrangle. The protagonist informs the reader about only those parts of the quadrangle that are visible from the "Fixed Viewpoint" of his one bedroom window. Jeffries' apartment is miserably hot and insect-infested when the light is on at night. Except that it is on the second floor of a stoop house, we are told little about the place. Jeffries' apartment is not truly his home. The few objects which the narrator describes – books and a bust – belonged to a previous tenant. Brenner Decl., Ex. A at 23.

*Disturbia* is set in the affluent California suburb of Springdale. Instead of merely looking at the neighborhood, Kale interacts with it physically (*e.g.*, running down the street chasing young hooligans and running to Turner's house). Ashley's swimming pool figures prominently: she swims in it, hosts a party around it, and she and Kale are saved by it in their leap from his roof. There are exterior street scenes, a courtroom, a classroom, a river, a mountain road, a store, a parking garage, and the ghoulish interior of Turner's home. Kale lives in what is clearly more than just a house: it is his home. The remnants of warmth are strewn about: family photos, the father's untouched office-cum-shrine, and Kale's room personalized with posters of rock groups.

### 8.    **The Total Concept And Feel Of The Two Works Is Substantially Dissimilar**

The total concept and feel of a literary work is comprised of the way an author selected, coordinated and arranged the elements of his or her work, taking into consideration the mood, details and characterization. *Feist*, 499 U.S. at 358; *Reyher v. Children's Television Workshop*, 533 F.2d 87, 91-92 (2d Cir. 1976); *Brown*, 2005 WL 1863673 at *10 (holding that works were different in total concept and feel, even though both were "mystery thrillers"). Here, the works

in question share no similarity of expression, each one creating a look and feel unique to that work. Indeed, as set forth above, the works are palpably different in plot, theme, characterization, dialogue, mood, pace, sequence and setting.

The Short Story is a brief detective story, told in a first-person narrative format. The narrative is succinct, with no subplots and sparse dialogue. In contrast, *Disturbia* has many moving parts: Kale's relationships with his father, his mother and teacher; Kales' depression; his romance with Ashley; the new friendship of Kale, Ashley, and Ronnie; Ashley's existence with her parents and their infidelity; the tentative friendship of Turner and Kale's mother; the punitive actions of Officer Gutierrez; Kale's feud with young neighbors; and Turner's serial killing.

Finally, unlike the Short Story, *Disturbia* has a uniquely youthful feel. Because *Disturbia* is largely about teens who interact with adults, the interactions among characters are decidedly youthful: *e.g.*, the rebellious sarcasm Kale doles out to his mother and to Detective Parker, Ashley teasing Kale that he has "that whole Martha Stewart thing going on" vis-a-vis his house arrest, Ronnie jokes about the Spanish word *quizás* sounding like "kiss ass," Kale complaining that his mother is "like the warden from 'Shawshank,'" the use of colloquial phrases like "check this out" and "gnarly," and Ronnie making fun of the dated music coming from Kale's computer: "My dad likes this song, by the way." Brenner Decl., Ex. B, *Disturbia* at 00:06:00, 00:09:23, 00:13:52, 00:14:29, 00:26:36; 00:39:10 – 00:39:35, 00:45:15.

**D.  Plaintiff's List Of Alleged Random Similarities Scattered Throughout The Works Is Inaccurate, Exaggerated And Cannot Support A Finding Of Substantial Similarity**

Lists of random similarities scattered throughout the works are not probative of substantial similarity, and are disfavored as "inherently subjective and unreliable." *Williams*, 84 F.3d at 590-91 ("trivial, scattered details" and lists of scattered similarities "cannot support a finding of substantial similarity"); *Litchfield v. Speilberg*, 736 F.2d 1352, 1356 (9th Cir. 1984) (lists of random fragments of scenes are not probative of substantial similarity); *Historical Truth*,

1995 WL 693189, at *13 (unwilling to credit plaintiff's list of alleged similarities, and noting that "plaintiff's list of similarities rests on misrepresentations about the two works and on uncopyrightable ideas and scenes-a-faire"); *Morris v. Wilson*, 189 F. Supp. 565, 567 (S.D.N.Y. 1960) (371-page chart of "similarities" held "strained, forced or non-existent").

Illustrating why selective lists are disfavored, Plaintiff's chart of alleged "similarities" (as set forth in paragraph 87 of its FAC) fails to distinguish between protectable and nonprotectable elements of the Short Story and contains numerous misstatements and exaggerations regarding the details of both works. For example, "similarities" no. 5, 13-14, 30, 33, 40 and 47 recite purported events which do *not* occur in the Short Story. "Similarities" no. 8, 17-18, 24, 26, 28-30, 37, 40, 57 (unclear in movie), and 59-60 recite purported events which do *not* occur in *Disturbia*. "Similarities" no. 4, 12, 18, 22-23, 27-29, 31, 34-35, 41-44, 46-48, 51-56, 58, and 60-65 are different even on the face of Plaintiff's own descriptions. Moreover, many of the alleged "similarities" constitute unoriginal and thus unprotectable elements,[10] are scenes a faire,[11] or are at best unprotected, generalized ideas which bear totally different expressions in the works.[12]

## IV. CONCLUSION

For the foregoing reasons, the Paramount Defendants respectfully request that the Court grant their motion for partial summary judgment.

LAW OFFICES OF SCOTT GOLDFINGER     WHITE O'CONNOR FINK & BRENNER LLP

Dated: March 25, 2009     By: _____s/Lee S. Brenner_____
                              Attorneys for the Paramount Defendants

---

[10] *See* FAC, ¶ 87, Alleged "Similarities" no. 1-3, 7, 16, 20, 21-22, 29, 32, 35, 43, 45-48, 51, 57. For example, the idea of a phone line being cut by the antagonist is far from original to the Short Story. Brenner Decl., ¶¶ 12 & 13; *see also Id.*, Exs. I & J, Prior Works With Those Elements.

[11] *See* FAC, ¶ 87, Alleged "Similarities" no. 2-3, 7, 11, 22, 25, 32, 35, 42-43, 45-47, 51-52, 57.

[12] *Id.*, Alleged "Similarities" no. 1-3, 7, 9, 11, 16, 18-21, 25, 32, 36, 38-39, 45-46, 51, 56, 62.