**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE SHELDON ABEND REVOCABLE TRUST, | : |
| | : |
| Plaintiff, | :   Case No.: 08-CIV-7810 (LTS)(JCF) |
| | : |
| vs. | : |
| | : |
| STEVEN SPIELBERG; DW STUDIOS, LLC | :   **SECOND AMENDED COMPLAINT FOR**: |
| (formerly known as DREAMWORKS, LLC); | : |
| PARAMOUNT PICTURES CORPORATION; | :   [1] **COPYRIGHT INFRINGEMENT** |
| VIACOM, INC.; UNITED INTERNATIONAL | :       (17 U.S.C. §§ 101 ET SEQ.); |
| PICTURES, B.V.; PARAMOUNT HOME | : |
| ENTERAINMENT, INC.; DREAMWORKS | :   [2] **CONTRIBUTORY COPYRIGHT** |
| HOME ENTERTAINMENT; MONTECITO | :       **INFRINGEMENT** |
| PICTURE COMPANY, LLC; COLD SPRING | : |
| PICTURES, LLC; UNIVERSAL PICTURES | :   [3] **VICARIOUS COPYRIGHT** |
| INTERNATIONAL, GmbH, and DOES 1-10, | :       **INFRINGEMENT** |
| | : |
| Defendants. | :   **DEMAND FOR JURY TRIAL** |
| | : |

Plaintiff, The Sheldon Abend Revocable Trust (hereinafter "Plaintiff"), by and through its

attorney of record, hereby alleges as follows:

## NATURE OF THIS ACTION

1.    Plaintiff brings this action to enforce Plaintiff's exclusive copyright and contract

rights.  This case arises out of Defendants' exploitation of a motion picture entitled "Disturbia"

(hereinafter "*Disturbia"* and/or the "infringing work"), which is derived from Plaintiff's

copyrighted work, an original short story by Cornell Woolrich entitled *Rear Window* (hereinafter

the *Rear Window* story).  *Disturbia* is also derived from the film work "*Rear Window*" (hereinafter

the *Rear Window* film), a work derivative of the *Rear Window* story and licensed by Plaintiff.

Plaintiff is the owner of copyrighted material embodied in the *Rear Window* film.  Defendants do

not possess any derivative motion picture rights to the *Rear Window* story or, upon information and

belief, to the *Rear Window* film.

2.      What the Defendants have been unwilling to do openly, legitimately, and legally, the Defendants have done surreptitiously, by their back-door use of the *Rear Window* story without paying compensation.  The production of the infringing *Disturbia* is the latest in an on-going pattern of behavior by major motion picture studios, and their predecessors, who on numerous occasions in the past utilized the *Rear Window* story without securing rights and paying compensation.  In multiple rounds of litigation during the 1970's, 1980's and 1990's, extending all the way to the United States Supreme Court (*see Stewart v. Abend*, 495 U. S. 207, 110 S. Ct. 1750 (1990)), the predecessors of Universal City Studios, LLLP have been required to acknowledge Plaintiff's rights in and to the *Rear Window* story and the *Rear Window* film resulting in, *inter alia*, the payment of compensation in order to obtain grants of rights in and to the *Rear Window* story.  *Id.* at pp. 1753-1755.

3.      Media interviews[1] with persons involved in *Disturbia* demonstrate that Defendants wanted to "remake" the *Rear Window* film:

| | |
|---|---|
| (1) SHIA LABEOUF (star of *Disturbia*): "The creation of this movie came from a conversation between [director] Caruso and [Steven] Spielberg.  Caruso wanted to skew toward a young audience and Spielberg wanted to revamp *Rear Window*." | Molly Woulfe<br>The Times nwi.com<br>*All grown up, Shia spouts off on 'Disturbia'* |
| (2) D.J. CARUSO (Director of *Disturbia*): "I didn't want to copy it or rip it off.  I just wanted to admire it in a reverential way." | Christine Champagne<br>Windows Version 2007<br>Filmjournal.com<br>*Disturbia Blends Teen Desire & Suspense in Rear Window-esque thriller* |

---

[1] *See* Exhibit A, Composite of Interviews.

(3) D.J. CARUSO: "Obviously, Rear Window was a big inspiration,' Caruso acknowledges. 'I embraced it instead of running away from it.'"

Bob Strauss
<u>Los Angeles Daily News</u>
*Looking Out the 'Rear Window'*

## JURISDICTION AND VENUE

4.      This is an action for copyright infringement and permanent injunctive relief under the United States Copyright Act, 17 U.S.C. §§ 101 et seq. (hereinafter, "the Copyright Act").

5.      This Court has original subject matter jurisdiction pursuant to the Copyright Act, 17 U.S.C. §101 et seq., 28 U.S.C. §1331 (federal question jurisdiction), and §1338(a) and (b) (jurisdiction over copyright actions), and §1332 as an action between citizens of different states with an amount in dispute exceeding $75,000.00.

6.      This Court has personal jurisdiction over the Defendants in that Defendants are conducting business in the State of New York and in this district, directly or through agents.  *See* N.Y. C.P.L.R. §301.  All Defendants have transacted business within New York and contracted to supply goods or services in New York in connection with the matters giving rise to this suit.  Id. § 302(a)(1).  Defendants have also committed infringing acts outside of New York causing injury to the Plaintiff in New York, and Defendants regularly conduct or solicit business in New York, and/or expect or should reasonably expect their infringing conduct to have consequences in New York where they derive substantial revenue from interstate commerce.  Id. §302(a)(3); N.Y.U.D.C. §404.

7.      Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. §§1391(b) and (c) and/or 1400(a).  Upon information and belief, each Defendant may be found in this district and/or has principal places of business in this district and/or a substantial part of the acts of infringement complained of herein occurs or has occurred in this district.

## PARTIES

8.     Plaintiff, The Sheldon Abend Revocable Trust (hereinafter "Plaintiff" and/or the "Trust"), owns property in the State of New York, conducts its primary business within this district in the State of New York, and has its principal places of business in the State of New York and the State of Florida.  The Trust is the successor copyright proprietor of the *Rear Window* story.

## I.  The Paramount Defendants

9.     Upon information and belief, Defendant Steven Spielberg (hereinafter "Spielberg" or with others collectively "Defendants" and/or "Paramount Defendants") is a resident of and/or owns real property in this district in the State of New York, and is upon information and belief, an owner and president of DW Studios, LLC (formerly known as DreamWorks, LLC), which is a wholly owned subsidiary of Defendants Paramount Pictures Corporation and Viacom, Inc., which is registered to, and conducts business in, this district in the State of New York.

10.    Upon information and belief, Spielberg controlled, directed and benefited from the infringing behavior of the other Defendants, their affiliates, subsidiaries, and third party distributors, and is an agent and/or employee of DW Studios, LLC, Paramount Pictures Corporation, and Viacom, Inc.

11.    Upon information and belief, Defendant DW Studios, LLC (formerly known as DreamWorks, LLC) (hereinafter "DreamWorks" or with others collectively "Defendants" and/or "Paramount Defendants") is a limited liability company organized and existing under the laws of the State of Delaware, is owned and controlled by Spielberg, and is registered to conduct business in the State of New York as a foreign limited liability company; and DreamWorks is a wholly owned subsidiary of Defendants Paramount Pictures Corporation and Viacom, Inc, and operates, owns, and controls other DreamWorks entities, including DW Films LLC, DreamWorks SKG,

DreamWorks Pictures, DW Studios Productions, LLC, DreamWorks Home Entertainment, and other foreign subsidiaries and affiliates. DreamWorks has an office in, and conducts business in, this district in the State of New York. On or about December 3, 2008, the Paramount Defendants informed Plaintiff that DreamWorks, LLC had changed its name to DW Studios, LLC.

12.     Upon information and belief, Defendant Paramount Pictures Corporation (hereinafter "Paramount" or with others collectively "Defendants" and/or "Paramount Defendants") is a corporation organized and existing under the laws of the State of Delaware, that Paramount owns, controls, and/or has equity interest in DreamWorks, that it is registered to do business in, conducts business in and maintains a business office in, this district in the State of New York; and that Paramount is a wholly owned subsidiary of Defendant Viacom, Inc., which is registered to, and conducts business in, this district in the State of New York.

13.     Upon information and belief, Defendant Viacom, Inc. (hereinafter "Viacom" or with others collectively "Defendants" and/or "Paramount Defendants") is a corporation organized and existing under the laws of the State of Delaware, and it owns, controls, and/or has equity interest in DreamWorks, Paramount, their subsidiaries, affiliates, and other distribution servicing and/or third party entities, including, but not limited to, Paramount Home Entertainment, Inc. and Viacom Global (Netherlands), B.V.; and Viacom has its principal place of business in this district in the State of New York.

14.     Upon information and belief, Defendant United International Pictures, B.V. (hereinafter "UIP" or with others collectively "Defendants" and/or "Paramount Defendants"), a joint venture owned and controlled by Viacom, the ultimate parent company, which is registered to, and conducts business in, this district in the State of New York. UIP was formed for the purpose of producing, financing, and distributing in international territories selected theatrical motion pictures

which were developed, produced, manufactured, and marketed in and from the United States.  UIP is the majority shareholder and predecessor to Universal Pictures International, GmbH (hereinafter "UPI Germany").

15.    Upon information and belief, UIP conducts business in this district in the State of New York directly and through UIP's owners, principals, and agents of the Paramount Defendants, and has distributed motion pictures produced by DreamWorks since 1997 pursuant to a distribution agreement.   UIP has common ownership with, and their activities are interrelated with, the Paramount Defendants, specifically Viacom. There is financial dependency on Viacom, and Viacom's, Paramount's, and DreamWorks' control is pervasive, including approval rights and control over marketing and operational policies, and any purported corporate separation is merely formal and technical.  The Paramount Defendants bear joint and several liability for the obligations of UIP as an affiliate/subsidiary and/or principal to lenders, and for domestic and foreign taxes on the earnings of domestic and foreign affiliates/subsidiaries, and the financial position and results of the domestic and foreign operations are consolidated with the agent/parent.

16.    Upon information and belief, Paramount Home Entertainment, Inc. (hereinafter referred to as "PHE" or collectively with others "Defendants" and/or "Paramount Defendants") is a corporation organized and existing under the laws of the State of Delaware, is a wholly owned subsidiary of Viacom, and operates in association with Paramount and DreamWorks having its principal place of business in New York at the same address as Viacom of 1515 Broadway, New York, New York, and conducts business in the State of New York.  The Paramount Defendants and PHE have a parent-subsidiary relationship and the parent company, Viacom, is within this Court's jurisdiction.

17.    Further, upon information and belief, Plaintiff alleges that PHE is a distribution arm

of Viacom and the Paramount Defendants, and receives a share of the sales and/or profits from the domestic and international distribution of DVDs of the infringing work (*Disturbia*).

18.     Upon information and belief, PHE is an alter-ego, mere department, or both principal and agent of the Paramount Defendants, specifically Viacom, as there is common ownership; there is financial dependency on Viacom, and Viacom's control is pervasive, including control over marketing and operational policies, and any purported corporate separation is merely formal and technical.   The subsidiary is financially dependent on the parent, the parent interferes with the selection and assignment of personnel and the parent exercises control over the subsidiary's marketing and operational policies.   Thus, the parent company, Viacom, bears joint and several liability for the obligations of the affiliate/subsidiary and/or principal to lenders, and for domestic and foreign taxes on the earnings of domestic and foreign affiliates/subsidiaries, and the financial position and results of PHE's operations are consolidated with the agent/parent.

19.     Upon information and belief, the Paramount Defendants and PHE are components of a tightly-knit commercial organization of common owned entities and the New York entities perform all the business services that PHE could perform there by its own officials (i.e., the agent-parent entered contracts with third parties which benefitted and were binding on the foreign principal/affiliate/subsidiary).   The agent-parent acted for the benefit of, and with the knowledge and consent of, PHE, and its foreign principals, subsidiaries, and affiliates.   The actions taken by the agents and/or parents in this matter involve the development, production, manufacturing, distribution, and marketing of the infringing work.

20.     Upon information and belief, Defendant DreamWorks Home Entertainment (hereinafter "DHE" or with others collectively "Defendants" and/or "Paramount Defendants") is a corporation organized and existing under the laws of the State of Delaware, is a subsidiary of

Viacom, operates in association with Paramount and DreamWorks, and DHE conducts business in this district in the State of New York.  Thus, the Paramount Defendants and DHE have a parent-subsidiary relationship and the parent company, Viacom, is within this Court's jurisdiction.

21.     Further, upon information and belief, Plaintiff alleges that DHE is a distribution arm of DreamWorks and the Paramount Defendants, and receives a share of the sales and/or profits from the domestic and international distribution of DVDs of the infringing work (*Disturbia*).

22.     Upon information and belief, DHE is an alter-ego, mere department, or both principal and agent of the Paramount Defendants, specifically Viacom, as there is common ownership; there is financial dependency on Viacom, and Viacom's control is pervasive, including control over marketing and operational policies, and any purported corporate separation is merely formal and technical.  The subsidiary is financially dependent on the parent, the parent interferes with the selection and assignment of personnel and the parent exercises control over the subsidiary's marketing and operational policies.  Thus, the parent company, Viacom, bears joint and several liability for the obligations of the affiliate/subsidiary and/or principal to lenders, and for domestic and foreign taxes on the earnings of domestic and foreign affiliates/subsidiaries, and the financial position and results of the domestic and foreign operations are consolidated with the agent/parent.

23.     Upon information and belief, the Paramount Defendants and DHE are components of a tightly-knit commercial organization of common owned entities and the New York entities perform all the business services that DHE could perform there by its own officials (i.e., the agent-parent entered contracts with third parties which benefitted and were binding on the foreign principal/affiliate/subsidiary).  The agent-parent acted for the benefit of, and with the knowledge and consent of, the principal.  The actions taken by the agents and/or parents in this matter involve

the development, production, manufacturing, distribution, and marketing of the infringing work (*Disturbia*).

24.     Upon information and belief, Defendant, Montecito Pictures Company, LLC (hereinafter referred to as "Montecito" or collectively as "Defendants" and/or "Paramount Defendants") is a limited liability company organized and existing under the laws of the State of Delaware, and operates in association with, and is controlled by, Spielberg and DreamWorks, and conducts business in the State of New York.

25.     Upon information and belief, Montecito's owners and principals, Tom Pollock and Ivan Reitman, are credited as Executive Producers for the infringing work. *Variety*, a reputable entertainment industry publication, on March 20, 2009, recently reported that Montecito received half of the profits from *Disturbia* (*see* http://www.variety.com/article/VR1118001492.html).

26.     Further, upon information and belief, Montecito conducts business in this district in the State of New York directly and through Montecito's owners, principals, and agents who bear joint and several liability for the obligations of the Paramount Defendants to lenders and partners (i.e. Societe Generale and J.P. Morgan Chase) for the production, manufacturing, and distribution costs of *Disturbia*.

27.     Upon information and belief, Defendant, Cold Spring Pictures, LLC (hereinafter referred to as "Cold Spring" or collectively as "Defendants" and/or "Paramount Defendants") is a limited liability company organized and existing under the laws of the State of Delaware, and operates in association with, and is controlled by, Spielberg, DreamWorks, and Montecito, and has its principal place of business in Montecito, California and conducts business in the State of New York.

28.     Further, upon information and belief, Cold Spring conducts business in this district

in the State of New York directly and through Cold Spring's owners, principals, and agents who bear joint and several liability for the obligations of the Paramount Defendants to lenders and partners (i.e. Societe Generale and J.P. Morgan Chase) for the production, manufacturing, and distribution costs of *Disturbia*.

29.     Upon information and belief, Montecito formed and utilized Cold Spring to develop and co-finance the infringing work in exchange for a share of the copyright ownership, sales, and/or profits derived from the exploitation of the infringing work, both domestically and overseas.

30.     Upon information and belief, Universal Pictures International, GmbH (hereinafter "UPI" or with others collectively "Paramount Defendants"), a company incorporated in Germany, is jointly owned by Viacom subsidiary, Viacom Global (Netherlands) B.V., and Universal Pictures International, B.V. (Netherlands), and is a successor to UIP for which Viacom is the ultimate parent company.  UPI distributes *Disturbia* in Germany, and is controlled by Viacom, which is registered to do business in, and conducts business in, this district in the State of New York.

31.     Upon information and belief, UPI was formed for the purpose of distributing films (including *Disturbia*) produced and manufactured in the United States in Germany pursuant to a distribution agreement with the Paramount Defendants.

32.     Upon information and belief, UPI conducts business in this district in the State of New York directly and through UPI's and UIP's corporate parents, owners, principals, and agents, including Viacom and the Paramount Defendants, and UPI has distributed motion pictures produced by DreamWorks since 2004.  There is financial dependency by UPI on Viacom, and Viacom's control of UPI is pervasive, including control over marketing and operational policies, and any purported corporate separation is merely formal and technical.

33.     Upon information and belief, UPI conducts business in this district in the State of

New York directly and through UPI's owners, principals, and agents, including Viacom and the Paramount Defendants who bear joint and several liability for the obligations of the affiliate/subsidiary and/or principal to lenders, and for foreign taxes on the earnings of foreign affiliates/subsidiaries, and for the financial position and results of the foreign operations are consolidated with the agent/parent.

34.     Upon information and belief, Defendants Spielberg, DreamWorks, Paramount, Viacom, Montecito, Cold Spring, UIP, UPI, and the Paramount Defendants' affiliates are, and at all times material hereto were, the alter-egos of each other and there exists, and has existed at all times material hereto, a unity of interest in ownership among such Defendants such that any separateness has ceased to exist in that these Defendants, and/or each of them, used assets of the other Defendants, and/or each of them, for its and/or their separate, individual purposes, and caused valuable assets, property rights and/or interests to be transferred to each other without adequate consideration.

35.     Upon information and belief, Defendants Spielberg, DreamWorks, Paramount, Viacom, Montecito, Cold Spring, UIP, PHE, DHE, UPI, and the Paramount Defendants' affiliates, and other foreign subsidiaries, affiliates, and agents unknown at this time, at all times material hereto, were principals and agents of one another, the alter-egos of each other, and a unity of interest and ownership among the Paramount Defendants, and their subsidiaries and affiliates, and the Paramount Defendants' affiliates, exists such that any separateness has ceased to exist; and the Paramount Defendants, and/or each of them, used assets of the other Defendants, and/or each of them, for its and/or their separate, individual purposes, and they transferred valuable assets, property rights and/or interests to each other without adequate consideration.

36.     Upon information and belief, Defendants Spielberg, DreamWorks, Paramount,

Viacom, Montecito, Cold Spring, UIP, PHE, DHE, UPI, and the Paramount Defendants' affiliates, and other foreign subsidiaries, affiliates, and agents unknown at this time, at all times material hereto, were principals and agents of one another, and at all times material hereto, were conducting business in the State of New York and this district for the purposes of N.Y. C.P.L.R. § 301, and/or have transacted business within the State of New York and/or contracted to supply goods or services in the State of New York in connection with the matters giving rise to this suit.  Id. § 302(a)(1).  These Defendants have also committed infringing acts outside of the State of New York causing injury to Plaintiff in the State of New York, and Defendants regularly conduct or solicit business in the State of New York, and/or derive substantial revenue from goods used or services rendered in the State of New York, and/or expect or should reasonably expect their infringing conduct to have consequences in the State of New York where they derive substantial revenue from interstate commerce. Id. § 302(a)(2) and N.Y. U.D.C. § 404.

## II.  The Universal Entities

37.     Upon information and belief, NBC Universal, Inc. (hereinafter "Universal") is owned by the publicly held General Electric Company (hereinafter "General Electric"), and is a New York corporation organized and existing under the laws of the State of New York, and has its principal place of business in this district in the State of New York.  General Electric is a New York Corporation with its principal place of business in this district in the State of New York.

38.     Upon information and belief, Universal Pictures Company, Inc. (hereinafter "Universal") is a wholly owned subsidiary of NBC Universal, Inc. and General Electric, and it is organized and existing under the laws of the State of Delaware, and it conducts business in, and maintains distribution and corporate offices in, this district in the State of New York, and is the successor to MCA, Inc. (a Delaware corporation) and Universal Film Exchange, Inc. (a Delaware

corporation).

39.     Upon information and belief, Universal City Studios, LLLP (hereinafter "Universal") is a wholly owned subsidiary of NBC Universal, Inc. and General Electric, and it is organized and existing under the laws of the State of Delaware, and conducts business in, and maintains distribution and corporate offices in, this district in the State of New York, and is the successor to MCA, Inc. (a Delaware corporation) and Universal Film Exchange, Inc. (a Delaware corporation).

40.     Upon information and belief, the fictitiously named Defendants captioned hereinabove as Does 1 through 10, inclusive, and each of them, were in some manner responsible or legally liable for the actions, damages, events, transactions and circumstances alleged herein.  The true names and capacities of such fictitiously named defendants, whether individual, corporate, associate, or otherwise are presently unknown to the Plaintiff and Plaintiff will amend this Complaint to assert the true names and capacities of such fictitiously named Defendants when the same have been ascertained.  For convenience, each reference herein to a named Defendant or to Defendants shall also refer to the Doe Defendants and each of them.

41.     Upon information and belief, each and all of the Defendants jointly and severally contributed to, and/or participated in, the infringing activity as set forth below and each Defendant was acting within the course and scope of employment, partnership and/or agency with the other, and each of the Defendants is jointly and severally liable for the injuries to Plaintiff.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

### I.  Plaintiff's Work: The *Rear Window* Story

42.     In 1942, author Cornell Woolrich (hereinafter "Woolrich" or "Author") wrote an original short story entitled "Murder from a Fixed Viewpoint," also known as "It Had To Be Murder," which is generally recognizable by the public as "*Rear Window*" (hereinafter collectively

"*Rear Window* story").

43.    Plaintiff is the successor copyright proprietor and the exclusive owner of the *Rear Window* story through the following chain of title:

a)  In or about January 1942, the *Rear Window* story copyright registration was issued to Popular Publications on behalf of the Author under number B-528177 (Ex. B – 1942 Copyright Registration).

b)  In or about April 1943, Popular Publications assigned all right, title, and interest in the *Rear Window* story back to the Author (Ex. C – 1943 Copyright Assignment).

c)  In or about May 1945, Woolrich assigned exclusive worldwide motion picture rights in the *Rear Window* story and five other short stories to B.G. DeSylva Productions, Inc. for the initial and renewal copyright terms.

d)  In or about 1953, actor James Stewart ("Stewart") and film director Alfred Hitchcock ("Hitchcock") formed a production company, Patron, Inc., which obtained the motion picture rights in the *Rear Window* story and in the treatment by Joshua Logan from DeSylva's successors in interest.

e)  In or about 1954, Patron, Inc., together with Paramount Pictures, the predecessor to the Paramount Defendants, produced, distributed, and exploited the motion picture "*Rear Window*" (the "*Rear Window* film"), which is based upon the *Rear Window* story.

f)  Woolrich died in September 1968 before he obtained the rights in the renewal term.  Woolrich died without a surviving spouse or issue.

g)  Woolrich left his literary properties (including the *Rear Window* story) to the Claire Woolrich Memorial Scholarship Fund, a trust administered by the Trustee, Chase Manhattan Bank ("Chase"), now J.P. Morgan Chase Bank, N.A., for the benefit of Columbia University.

h)  On or about December 29, 1969, Chase, as Executor of the Estate of Cornell Woolrich, renewed the copyright under number R475565 (Ex. D – 1969 Chase Copyright Renewal).

i)  As a result of an assignment in about October 1971 and other supplemental agreements in or about October 1971 and April 1983, Chase sold and assigned to Sheldon Abend, doing business as Author's Research Company (hereinafter collectively "Abend"), the exclusive rights in and to the *Rear Window* story.

j)  On or about April 26, 1972, the Assignment from Chase to Abend was registered in the United States Copyright Office, Volume 1446, pages 364-371 (Ex. E – 1972 Chase Assignment Registration to Abend).

k)  In about 1971, Stewart and Hitchcock authorized a nationwide television broadcast on the ABC network of the *Rear Window* film.

l)  In about 1974, Abend brought a copyright infringement action against Universal's predecessors, Stewart, Hitchcock, and MCA, Inc. in the Southern District of New York. The case was settled in 1976.

m) Upon information and belief, in about 1982, the copyright in the *Rear Window* film was renewed.

n)  Upon information and belief, in about 1983, Stewart and the Hitchcock co-trustees authorized Universal Pictures, a division of Universal City Studios, Inc. (Universal), to re-release the *Rear Window* film throughout the world.

o)  On or about April 10, 1984, Abend instituted an action for copyright infringement which resulted in a United States Supreme Court opinion dated April 24, 1990, which held that the continued exploitation of the *Rear Window* film without Abend's consent was

infringement and not a fair use.  *Stewart v. Abend,* 495 U. S. 207, 110 S. Ct. 1750, 1753, 1755 (1990).  The parties thereafter entered a settlement and licensing agreement.

p)  Abend died in August 2003, and on November 14, 2005, the *Rear Window* story was transferred by the Estate of Sheldon Abend to Plaintiff.  The Plaintiff is the successor copyright proprietor of the *Rear Window* story pursuant to an order by the Circuit Court of Palm Beach County, Florida Probate Division dated November 7, 2005 (Ex. F – Probate Court Order).

q)  A Certificate of Recordation was issued by the U.S. Copyright Office on December 13, 2005, number V3532 D706 P1-2 (Ex. G – Assignment to The Sheldon Abend Revocable Trust).

44.     Woolrich is a widely recognized author having written in excess of 200 short stories and 24 novels.  He has been called "the greatest writer of suspense fiction that ever lived" by Professor Francis M. Nevins, author and Woolrich biographer.  Francis M. Nevins, First You Dream, Then You Die vii (1988).  Woolrich died in New York City in about September 1968.  The Author's stature rivals and he is considered equal to writers like Dashiell Hammett and Raymond Chandler. Woolrich's literary works have been the subject of more than 30 motion pictures (including 6 which were made before the *Rear Window* film) and 100 television shows.

45.     The *Rear Window* story contains significant characters, scenes, themes, concepts, and expressions, separately and in combination, which, in absolute terms and in particular in the film industry, are specific, original, unique, novel, and were never commercially available or exploited in the film industry, except upon written permission from the Plaintiff.

46.     The *Rear Window* story contains elements that are combined and arranged in an original and copyright protectible manner.

47.     The *Rear Window* story and, upon information and belief, the *Rear Window* film

were registered in conformity with the provisions of the United States Copyright Act and all other applicable laws in the United States governing copyright.

## II.  Plaintiff's Licensee's Derivative Work: The *Rear Window* Film

48.     In or about 1953, Hitchcock obtained motion picture rights to the *Rear Window* story from the successor to B.G. DeSylva Productions, Inc.  Hitchcock produced and/or directed films based on various other ideas and works created and written by Woolrich, including: "The Big Switch" (1956), "Momentum" (1956), "Post Mortem" (1958), "The Black Curtain" (1962), and "4 o'clock" (1957).

49.     The *Rear Window* film was directed by Hitchcock from a treatment and final screenplay written in or about 1953 by screenwriter John Michael Hayes (hereinafter "Hayes") (hereinafter "*Rear Window* screenplay") which was based upon the *Rear Window* story.

50.     The *Rear Window* story, its structural spine, organization, format, back story, primary characters, plot, setting, theme, scenes, and total concept and feel are embodied in the *Rear Window* film.  Professor Francis M. Nevins, in his biography of Woolrich, states that the *Rear Window* film is "simply a translation of the story's material into visual terms." Francis M. Nevins, First You Dream, Then You Die 476 (1988).  In Nevins' introduction to a Woolrich collection, he states that Woolrich was "the supreme master of the art, the Hitchcock of the written word." Francis M. Nevins, Night and Fear v (2004).

51.     The United States Supreme Court stated that the *Rear Window* film expressly uses the *Rear Window* story's "unique setting, characters, plot, and sequence of events," and further that "the Court of Appeals determined that the story was a substantial portion of the motion picture." *Stewart v. Abend*, 495 U. S. 207, 110 S. Ct. 1750, 1754-1755 (1990).

52.     Upon information and belief, the *Rear Window* film screenwriter Hayes stated that

45% of the *Rear Window* screenplay and 50% of the value of the *Rear Window* film are attributable to the *Rear Window* story. The U.S. Supreme Court stated that, even if arguably less of the *Rear Window* story was used, "that does not mean that a substantial portion of the story was not used in the film." *Id.* at 1754-1755. On August 8, 1991, Hayes stated under oath:

> (a)   "I copied the background, the atmosphere [of the *Rear Window* story]. As much of every element of the story that I could was put into my treatment and screenplay."
>
> (b)   "And when I wrote it, wrote the screenplay that is, I had the story on my desk at all times and constantly referred to it."
>
> (c)   "I took a mystery that another man wrote and dressed it up, the way you'd dress up a Christmas tree when you bring it home… The mystery content of Rear Window [film] came from Cornell Woolrich."
>
> (d)   "I used everything I could from the story. After all, that's what we had bought and paid for, and I picked the bones of it as clean as I could."

53.   Upon information and belief, the *Rear Window* screenplay constitutes a registered work recorded in 1953 pursuant to the terms of the United States Copyright Act, and registration was renewed in 1988, number PAU: 2-306-980; and the *Rear Window* film's copyright was renewed in 1982, number RE0000137344/1954-01-01.

54.   The *Rear Window* film premiered on August 4, 1954 at the Rivoli Theater in New York City and was distributed by Paramount through 1983. The *Rear Window* screenplay was nominated for an Academy Award and the Writer's Guild nominated it for Best Drama of 1954. The *Rear Window* film was the fifth highest grossing film of 1954 and has been selected for the National Film Registry's and the American Film Industry's list of one hundred greatest movies.

55.   In 1974, Plaintiff's predecessor, Abend, filed suit in the Southern District of New York against Universal's predecessors (Universal City Studios, Inc., MCA, Inc., General Electric,

Hitchcock, and Stewart) when the *Rear Window* film was televised without Abend's consent.   A settlement was subsequently reached.

56.     Upon information and belief, on or about March 10, 1983, Stewart's and Hitchcock's successors entered into a distribution agreement with Universal's predecessor, Universal Pictures, a division of Universal City Studios, LLLP (a wholly owned subsidiary of MCA, Inc.), to distribute the *Rear Window* film; and Universal's exploitation of the *Rear Window* film is further governed by a license agreement between Universal and Hitchcock's successors and/or trustees.

57.     In 1984, Plaintiff's predecessor, Abend, again filed suit against Universal's predecessors (Hitchcock, Stewart, MCA, Inc., and Universal Film Exchange, Inc.) after they re-released the *Rear Window* film to theaters, television, and video.   Litigation ensued which resulted in the United States Supreme Court decision, *Stewart v. Abend*, 495 U.S. 207, 110 S. Ct. 1750 (1990), which held that the continued exploitation of the *Rear Window* film was infringement of the rights of Abend and such exploitation was not a fair use. *Id.* at pp. 1753, 1755.

58.     In 1984, Plaintiff's predecessor, Abend, communicated with Spielberg and Universal (the producer and distributor of Spielberg's films at that time) regarding licensing the *Rear Window* story for a remake of the *Rear Window* film for a television program Spielberg was producing entitled "Amazing Tales."   Spielberg and Universal declined to remake the *Rear Window* story at that time.

59.     In 1991, Plaintiff, via Plaintiff's predecessor, Abend, entered a settlement and license agreement with Universal's predecessor in interest, MCA, Inc., Stewart, and the trustees of the Hitchcock estate (hereinafter respectively referred to as "Settlement Agreement" and "License Agreement"), which, among other things, provided payment to Plaintiff for past and future use of the *Rear Window* story and which imposed conditions upon the license granted to Universal, and

expressly preserved, reserved, and/or granted Plaintiff various exclusive rights in the *Rear Window* story and in the *Rear Window* film, including Plaintiff's right to license the copyright in the *Rear Window* story (License Agreement, pp. 2-3).

60.     The License Agreement provides for Plaintiff's copyright ownership interest in the *Rear Window* story, and for Plaintiff's exclusive beneficial interest in the *Rear Window* film, and merely conveys to the Licensee (Universal) the non-exclusive right to exploit those elements of the *Rear Window* story that are embodied in the *Rear Window* film, whether or not copyright protectible (Id., p. 5).

61.     The License Agreement provides, inter alia, material inducements to Plaintiff and is subject to conditions imposed upon Universal as follows:

(a)     Plaintiff owns the exclusive right to adapt or copy the *Rear Window* story;

(b)     Plaintiff reserves all rights not specifically granted to the Licensee (License Agreement, p. 5);

(c)     Plaintiff owns theatrical rights to the *Rear Window* story subject to the Licensee's (Universal's) right to continued distribution and exploitation of the *Rear Window* story only to the extent as specifically expressed and embodied in the *Rear Window* film (Id., pp. 3, 4);

(d)     Licensee (Universal) is prohibited from modifying, or from producing a sequel to, or from making other works derivative of the *Rear Window* film under the License Agreement (Id., p. 4);

(e)     Licensee (Universal) may "continue to use said work (i.e. the *Rear Window* story) as embodied in said Film," but "no matter not included in the 1954 theatrical version may be added to the body of the Film" (Id., p. 5);

(f)     Conditions to, and restrictions and reservations upon Universal's use of ideas,

elements, and expressions embodied in the *Rear Window* film are exclusive to Plaintiff, and the ideas contained in the *Rear Window* story and as embodied in the *Rear Window* film are contractually protected by the terms of the License Agreement, whether or not the ideas are copyright protectable;

(g)     The License Agreement provides that such document would be made "a matter of record in the United States Copyright Office," and attached a "Short Form License Agreement" (Ex. H – Short Form License Agreement) which was recorded in the United States Copyright Office on March 12, 1992;

(h)     The License Agreement is binding upon "all persons or entities authorized by Licensee to exploit or assist in exploiting the Film" and requires that the *Rear Window* film continue to display the credit "Based on the Short Story by Cornell Woolrich" (License Agreement, p. 5); and

(i)     Universal expressly agreed that the *Rear Window* film would not be "distributed, exhibited, performed, or otherwise exploited any where during the three year period commencing November 1, 1996 and ending on October 31, 1999" to permit Plaintiff to exploit film adaptations of the *Rear Window* story (License Agreement, p. 6).

(j)     The Licensee's (Universal's) use of "certain dramatic and literary material" (the *Rear Window* story) is expressly made "subject to the terms and provisions of said License Agreement" (Ex. H - Short Form License Agreement, p. 2).

62.     Each public display of the *Rear Window* film and every DVD manufactured of the *Rear Window* film displays, or should display, a copyright notice advising the viewer that the motion picture is protected by copyright laws, and additionally, pursuant to the License Agreement, a notice that it is "Based on the Short Story by Cornell Woolrich."

63.     On May 12, 1992, Plaintiff and Universal entered an "Agreement for Settlement of Claim and Release" (hereinafter "2nd Settlement Agreement") which provided for additional payments to Plaintiff, and which granted to Universal the right to use excerpts from the *Rear Window* story and *Rear Window* film for display in the Hitchcock Exhibit at Universal Studio's Florida theme park (2nd Settlement Agreement, ¶ 2.5).  In 1995, Spielberg entered into a consulting agreement with Universal for the Universal theme parks, which is still in effect.

64.     In or about 1996, Abend, again communicated with Spielberg, DreamWorks, and Universal regarding licensing the *Rear Window* story for a remake of the *Rear Window* film.  Abend met with Spielberg's agent from the Creative Artists Agency and discussed casting Christopher Reeve in a remake of the *Rear Window* film.

65.     Spielberg and Universal declined overtures at that time to remake the *Rear Window* film, and on November 22, 1997, Plaintiff licensed the *Rear Window* story to RHI Entertainment, Inc. (Hallmark Entertainment) for a made for television movie entitled "*Rear Window*" for broadcast on ABC television, which starred Christopher Reeve and Darryl Hannah.  The television movie was originally broadcast on November 22, 1998.

66.     Plaintiff continues to license the *Rear Window* story and the *Rear Window* film to the extent of its interest therein.  Plaintiff has permitted the use of excerpts from the *Rear Window* story and, to the extent of its interest, in the *Rear Window* film at the recent Academy Awards ceremonies, for use in television awards, and in television productions under the auspices of the American Film Institute which celebrates various noteworthy and acclaimed motion pictures.

67.     The Paramount Defendant Viacom has solicited Plaintiff for grants of licenses for the use of clips from the *Rear Window* film.

68.     Plaintiff and Universal have mutually managed and exploited the *Rear Window* film

by jointly licensing clips from the *Rear Window* film, and by sharing royalties for the licensing of the *Rear Window* film.  Universal has utilized various subsidiaries for this purpose, including but not limited to, Universal City Studios, LLLP, Universal Studios Licensing, Inc., and Universal Pictures Corporation.

69.     Plaintiff and Universal have developed, and Plaintiff has come to expect and rely upon, a course of dealing whereby Universal has disclosed to, and referred to, Plaintiff opportunities and inquiries regarding mutual benefit from the licensure of *Rear Window* film clips and stills.

70.     Universal prepared and distributed a re-release of the *Rear Window* film in 2000 (the "Collector's Edition DVD")(Ex. I - DVD Jacket), with new subtitles, interviews, and re-release trailer narrated by Stewart.

71.     Upon information and belief, Universal prepared and distributed a re-release of the *Rear Window* film in October 2008.

### III.  The Infringing *Disturbia* Film

72.     Upon information and belief, in or about 2006, Spielberg conceived and developed an idea for a film now known as "*Disturbia*" which was in fact based upon the same expression and combination of concepts, ideas and expressions contained in the *Rear Window* story, and as such is embodied in the *Rear Window* film.

73.     Upon information and belief, the creation of *Disturbia* came from the desire by Spielberg, Montecito (specifically Joe Medjuck, Producer of *Disturbia*), Cold Spring, and Landon to re-make the *Rear Window* film for a younger audience.  Landon stated in an interview with author Anthony Kaufman of the film industry publication *Variety* published on June 21, 2007, that "Rear Window is one of my favorite films." (*see* http://www.variety.com/article/VR1117967383.html).

74.     The *Rear Window* story and *Rear Window* film are widely disseminated, and has been the subject of academic critiques and analyses, and have received great recognition in the literary and film industries.  The title (the name) "*Rear Window*" has achieved a significance and identification with the public and in the entertainment industry attaining a secondary meaning. Upon information and belief, all named Defendants had access to the *Rear Window* story and *Rear Window* film, and there is a reasonable possibility that all Defendants had an opportunity to view and/or copy the *Rear Window* story and *Rear Window* film.

75.     Upon information and belief, *Disturbia* is based upon the *Rear Window* story and the *Rear Window* film and this derivation is evidenced by interviews with persons involved in the *Disturbia* (Ex. A; and Ex. J – The Times interview of April 13, 2007 with Shia La Boeuf posted on nwi.com wherein La Boeuf states that "Spielberg wanted to revamp *Rear Window*").

76.     Production notes for *Disturbia* published on the DreamWorks website (www.disturbia.com) contain Montecito Producer Joe Medjuck's statement that "[a]ll films are essentially voyeuristic in some way… [b]ut there are some great ones that are actually about people observing, looking at things.  There's… Hitchcock's 'Rear Window'…"

77.     Upon information and belief, DreamWorks, Montecito, and Landon entered into an agreement in or about 2006 for Landon to assign a completed screenplay for *Disturbia* to DreamWorks and Montecito.

78.     Upon information and belief, Montecito then formed and utilized Cold Spring to develop, co-finance, manufacture, and distribute *Disturbia* in exchange for a share of the copyright ownership and sales and/or profits derived from the exploitation of *Disturbia* in the United States and in foreign territories.

79.     Upon information and belief, on August 6, 2006 Cold Spring registered a copyright

security agreement in *Disturbia* as registration number V3542D540 P1-8, and on April 13, 2007, DreamWorks, Cold Spring, and Montecito registered the copyright (number PA0001367903) of *Disturbia* wrongfully and illegally, as it embodies Plaintiff's previously copyrighted work.

80.     Upon information and belief, in or about 2006, Spielberg (a principal of DreamWorks), acting as Executive Producer of *Disturbia*, entered agreements with Paramount, Viacom, PHE, DHE, Montecito, Cold Springs, UIP, UPI, the Paramount Defendants' affiliates, Universal, and others in connection with the financing, domestic and foreign theatrical and DVD distribution, and further exploitation and marketing of *Disturbia*.

81.     Upon information and belief, with respect to the use, international theatrical distribution and exploitation rights in and to *Disturbia* in territories other than the United States, Spielberg, the Paramount Defendants, Montecito, Cold Springs, UIP, and UPI after committing acts (i.e. copying, reproducing, and manufacturing) in the United States for the purposes of international distribution, entered into, and derived revenue and profits from, license agreements, and/or distribution servicing agreements, and/or other third party agreements with UIP, UPI, and the Paramount Defendants' affiliates, and other controlled affiliates, licensee affiliates, sub-distributors, and other entities.

82.     Upon information and belief, during all times relevant to the claims herein, Universal, pursuant to Plaintiff's grants under the License Agreement, also distributed and exploited the *Rear Window* film, which embodies the *Rear Window* story, internationally via UIP, Universal's joint venture with Paramount.

83.     Upon information and belief, DreamWorks' films were produced and distributed by Universal prior to DreamWorks being purchased by Paramount and Viacom, pursuant to theatrical distribution agreements.

84.    Upon information and belief, the Paramount Defendants and Spielberg conducted approximately 800 test-screenings of the *Rear Window* film to measure its familiarity with members of the general public aged 25 years and younger for the purpose of strategic planning for the development and marketing of *Disturbia*.

85.    Upon information and belief, all Defendants knew, or should have known had they conducted reasonable, adequate or good faith investigation that, pursuant to Plaintiff's course of dealing with Universal and Paramount Defendant Viacom, and pursuant to the License Agreement and the Short Form License Agreement evidencing Plaintiff's copyright interests regarding the *Rear Window* story and the *Rear Window* film publicly recorded in the United States Copyright office, the rights to adapt, reproduce, perform, display, or to produce a film derived from the *Rear Window* story, or the *Rear Window* film, were clearly owned and controlled by Plaintiff and that use thereof required approval thereof.

86.    Upon information and belief, Universal by various means, expressly or tacitly, did tolerate and permit all the Defendants, and other third parties, to distribute *Disturbia* overseas.

87.    Upon information and belief, in or about March 2006, a revised screenplay was written (hereinafter "*Disturbia* screenplay").

88.    Upon information and belief, in or about 2006 the Paramount Defendants commenced principal photography of *Disturbia* in the United States.

89.    Upon information and belief, the filming of *Disturbia* was conducted by the Paramount Defendants utilizing Paramount's Stage 18, the same stage utilized in 1954 for the filming of the *Rear Window* film.

90.    Upon information and belief, all Defendants with knowledge and intent, participated in, contributed to, financed, developed, produced, manufactured, distributed, and exploited

*Disturbia* which was a derivative product of the *Rear Window* story and *Rear Window* film without properly securing consent, approval of, a grant, or license from the Plaintiff.

91.      Upon information and belief, none of the named Defendants made any effort to remove from the *Disturbia* screenplay or the *Disturbia* film copyrighted elements and material embodied in the *Rear Window* film derived from the *Rear Window* story, and as embodied in the *Rear Window* film, and these acts, failures, and omissions constitute a reckless disregard of Plaintiff's rights and interests.

92.      In or about April 2007, a Universal lawyer spoke with Plaintiff's representative to discuss the production of *Disturbia* and, upon information and belief, the Universal lawyer also contacted Paramount and requested that Paramount provide trailers and/or a screening prior to the release of *Disturbia*.

93.      Upon information and belief, confidential discussions were conducted between Universal's lawyer and Plaintiff's representative regarding the infringement of the copyright in the *Rear Window* story and the *Rear Window* film, and what joint legal action to take.

94.      The attorney for Universal also informed Plaintiff's representative that Universal executives were interested in discussing alternatives to joint legal action, but that no legal action should be taken until after *Disturbia* was released to the public, with the result that Plaintiff's forbearance to protect its rights was induced.  Soon thereafter the Universal lawyer suddenly ceased communications with Plaintiff's representative.

95.      Upon information and belief, "DreamWorks LLC", the named author of *Disturbia*, according to an April 13, 2007 Certificate of Registration, assigned a portion of its interest to Cold Spring.

96.      Upon information and belief, in or about April 2007, the Paramount Defendants

began domestic theatrical distribution of *Disturbia*, in or about August 2007 began domestic and foreign DVD distribution, and foreign theatrical distribution, with the film credits in all advertising stating "Story by Chris Landon."

97.    Upon information and belief, gross revenue (box office, DVD, domestic and foreign sales, etc.) for *Disturbia* exceeds $150,000,000.00.

98.    The Paramount Defendants commercially advertised *Disturbia* utilizing ads and posters similar to the advertising for the *Rear Window* film which depict the protagonist spying on neighbors through binoculars (Ex. K - Promotional Posters and Promotional Stills for *Disturbia* and the *Rear Window* film).

99.    Upon information and belief, on April 13, 2007, a Certificate of Registration was issued for "*Disturbia*," with the "copyright claimant" and the "name of the author" listed as "DreamWorks, LLC" (number PA0001367903); and such registration of *Disturbia* is wrongful and illegal as it violates and infringes upon the rights and interests of the Plaintiff in connection with the *Rear Window* story, and as embodied in the *Rear Window* film, without Plaintiff's consent.

100.    Upon information and belief, all Defendants, including Spielberg, DreamWorks, Paramount, Viacom, Montecito, Cold Spring, UIP, PHE, DHE, and UPI, as well as Universal and General Electric, their executives and their representatives, were in possession of, and shared with each other, knowledge of Plaintiff's rights under the License Agreement; and in or about 2007 and 2008 DreamWorks, while still owned by Paramount and Viacom, Spielberg and representatives of Universal, including General Electric, held confidential meetings in New York City to negotiate a purchase of DreamWorks by Universal for the purpose of resuming their business endeavor of financing, producing and distributing films, at which time all Defendants were further informed about *Disturbia* and the License Agreement.

101.   Upon information and belief, DreamWorks, in or about October 2008, attempted to resume a business relationship with Universal.

102.   Upon information and belief, each and all of the Defendants directly infringed the *Rear Window* story and the *Rear Window* film, and they knew, or should have known, of the infringing acts of each of the other Defendants, and they materially participated in, and contributed to the infringement.

103.   All Defendants, including Spielberg, DreamWorks, Paramount, Viacom, Montecito, Cold Spring, PHE, DHE, UIP, and UPI are liable for contributory infringement in that they knowingly caused, induced and/or materially contributed to the infringing acts of parties with whom they had a direct connection, and/or distribution servicing agreements, and/or third party service agreements including, but not limited to, DreamWorks, Paramount, Viacom, UIP, PHE, DHE, Montecito, Cold Spring, UPI, and the Paramount Defendants' affiliates.

104.   Cold Spring is liable for contributory infringement in that it knowingly caused, induced and/or materially contributed to the infringing acts of domestic and foreign parties with whom it had a direct connection, namely Spielberg, DreamWorks, Paramount, Viacom, UIP, PHE, DHE, Montecito, Cold Spring, UPI, and the Paramount Defendants' affiliates.

105.   Montecito is liable for contributory infringement in that it knowingly caused, induced and/or materially contributed to the infringing acts of domestic and foreign parties with whom it had a direct connection, namely Spielberg, DreamWorks, Cold Spring, Paramount, Viacom, UIP, UPI, and in that DreamWorks, Paramount, Viacom, UIP, PHE, DHE, Montecito, Cold Spring, UPI, and the Paramount Defendants' affiliates, and others induced Landon to write and revise the infringing *Disturbia* screenplay.

106.   PHE is liable for contributory infringement in that it knowingly caused and/or

materially contributed to the infringing acts of domestic and foreign parties with whom it had a direct connection, namely DreamWorks, Paramount, Viacom, UIP, PHE, DHE, Montecito, Cold Spring, UPI, and the Paramount Defendants' affiliates.

107.   DHE is liable for contributory infringement in that it knowingly caused and/or materially contributed to the infringing acts of parties with whom it had a direct connection, namely Spielberg, DreamWorks, Paramount, Viacom, UIP, PHE, DHE, Montecito, Cold Spring, UPI, and the Paramount Defendants' affiliates.

108.   Spielberg, DreamWorks, PHE, DHE, Montecito, Cold Spring, Paramount, Viacom, UIP, and UPI are vicariously liable for copyright infringement as they had the right and the power to control both directly and pursuant to distribution servicing agreements and/or third party service agreements, including those related to foreign territories, the activities of each and all Defendants, as well as the infringing activities of UIP, UPI, and the Paramount Defendants' affiliates, and others, and these Defendants received a direct financial benefit, financial advantages, and/or other economic consideration from the infringing activities. Thus, all Defendants are liable for foreign profits resulting from the copyright infringement in the United States.

109.   The Paramount Defendants, specifically Viacom and Paramount, are both principals and agents for their subsidiaries PHE, DHE, UIP, and UPI, and their producers, Montecito and Cold Spring, as much of the product exported to, and marketed by the Paramount Defendants' affiliates and subsidiaries is derived from all Defendants' activities in the United States, specifically, development, production, reproduction, printing, manufacturing, and marketing.

110.   Upon information and belief, agreements were entered into between the agent-parent Defendants and their foreign subsidiaries, affiliates, and distributors which created principal-agency relationships.

111.    Upon information and belief, Viacom and Paramount, as agents, principals and parents of foreign affiliates, including UIP and the Paramount Defendants' affiliates, entered contracts which were binding on their foreign affiliates, including contracts for distribution and are liable for the foreign profits of these foreign affiliates for their copyright infringement.

112.    The Paramount Defendants' foreign affiliates, including UIP and UPI induced, participated in, and contributed to, acts of copyright infringement in the United States, namely the adaptation and reproduction of copyrighted material in the United States preliminary to its publication and/or distribution abroad.

113.    Upon information and belief, Universal did not curtail, stop, or enjoin Defendants and others from infringing upon Plaintiff's rights and interests in the *Rear Window* story, and as embodied in the *Rear Window* film, or take any legal action, but instead, concealed information in their possession and induced Plaintiff's inaction to protect their rights.

114.    Upon information and belief, the acts of copyright infringement complained of herein occurred in whole or in part within the United States which resulted in foreign profits in the following countries, including, but not limited to: Germany, Italy, Mexico, New Zealand, Norway, Spain, Sweden, UK, Netherlands, Japan, Serbia, Montenegro, Bosnia, Herzegovina, France, Australia, Argentina, Singapore, Switzerland, Belgium, Algeria, Monaco, Morocco, Tunisia, South Korea, and Mexico.

115.    All Defendants, by their actions, failures, and omissions, constitute competitors with Plaintiff for the exploitation of remakes, sequels, or adaptations of the *Rear Window* story and/or the *Rear Window* film.

116.    *Disturbia* and the *Rear Window* story are essentially the same story as both emerge from a situation conceived and created by Woolrich which constitutes the "spring board" for

*Disturbia*.

117.    An analysis of the *Disturbia* screenplay and *Disturbia* reveals expressions of ideas, the compilation of ideas, a concrete pattern or sequence of events, and scenes that are substantially similar to those contained in the *Rear Window* story and as embodied in the *Rear Window* film. Some of the similarities between the *Rear Window* story, the *Rear Window* film, and *Disturbia* include:

## PLOT

| *Rear Window* story (1942)[2] | *Rear Window* film (1954)[3] | *Disturbia* (2007)[4] |
|---|---|---|
| 1. Protagonist (Hal Jeffries "Jeff") is a single male confined to apartment after an accident. | Protagonist (L.B. Jefferies "Jeff") is a single male confined to apartment after an accident. | Protagonist (Kale Brecht) is a single male confined to house arrest after fight with teacher. |
| 2. Boredom induces him to voyeuristic behavior from his window using spyglass. | Boredom induces him to voyeuristic behavior from his window using binoculars & telephoto lens. | Boredom induces him to voyeuristic behavior from his window using binoculars & video camera. |
| 3. From his upstairs room, he can view the windows of his neighbors and he becomes a peeping Tom obsessed with the seemingly mundane daily activities of his immediate neighbors. | From his upstairs room, he can view the windows of his neighbors and he becomes a peeping Tom obsessed with the seemingly mundane daily activities of his immediate neighbors. | From his upstairs room, he can view the windows of his neighbors and he becomes a peeping Tom obsessed with the seemingly mundane daily activities of his immediate neighbors. |
| 4. He suspects one neighbor/the Antagonist (Thorwald) has killed a woman and hidden her body in his apartment. | He suspects one neighbor/the Antagonist (Thorwald) has killed a woman and hidden her body in his apartment. | He suspects one neighbor/the Antagonist (Turner) has killed women and hidden their bodies in his home. |

---

[2] Page citations are to the *Rear Window* story as it appears in <u>The Best American Mystery Stories</u> published by Houghton, Mifflen Co. © 2000.
[3] Page citations are to the *Rear Window* screenplay.
[4] Page citations are to the *Disturbia* screenplay.

| *Rear Window* story (1942)[2] | *Rear Window* film (1954)[3] | *Disturbia* (2007)[4] |
|---|---|---|
| 5.  Antagonist is seen dragging heavy item presumed to be a body behind him. | Antagonist is seen dragging heavy item presumed to be a body behind him. | Antagonist is seen dragging heavy item (bag) presumed to be a body behind him. |
| 6.  N/A | Antagonist is seen gardening. | Antagonist is seen gardening. |
| 7.  Protagonist watches the Antagonist's windows and ducks out of the way to avoid being seen. | Protagonist watches the Antagonist's windows and ducks out of the way to avoid being seen. | Protagonist watches the Antagonist's windows and ducks out of the way to avoid being seen. |
| 8.  The Antagonist pulls down the shades. | The Antagonist pulls down the shades. | The Antagonist has metal shades installed. |
| 9.  The Antagonist learns he is being watched. | The Antagonist learns he is being watched. | The Antagonist learns he is being watched. |
| 10. N/A | Antagonist kills a small dog snooping around the garden. | Antagonist kills a rabbit hopping around the garden. |
| 11. Protagonist investigates the Antagonist using another character (houseman). | Protagonist investigates the Antagonist using another character (girlfriend & nurse). | Protagonist investigates the Antagonist using another character (girlfriend & friend). |
| 12. Antagonist's gun flashes and lights up dark room. | Protagonist uses camera flashes on Antagonist as a signal and lights up dark room. | Protagonist's video camera flashes while watching Antagonist and lights up dark room. |
| 13. Protagonist's investigative assistant (Sam) invades the Antagonist's apartment & almost gets caught by Antagonist. | Protagonist's investigative assistant (Lisa) invades the Antagonist's apartment to search for evidence and gets caught by Antagonist. | Protagonist's investigative assistant (Ronnie) invades the Antagonist's car and home to search for evidence and appears to get caught by Antagonist. |
| 14. Danger and suspense build as the Antagonist confronts the assistant and the confined Protagonist. | Danger and suspense build as the Antagonist confronts the assistant and the confined Protagonist. | Danger and suspense build as the Antagonist confronts the assistant and the confined Protagonist. |

| Rear Window story (1942)[2] | Rear Window film (1954)[3] | Disturbia (2007)[4] |
|---|---|---|
| 15. The police are called but find nothing when they search the Antagonist's apartment. They do not believe the Protagonist's suspicions. | The police are called but find nothing when they search the Antagonist's apartment and trunk. They do not believe the Protagonist's suspicions. | The police are called but find nothing when they search the Antagonist's home. They do not believe the Protagonist's suspicions. |
| 16. The Antagonist violently confronts the Protagonist and attempts to kill him. | The Antagonist violently confronts the Protagonist and attempts to kill him. | The Antagonist violently confronts the Protagonist and attempts to kill him. |
| 17. The police arrive in time to save the Protagonist and determine that the Antagonist is indeed a killer (body buried in cement in his apartment). | The police arrive in time to save the Protagonist and determine that the Antagonist is indeed a killer (body parts buried in the garden behind his apartment). | The police arrive in time to save the Protagonist and determine that the Antagonist is indeed a killer (bodies are buried in the basement in his home). |
| 18. The Antagonist is killed after a fall (he is shot). | The Antagonist is apprehended after the Protagonist's fall (he is almost shot). | The Antagonist is killed after a fall (he is shot in the *Disturbia* screenplay and stabbed in the *Disturbia* film). |
| 19. Protagonist vindicated. | Protagonist vindicated. | Protagonist vindicated. |

**MOOD**

| Rear Window story (1942) | Rear Window film (1954) | Disturbia (2007) |
|---|---|---|
| 20. Suspense Thriller/ Murder Mystery | Suspense Thriller/ Murder Mystery | Suspense Thriller/ Murder Mystery |

**CHARACTERIZATION**

| Rear Window story (1942) | Rear Window film (1954) | Disturbia (2007) |
|---|---|---|
| 21. Protagonist, Hal Jeffries ("Jeff"), is a confined single male | Protagonist, L.B. Jefferies ("Jeff" a photo journalist), is a confined single male<br>*James Stewart* | Protagonist, Kale Brecht (young student), is a confined single male<br>*Shia LaBeouf* |

| _Rear Window_ story (1942) | _Rear Window_ film (1954) | _Disturbia_ (2007) |
|---|---|---|
| 22. Protagonist's assistant in the investigation: Sam (houseman) | Protagonist's assistants in the investigation: Lisa Carol Fremont (girlfriend) and Stella (nurse)<br><br>_Grace Kelly_<br>_Thelma Ritter_ | Protagonist's assistants in the investigation: Ashley (girlfriend) and Ronnie (best friend)<br><br>_Sarah Roener_<br>_Aaron Yoo_ |
| 23. Antagonist is a neighbor suspected of killing a woman: Lars Thorwald | Antagonist is a neighbor suspected of killing a woman: Lars Thorwald<br><br>_Raymond Burr_ | Antagonist is a neighbor suspected of killing women: Giles Turner<br><br>_David Morse_ |
| 24. Protagonist has a close relationship with the police: Inspector Boyne (detective) | Protagonist has a close relationship with the police: Tom Doyle (detective)<br><br>_Wendell Corey_ | Protagonist has a close relationship with the police: Parker<br><br>_Viola Davis_ |
| 25. The _Rear Window_ neighbors<br>• newlywed couple ("jitter couple") | The _Rear Window_ neighbors<br>• newlywed couple<br>• sunbathers<br>• Miss Torso (ballet exercises)<br>• Neighbors with small dog | The _Rear Window_ neighbors<br>• married couple<br>• sunbathers (Ashley)<br>• Ashley (yoga exercises)<br>• Neighbor with small dog on electric collar |

## PACE

| _Rear Window_ story (1942) | _Rear Window_ film (1954) | _Disturbia_ (2007) |
|---|---|---|
| 26. Action over several days. | Action over several days. | Action over several days. |

## SETTING

| _Rear Window_ story (1942) | _Rear Window_ film (1954) | _Disturbia_ (2007) |
|---|---|---|
| 27. Apartment<br>New York City | Apartment<br>Greenwich Village | Suburban home<br>Springdale, WI |

| _Rear Window_ **story (1942)** | _Rear Window_ **film (1954)** | _Disturbia_ **(2007)** |
|---|---|---|
| 28. Upstairs window is the primary viewpoint<br><br>"The bay window was about the best feature my rear bedroom had in the warm weather" (p. 288) | Upstairs window is the primary viewpoint<br><br>"The summer air is motionless and heavy with humid heat." The opened windows "brought the neighborhood into sweltering intimacy" (p. 1) | Upstairs window is the primary viewpoint<br><br>"Ah... the sights and sounds of summer" (p. 17)<br><br>Kale: "I mean there's so much structure to it, so many layers, but it's invisible if you're not looking close enough."<br>Ronnie: "What are you talking about?"<br>Kale: "The world right outside that window." (p. 24) |

## SEQUENCE OF EVENTS
(List of underlined scenes taken from _Rear Window_ Collector's Edition DVD of the _Rear Window_ film, scenes released by Universal 2006.)

| _Rear Window_ **story (1942)** | _Rear Window_ **film (1954)*** | _Disturbia_ **(2007)** |
|---|---|---|
| 29. The Plaster Cocoon<br><br>Protagonist confined in cast | The Plaster Cocoon<br><br>Protagonist confined in cast | The Plaster Cocoon<br><br>Protagonist confined to house arrest by monitoring device |
| 30. Stella's Advice<br><br>Sam's advice about spying on neighbors | Stella's Advice<br><br>Nurse's advice about spying on neighbors | Stella's Advice<br><br>Mother/ Julie's advice about spying on neighbors |
| 31. Lisa (Sam)<br><br>Protagonist's houseman equivalent to Lisa | Lisa<br><br>Protagonist's girlfriend | Lisa (Ashley )<br><br>Protagonist's girlfriend |
| 32. Meet the Neighbors<br><br>Spying on daily activities of immediate neighbors | Meet the Neighbors<br><br>Spying on daily activities of immediate neighbors | Meet the Neighbors<br><br>Spying on daily activities of immediate neighbors |

| _Rear Window_ story (1942) | _Rear Window_ film (1954)* | _Disturbia_ (2007) |
|---|---|---|
| 33. <u>Mismatched Lives</u><br><br>Viewer "meets" different neighbors | <u>Mismatched Lives</u><br><br>Viewer "meets" different neighbors | <u>Mismatched Lives</u><br><br>Viewer "meets" different neighbors |
| 34. <u>All Through the Night</u><br><br>Jeff witnesses Thorwald's strange behavior at night. Jeff becomes suspicious. | <u>All Through the Night</u><br><br>Jeff witnesses Thorwald's strange behavior at night watching him leave and enter the apartment several times. Jeff becomes suspicious.  He hears Thorwald leaving his apartment carrying a sample case in the middle of the night.<br><br>Jeff  : "He went out several times last night in the rain carrying his sample case. He was taking something out the apartment.  I'm certain." (p. 56) | <u>All Through the Night</u><br><br>Kale witnesses Turner's strange behavior at night and then sees the dented fender. Kale becomes suspicious.  He hears Turner drive his vintage Mustang into the driveway and connects it to the news of the missing women. |
| 35. <u>The Watcher</u><br><br>The naked eye, then a spyglass<br><br>"… with the first brightening of day… I saw him standing there looking out." (p. 290) | <u>The Watcher</u><br><br>The naked eye, then binoculars & telephoto lens<br><br>The morning after the surveillance, Jeff first suspects Mrs. Thorwald is missing.  He sees Thorwald in his garden and watches Thorwald shoo away a small dog sniffing in his garden.<br><br>Jeff draws Stella into the mystery as they watch the next morning and talk about Thorwald. | <u>The Watcher</u><br><br>The naked eye, then binoculars & video camera<br><br>The morning after the surveillance, Kale sees a newspaper report of another missing woman.  He sees Turner in his garden and watches Turner strangle a rabbit he catches in his garden.<br><br>Kale draws Ronnie into the mystery as they watch the next morning and talk about Turner. |

| ***Rear Window* story (1942)** | ***Rear Window* film (1954)\*** | ***Disturbia* (2007)** |
|---|---|---|
| 36. Something's Wrong<br><br>Suspicion of woman's murder by neighbor<br><br>Jeff tells the police he believes Thorwald to be a murderer.  He tells the police the details he has seen so far.  The police are skeptical, but agree to investigate. | Something's Wrong<br><br>Suspicion of woman's murder by neighbor<br><br>Jeff tells Lisa he believes Thorwald to be a murderer.  He tells her the details he has seen so far.  Lisa is skeptical at first, but then becomes intrigued.  In the very next scene, Lisa has joined the investigation and is digging up information on Thorwald. | Something's Wrong<br><br>Suspicion of woman's murder by neighbor<br><br>Kale and Ronnie tell Ashley they believe Turner to be a murderer.  Kale tells her the details that he has seen so far.  Ashley is skeptical at first, but then becomes intrigued.  In the very next scene, Ashley has joined the investigation and is digging up information on Turner. |
| 37. Doyle Investigates (Boyne)<br><br>Skeptical cops called in | Doyle Investigates<br><br>Skeptical cops called in | Doyle Investigates (Cops)<br><br>Skeptical cops called in |
| 38. Eyes on Thorwald<br><br>Protagonist persists with suspicions | Eyes on Thorwald<br><br>Protagonist persists with suspicions | Eyes on Thorwald (Turner)<br><br>Protagonist persists with suspicions |
| 39. There's No Case<br><br>Cops check trunk & find nothing | There's No Case<br><br>Cops check trunk & find nothing | There's No Case<br><br>Cops check bag & find nothing |
| 40. *Rear Window* Ethics<br><br>Dialogue about the evils of voyeurism | *Rear Window* Ethics<br><br>Dialogue about the evils of voyeurism | *Rear Window* Ethics<br><br>Dialogue about the evils of voyeurism |
| 41. Message to a Murderer<br><br>Note to Antagonist:  "What have you done with her?" | Message to a Murderer<br><br>Note to Antagonist: "What have you done with her?" | Message to a Murderer<br><br>Protagonist accuses Antagonist directly in presence of cops: "So where's my friend then?" (p. 90) |

| *Rear Window* story (1942) | *Rear Window* film (1954)* | *Disturbia* (2007) |
|---|---|---|
| 42. <u>Lisa's Risk</u> (Sam's)<br><br>Sent by Protagonist to investigate killer<br><br>Jeff sends Sam over to Thorwald's apartment to disturb the room and get Thorwald to reveal something incriminating. | <u>Lisa's Risk</u><br><br>Sent by Protagonist to investigate killer<br><br>Jeff sends Stella and Lisa over Thorwald's fence so they can see what is buried in the flower bed.<br>Lisa gets into Thorwald's apartment and gets Mrs. Thorwald's wedding ring. | <u>Lisa's Risk</u> (Ronnie's)<br><br>Sent by Protagonist to investigate killer<br><br>Kale sends Ronnie over Turner's fence so he can retrieve the code for his garage door opener.  Ronnie gets into Turner's other car and gets the garage door opener. |
| 43. <u>Killer in the Dark</u><br><br>Phone lines cut & Thorwald invades dark apartment & shoots at Jeffries.  Lars revealed as killer of wife who buried her in cement. | <u>Killer in the Dark</u><br><br>Thorwald invades dark apartment and pushes Jeff over rail & Lars revealed as killer of wife who buried her in the yard. | <u>Killer in the Dark</u><br><br>Phone lines cut, Turner invades dark house with a baseball bat.  Turner revealed as the woman's killer who buried her in the basement. |
| 44. <u>A Few Changes</u><br><br>Protagonist is vindicated and has cast removed. | <u>A Few Changes</u><br><br>Protagonist is vindicated but he has 2 broken legs. | <u>A Few Changes</u><br><br>Protagonist is vindicated & ankle bracelet removed. |

## SCENES & DIALOGUE

| *Rear Window* story (1942) | *Rear Window* film (1954) | *Disturbia* (2007) |
|---|---|---|
| 45. <u>Protagonist obsessed with mundane daily activities of neighbors</u><br><br>Jeff: "I could have constructed a timetable of their comings and goings, their daily habits and activities." (p. 288) | <u>Protagonist obsessed with mundane daily activities of neighbors</u><br><br>Jeff: "Six weeks sitting in a two-room apartment with nothing to do except look out the window at the neighbors." (p. 9) | <u>Protagonist obsessed with mundane daily activities of neighbors</u><br><br>Kale (counting down time table of neighbor's habits): "Three…two…one…dog…." "Four o'clock every Thursday, she goes to the country club…" (p. 24)<br><br>Kale: "I mean there's so much structure to it, so many layers, but it's invisible if you're not |

| *Rear Window* story (1942) | *Rear Window* film (1954) | *Disturbia* (2007) |
|---|---|---|
| | | looking close enough." <br> Ronnie: "What are you talking about?" <br> Kale: "The world right outside that window." (p. 24) |
| 46. Protagonist's confinement leads to boredom & desperation <br><br> Jeff: "The idea was, my movements were strictly limited just around this time... stewing in a vacuum of total idleness..." (p. 291) <br><br> "I had never acquired the habit of reading books to ward off boredom..." (p. 288) | Protagonist's confinement leads to boredom & desperation <br><br> Jeff: "Listen – if you don't pull me out of this swamp of boredom – I'll do something drastic." (p. 10) | Protagonist's confinement leads to boredom & desperation <br><br> Kale: "These are just simple observations... natural side of chronic boredom..." (p. 26) |
| 47. Protagonist is almost caught spying & retreats into darkness <br><br> Jeff: "I withdrew several yards inside my room.  There was still enough blue night shade in my room to keep my slight withdrawal from catching his eye." (p. 290). <br><br> "I knew he couldn't see me within the darkness of the bay window." (p. 292) <br> "I remained carefully immobile until the distant glance had passed me safely by." (p. 292) <br><br> "Leave the light out in here." (p. 309) | Protagonist is almost caught spying & retreats into darkness <br><br> His eyes move closer toward Jeff's apartment.  Jeff is in his chair, facing the window.  Stella is beside him.  Jeff nearly knocks the startled Stella off her feet with his arm. <br><br> Jeff: "Get back!  Out of sight! Quick!" (p. 53) <br><br> Jeff: "Get back there!  He'll see you!" (p. 54) | Protagonist is almost caught spying & retreats into darkness <br><br> Ronnie: "Dude, he's gonna see." <br> Kale: "He can't. We don't have any lights on." (p. 25) |

| _Rear Window_ story (1942) | _Rear Window_ film (1954) | _Disturbia_ (2007) |
|---|---|---|
| 48. Protagonist's window is the "eye" of the film<br><br>Jeff: "The bay window was about the best feature my rear bedroom had in the warm weather." (p. 288)<br><br>"Here and there a wall played back, like a sounding board, a snatch of radio program that was coming in too loud. If you listened carefully, you could hear an occasional click of dishes mixed in, faint, far off. The chain of little habits that were their lives unreeled themselves." (p. 291). | Protagonist's window is the "eye" of the film<br><br>"The summer air is motionless and heavy with humid heat." The opened windows "brought the neighborhood into sweltering intimacy" (p. 1) | Protagonist's window is the "eye" of the film<br><br>We hear kids playing in the street O.S.<br>Kale glances out the window.<br><br>HIS POV: Kids on bikes.<br>Neighbors out on walks.<br>Kale: "ahh.... the sights and sounds of summer." (p. 17) |
| 49. Protagonist spies on female neighbors in various sexy poses & while exercising<br><br>N/A | Protagonist spies on female neighbors in various sexy poses & while exercising<br><br>The girl, now dressed in dark and revealing leotard, and ballet slippers, has just turned away from a portable record player. She begins her first graceful movement of a modern ballet interpretation (pp. 7 - 8) | Protagonist spies on female neighbors in various sexy poses & while exercising<br><br>Ashley turns around, goes back to her yoga mat. She takes a breath, getting back into the "zone" then – she slowly raises her arms and bends into a ridiculously sexy pose (p. 31)<br><br>Ashley is working out to a yoga DVD (p. 30).<br><br>As if eerily on cue, Ashley suddenly stops. She goes to her window and peers out – Kale ducks – He looks back up, sees Ashley gazing in his direction – Kale's breathing intensifies – could she actually be seeing him? (p. 31) |

| *Rear Window* story (1942) | *Rear Window* film (1954) | *Disturbia* (2007) |
|---|---|---|
| 50. Protagonist spies on female neighbors in various stages of undress<br><br>N/A | Protagonist spies on female neighbors in various stages of undress<br><br>Two pretty girls... They take off their robes, slipping them down over their shoulders slowly.  Then, seductively they turn – revealing the full beauty of their tanned and bathing suited bodies.  It is almost as if they want to be noticed, the center of the neighborhoods attention.  They at least have all of Jeff's attention.  Then they spread the robes in front of them, and lie down on the roof, and out of sight.  Jeff seems a little disappointed. (p. 6) | Protagonist spies on female neighbors in various stages of undress<br><br>Ashley swims underwater the length of the pool.  She finally surfaces in all her two piece glory.  They watch as Ashley steps out of the pool, towels off.  She pulls her bikini from her butt, lies in the lounge chair (p. 27).<br><br>Ashley flips here sandals off one at a time, pulls her tank off revealing her bronzed back and bikini top.  Ashley slinks out of her shorts revealing a "near-thong" bikini this time (p. 34).<br><br>She... shifts her gaze up toward Kale and Ronnie!  Kale (pulling Ronnie down) "I think she saw me." (p. 35). |
| 51. Protagonist's restriction is uncomfortable<br><br>Jeff: "I couldn't sleep, because I was used to getting plenty of exercise." (p. 288) | Protagonist's restriction is uncomfortable<br><br>His leg, under the cast, begins itching.  He reaches for a long, Chinese back scratcher lying on the window sill... He works it under the cast... He scratches, and a look of sublime relief comes over his face (p. 12). | Protagonist's restriction is uncomfortable<br><br>Kale's ankle begins itching at the ankle monitor.  He works a stick under the ankle monitor and scratches, and a look of sublime relief comes over his face (in *Disturbia* film but not in *Disturbia* screenplay). |
| 52. Protagonist's boredom leads to overactive imagination<br><br>Jeff: "...me, stewing in a vacuum of total idleness" (p. 291) | Protagonist's boredom leads to overactive imagination<br><br>Jeff: "You've got to get me out of here! Six weeks – sitting in a two room apartment with nothing to do but look out the | Protagonist's boredom leads to overactive imagination<br><br>Parker to Kale: "House arrest might sound like a breeze, but trust me, I've seen all kinds of folks get a bit loopy before too |

| _Rear Window_ story (1942) | _Rear Window_ film (1954) | _Disturbia_ (2007) |
|---|---|---|
| "...when a man ain't got nothing to do but just sit all day, he sure can think up the lamest things..." (p. 297)<br><br>"Then suddenly, just as idle speculation about this whole matter was about to alight on some fixed point in my mind, crystallize into something like suspicion, the shade came up again…" (p. 293)<br><br>"… a disembodied suspicion… had been flitting and volplaning around in my mind…" (p. 296) | window at the neighbors!" (p. 9)<br><br>"I want to get this thing off and get moving" (p. 28)<br><br>Lisa: "-- with <u>binoculars</u>, and with wild opinions of every little movement you <u>see</u> – is, is <u>diseased</u>!" (p. 63) | long, some after just a day or two." (p. 291)<br><br>"Dammit, Ronnie, I'm losing my mind." (p. 17) |
| 53. <u>Protagonist accused of spying & becoming delusional</u><br><br>Sam: "You're going to be a wreck, Mr. Jeff" (p. 295)<br><br>Only someone like me, stewing in a vacuum of idleness, would have noticed it at all. ( p. 291) | <u>Protagonist accused of spying & becoming delusional</u><br><br>Stella: "The New York State sentence for a peeping Tom is six months in the workhouse" (p. 14)<br><br>Lisa: "...sitting around, looking out a window to kill time, is one thing – but doing it the way you are (she gestures) – with binoculars, and with wild opinions about every little movement you see – is, is diseased!" (p. 63) | <u>Protagonist accused of spying & becoming delusional</u><br><br>Ronnie: "...you become a stalker?"<br>Kale: "No, stalking's for psychos" (p. 26)<br><br>Ashley: "Are you spying on the neighbors Kale?"<br>Ronnie: "Actually, he is." (Id., p. 38)<br><br>Ashley: "...like you're determined to turn Giles in to who you think he is... I just didn't realize – you were this"<br>Kale: "What, crazy? Maybe I am. But maybe I'm right" (p. 79) |
| 54. <u>Protagonist implores skeptical cops to help</u><br><br>Jeff to cop: "I've got a firm belief you'll uncover a | <u>Protagonist implores skeptical cops to help</u><br><br>Jeff to cop: "It's probably nothing important – just a little | <u>Protagonist implores skeptical cops to help</u><br><br>Kale to cop: "Please, my friend's been kidnapped, he's |

| _Rear Window_ story (1942) | _Rear Window_ film (1954) | _Disturbia_ (2007) |
|---|---|---|
| murder there if you start digging at it...There's been a man and a wife living there until now. Now there is just the man. Her trunk went out early this morning." (p. 299)<br><br>"...then you located the trunk?... And you opened it?" (p. 303) | neighborhood murder.  That's all -- As a matter of fact, I did say murder." (p. 69)<br><br>"...because everything the man's done has been suspicious.  Trips at night in the rain, saws, knives, trunks with rope, and a wife that isn't there anymore." (p. 75) | in this house – he's inside, I think the owner's trying to kill him..."(p. 86)<br><br>"... he killed maybe three others, all redheads, they could be in a bag – a big blue plastic bag – in his garage." (p. 88) |
| 55. Protagonist is not believed<br><br>Inspector Boyne to Jeff: "We haven't turned up anything that seems to bear out your impression so far" (p. 300)<br><br>"Give up Jeff, he said. There's such a thing as going too far" (p. 302)<br><br>"You're not yourself" (p. 304) | Protagonist is not believed<br><br>Jeff to cop: "You think I made this all up?" (p. 76)<br><br>Jeff to cop: "All right. You don't believe me." (p. 77) | Protagonist is not believed<br><br>Kale to cop: "Does anyone believe me?!" (p. 90)<br><br>Ashley: "This is obviously not a cute little game anymore. This has gone way too far." (_Disturbia_ film)<br><br>Kale: "I just… didn't think you'd believe me…" (p. 91) |
| 56. Antagonist catches Protagonist spying on him<br><br>Jeff: "As he turned to do so, I saw him give a glance out the window... It was certainly anything but vacant or random, it had a bright spark of fixity in it. It wasn't one of those precautionary sweeps I'd seen him give, either.   It hadn't started over on the other side and worked its way around to my side, the right.  It had hit dead-center at my bay window, for just a split second while it lasted, and then it was gone | Antagonist catches Protagonist spying on him<br><br>The lens pans upward and across until it brings Thorwald's profile into the picture.  He is looking down directly at Lisa's hands.  His head slowly turns, and he looks right up--directly into the lens.<br><br>Jeff: "Stella! The lights! He'd seen us!" Stella hurries from the window, turning off the lights, as Jeff backs his chair into the room.  (p. 143) | Antagonist catches Protagonist spying on him<br><br>Binocular POV - Over the above, Kale slowly pans back across the same windows, comes to the last one and see Giles staring right back at him. Kale spins and dives to the floor, knocking the other camera tri-pod over. Kale shoves himself against the wall, frozen in terror.  (p. 53) |

| _Rear Window_ story (1942) | _Rear Window_ film (1954) | _Disturbia_ (2007) |
|---|---|---|
| again." (p. 311)<br><br>"Suddenly, death was somewhere inside the house here with me." (p. 313)<br><br>"He withdrew into the room, and it blacked out." (p. 295) | | |
| 57. Antagonist cuts the phone lines<br><br>Jeff: "I dialed the precinct house." (p. 312)<br><br>"Operator, I've been cut off...I hadn't been cut off... My wire had been cut." (p. 313) | Antagonist cuts the phone lines<br><br>Jeff: "Hello, Doyle? Tom? Tom, I think Thorwald's left.  I don't see anything of-- He looks at receiver, then -- "Hello."  Slowly he looks up toward Thorwald's apartment.  Then, back to the receiver. (p. 149) | Antagonist cuts the phone lines<br><br>Kale grabs the cordless phone off his bed, clicks it on: DEAD.  (p. 97)<br><br>Ashley heads for the desk phone. Kale: "It's dead." (p. 101) |
| 58. Protagonist accuses killer<br><br>The note (to Thorwald) reads: "What have you done with her?" (p. 304) | Protagonist accuses killer<br><br>The message (to Thorwald) reads, simply, "What have you done with her?" (p. 124) | Protagonist accuses killer<br><br>Kale: "So where's my friend then?" (p. 90) |
| 59. Protagonist asks Assistant (Sam) to break in & Assistant almost gets caught (has 25 minutes)<br><br>"He must have been tense, doing it.  I was twice as tense, watching him do it." (p. 309)<br><br>"Chase around the corner a minute and get me the exact | Protagonist asks Assistant (Lisa) to break in & Assistant almost gets caught [5]<br><br>Lisa:  "Okay, chief.  What's my next assignment?" (p. 68)<br><br>Jeff: "Lisa!  Look out!  He's coming!"<br>There is a sigh of relief from both of them. | Protagonist asks Assistant (Ronnie) to break in & Assistant almost gets caught (has 21 minutes) [6]<br><br>Ronnie invades Turner's home looking for evidence creating a tense situation watched by Kale (pp. 71-77)[7]<br><br>Kale sighs in relief.<br>Waves Ashley the "all clear." |

---

[5] The _Rear Window_ screenplay (pp. 124-129) has Lisa invading Thorwald's apartment looking for evidence creating a tense situation watched by Jeff through binoculars.

[6] The _Disturbia_ screenplay (pp. 73 – 75 and pp. 82 – 85) has Kale watching Ronnie's break-in and investigation through binoculars while almost getting caught.

[7]  Similar to the _Rear Window_ film, the police interrupt the situation.

| _Rear Window_ story (1942) | _Rear Window_ film (1954) | _Disturbia_ (2007) |
|---|---|---|
| number on it will you?... And try not to let anyone catch you at it" (p. 297)<br><br>"Let's see if you're fast enough to keep from being caught at it." (p. 304)<br><br>"I want you to do something for me that's a little risky… You've got twenty five minutes starting from now" (p. 308)<br><br>"I'm just an easy mark for you, he said ruefully, but he went." (p. 308)<br><br>"He got in, lit the light, looked over at me.  I motioned him to go ahead, not weaken " (p. 308) | Stella: "Thank heaven that's over!<br>Jeff: "I have a feeling we've just begun" (p. 126)<br><br>Jeff: "C'mon. C'mon! Get out of there!" (p. 137)<br><br>Stella: "—What can we do?" (p. 125) | Ashley heads back over to Kale, breathless.<br>Ashley (oddly exhilarated): "That was intense!" (p. 51)<br><br>Ronnie (prelap): "You want me to do what"… "For the later purpose of doing what? Breaking into his house?"<br>Kale: "No, not breaking in. We're just talking about having access to his garage so we can go in on our own time – when he's not there- to just…to get a closer look at the car, the bag—" (p. 71)<br><br>Kale: "Look, if we're going to do this, it's gotta be now.  He takes 21 minutes average to mow his front yard…You'll be hearing him the whole time…" Ashley grabs the remote.<br>Ashley: "I'll do it."  (p. 72)<br><br>Kale: "I just need you to do one thing."<br>Ronnie (shaking his head): "Phase 2.  I knew it." (p. 82)<br><br>Ronnie (… suddenly sounding not so macho) "I can't believe I'm doing this." (p. 72)<br><br>Ronnie (keeping low as he darts to the fence) turns peers back up to Kale, give him the thumbs up or down.<br><br>Kale:<br>"You're all good." ( p. 73) |

| *Rear Window* story (1942) | *Rear Window* film (1954) | *Disturbia* (2007) |
|---|---|---|
| 60. <u>Protagonist falls asleep often while on duty</u><br><br>"I'd missed a few hours, been asleep" (p. 298)<br><br>"… I finally succumbed in the flaming light of the early sun." (p. 303) | <u>Protagonist falls asleep often while on duty</u><br><br>His head nods sleepily as he dozes.  Jeff wakens a little more fully as his attention is drawn to. (p. 46)<br><br>Jeff sits in his wheelchair, looking quietly out at the neighborhood, sleep beginning to take hold on him again.  He is still in his wheelchair, sound asleep.  The camera pans back into Jeff's sleeping face.  (p. 50) | <u>Protagonist falls asleep often while on duty</u><br><br>We pan to reveal Kale asleep in the leather chair. (p. 51)<br><br>Kale snaps awake. Breathing hard. Bad dream.  He sits up, peers across to Ashley's windows.  (p. 31) |
| 61. <u>Protagonist's Assistant(s) think he is going crazy</u><br><br>"You ain't touched a thing. And your face looks like a sheet" (p. 297) | <u>Protagonist's Assistant(s) think he is going crazy</u><br><br>Lisa (insistent): "What is it you're looking for?"<br>Jeff: "I want to find out what's wrong with the salesman's wife. Does that make me sound like a madman?"(p. 64) | <u>Protagonist's Assistant(s) think he is going crazy</u><br><br>Ashley: "Kale, what are you doing"<br>Kale: "Trying to get to the bottom of this." (p. 79)<br><br>Ashley (beat; thin): "I just didn't realize—you were this—"<br>Kale: "What, crazy?  Maybe I am.  But maybe I'm right." (p. 79) |
| 62. <u>Protagonist angrily recites his evidence</u><br><br>"… I say that man has done away with his wife!  Trace that trunk he shipped out. Open it up when you've located it – and I think you'll find her!" (p. 302) | <u>Protagonist angrily recites his evidence</u><br><br>Jeff: "…Not a sight or sound of his wife!  Now you tell me where she is and what she's doing!" (p. 65).<br><br>The police interrupt the situation. | <u>Protagonist angrily recites his evidence</u><br><br>Kale (heading out): "Fine, but what about the bumper sticker, there's still a girl missing, just…What's in the bag? (Then from O.S.) Can anyone tell me that?" (p. 78) |

| _Rear Window_ story (1942) | _Rear Window_ film (1954) | _Disturbia_ (2007) |
|---|---|---|
| 63. <u>Jeff catches a small visual clue</u><br><br>Jeff sees Thorwald and the rental agent moving from the living room to the kitchen in separate apartments and realizes that the new cement floor in the kitchen above Thorwald's is raised.  He believes that's where the body is hidden. | <u>Jeff catches a small visual clue</u><br><br>Jeff notices that the zinnias in Thorwald's garden are shorter than they were before.  Jeff examines the slide frames from the photos he took of the zinnias previously and is right.  He believes that's where the body is hidden.<br><br>Jeff: "There is a dip at this end.  Since when do flowers grow shorter in two weeks?" (p. 121) | <u>Kale catches a small visual clue</u><br><br>Kale watches the video on the camera that Ronnie brings back and catches a detail.  He examines the video frame by frame.  A video frame reveals the face of a murder victim hidden in the wall of Turner's house. |
| 64. <u>Gunshot lights up the room</u><br><br>The flash of the shot lit up the room for a second, it was so dark… it was like looking at sunrise in the face." (p. 314)<br><br>Something sparked in the darkness of one of his own windows. (p. 315) | <u>Protagonist's camera flashes to light up the room</u><br><br>Jeff: "One of you watch this window.  If I see him coming back, I'll signal with a flashbulb." (p. 133)<br><br>Jeff lifts the flash holder to face level and closes his eyes.  He explodes the flash. (p. 151) | <u>Protagonist's camera flashes to light up the room</u><br><br>… the camera's lamp suddenly IGNITES, MOMENTARILY LIGHTING UP KALE'S ROOM! (p. 52) |
| 65. <u>Antagonist Hides the Body</u><br><br>Thorwald buried his wife's body in the new cement floor kitchen floor. (p. 316) | <u>Antagonist Hides the Body</u><br><br>Detective:  "Thorwald's ready to take us on a tour of the East River."<br><br>Doyle:  "Did he say what was buried in the flower bed?"  Detective: "Yeah.  It's over in his apartment.  In a hat box.  Wanna look?" (p. 157) | <u>Antagonist Hides the Body</u><br><br>Kale has researched Turner's house and learns that the garage and house were not originally connected, but now are.  He believes something may be hidden in the new wall. (_Disturbia_ film) |

118.    The _Rear Window_ story's significant character, Hal Jeffries, constitutes protectible expression as the character was developed by Woolrich, the character constitutes the story being

told in the *Rear Window* story, the plot unfolds from the character's visual perspective, and because the *Rear Window* story and *Rear Window* film focus on this character.

119.   *Disturbia* utilizes numerous points of view of the protagonist (i.e. Kale binocular and video camera "POV" in the *Disturbia* screenplay) which are substantially similar to the same points of view utilized in the *Rear Window* story and *Rear Window* film.

120.   Upon information and belief, in *Disturbia* the Defendants purposefully employed immaterial variations or transparent re-phrasing to produce essentially the same story as the *Rear Window* story, and Defendants' additions, alterations, and editing choices provide evidence of copying rather than independent creation.

121.   The acts of infringement committed abroad were permitted and/or initiated by preliminary, predicate acts of infringement within the United States by all Defendants, namely the adaptation, reproduction, manufacturing, distribution, printing, editing, and marketing of *Disturbia* with the intention and purpose of exporting it to the Paramount Defendants subsidiaries, affiliates, and distributors in foreign territories.

122.   The Paramount Defendants have acted as agents in the United States for their foreign subsidiaries.

## FIRST CLAIM FOR RELIEF

### (Copyright Infringement, 17 U.S.C. §§ 101 et seq. – Against All Defendants)

123.   Plaintiff re-alleges and incorporates by reference paragraphs 1 through 122 inclusive, as though fully set forth herein.

124.   Plaintiff owns copyright interests in the *Rear Window* story, and as embodied in the *Rear Window* film, which are original copyrighted works under the laws of the United States.

125.   Plaintiff has the exclusive right to prepare derivative works based upon the

copyrighted work the *Rear Window* story pursuant to 17 U.S.C. §106 (2), as well as all other rights provided for in §106.

126.    The Defendants' acts in the United States and in foreign territories, including copying, downloading, use, modification, reproduction, display and distribution of elements of the *Rear Window* story, and as embodied in the *Rear Window* film, including without limitation, the ideas, expression of concepts, pattern, sequence, theme, text and plot contained therein and all derivatives thereof, constitute a violation of the United States Copyright Act, Title 17 U.S.C. §§ 501(a), 106(1), 106(2) and 106(3), and all Defendants were acting as infringers within the meaning of 17 U.S.C. §105(a).

127.    By all the Defendants' participation in, and contribution to, the production, distribution, use, and exploitation of *Disturbia*, both in the United States and for export to foreign territories, Defendants knowingly and willfully infringed, authorized others to infringe, and will continue to infringe Plaintiff's copyright in the *Rear Window* story, and as embodied in the *Rear Window* film.

128.    As a proximate result of Defendants' copyright infringement, and that of their agents, affiliates, subsidiaries, and distributors, both in the United States and in foreign territories, Plaintiff has suffered and will continue to suffer irreparable injury, some of which cannot be compensated in money damages if such wrongful conduct continues.

WHEREFORE, Plaintiff is entitled to and prays for relief as follows:

129.    A permanent injunction, pursuant to 17 U.S.C. §502, enjoining all Defendants, their officers, agents, employees, licensees, assigns, distributors, sub-distributors, and all persons acting in concert with them, from engaging in such further violations of the Copyright Act;

130.    A permanent injunction enjoining all Defendants, their officers, agents, employees,

licensees and assigns, distributors, sub-distributors, and all persons acting in concert with them, from engaging in or authorizing the production, copying, distribution and/or exploitation of *Disturbia*;

131. Recovery from all Defendants of the damages, including pre-judgment interest it sustained and will sustain, and any income, gains, profits, and advantages obtained by Defendants and their subsidiaries, affiliates, distributors, and service providers, both domestic and foreign, as a result of their wrongful acts alleged hereinabove pursuant to 17 U.S.C. §504(b), in an amount which cannot yet be fully ascertained, but which shall be assessed at the time of trial;

132. The maximum statutory damages in the amount of $30,000.00 per infringement, and/or $150,000.00 per willful infringement pursuant to 17 U.S.C. §504(c), or for such other amount as may be proper under 17 U.S.C. §504(c). Plaintiff is further entitled to their attorney's fees and full costs pursuant to 17 U.S.C. §505; and

133. For such other and further relief and remedies available under the Copyright Act, 17 U.S.C. §§101 et seq., and/or for which the Court may deem just and proper, including punitive damages.

## SECOND CLAIM FOR RELIEF

### (Contributory Infringement – Against All Defendants)

134. Plaintiff re-alleges and incorporates herein by reference the allegations set forth in paragraphs 1 through 122 inclusive, as though fully set forth herein.

135. Upon information and belief, all Defendants individually, and in concert with the other named Defendants, and with other persons and entities, encouraged, induced, or materially contributed to, the infringement of the *Rear Window* story, and as embodied in the *Rear Window* film, in that:

(a)     all of the Defendants used, distributed, and/or exploited *Disturbia* in the United States and in foreign territories;

(b)     all of the Defendants, including Viacom and its subsidiaries, Paramount, DreamWorks, and others, produced, filmed, distributed, and edited *Disturbia* for domestic and foreign distribution;

(c)     Viacom's and Paramount's subsidiaries, PHE, DHE, UIP, UPI, and others distributed, promoted, and advertised *Disturbia* in foreign territories after its production and manufacture in the United States, and, upon information and belief, induced infringement in the United States by providing financing, guarantees, and agreements for distribution of *Disturbia*; and

(d)     the Defendants further participated in the international distribution of *Disturbia* pursuant to license agreements, and/or distribution servicing agreements, and/or third party service agreements with or utilizing subsidiaries of the Paramount Defendants, including, but not limited to, PHE, DHE, UIP, and UPI.

136.    Upon information and belief, the Defendants' actions were performed with actual and constructive knowledge of Plaintiff's rights and interests.

137.    The Defendants are jointly and severally liable for contributory copyright infringement.

WHEREFORE, Plaintiff is entitled to and prays for relief as follows:

138.    A permanent injunction, pursuant to 17 U.S.C. §502, enjoining the Defendants, their officers, agents, employees, licensees, assigns, distributors, and all persons acting in concert with them, from engaging in such further violations of the Copyright Act;

139.    A permanent injunction enjoining the Defendants, their officers, agents, employees, licensees, assigns, distributors, sub-distributors, and all persons acting in concert with them, from

engaging in or authorizing the production, reproduction, copying, use, distribution, exploitation, advertising, and promotion of *Disturbia*;

140.    Recovery from the Defendants of the damages, including pre-judgment interest it sustained and will sustain, and any income, gains, profits, and advantages obtained by the Defendants, their officers, agents, employees, licensees, assigns, distributors, sub-distributors, and all persons acting in concert with them, as a result of their wrongful acts committed in the United States, and those of their subsidiaries, affiliates, and distributors in foreign territories, alleged hereinabove pursuant to 17 U.S.C. §504(b), in an amount which cannot yet be fully ascertained, but which shall be assessed at the time of trial;

141.    The maximum statutory damages in the amount of $30,000.00 per infringement, and/or $150,000.00 per willful infringement pursuant to 17 U.S.C. §504(c), or for such other amount as may be proper under 17 U.S.C. §504(c). Plaintiff is further entitled to their attorney's fees and full costs pursuant to 17 U.S.C. §505; and

142.    For such other and further relief and remedies available under the Copyright Act, 17 U.S.C. §§101 et seq., and/or for which the Court may deem just and proper, including punitive damages.

## **THIRD CLAIM FOR RELIEF**

### **(Vicarious Copyright Infringement - Against All Defendants)**

143.    Plaintiff re-alleges and incorporates herein by reference the allegations set forth in paragraphs 1 through 122 inclusive, as though fully set forth herein.

144.    All of the Defendants had the right, authority, and the ability to control or supervise the actions, failures, and omissions of their fellow Defendants, and other persons and entities, including their subsidiaries, affiliates, and distributors, domestic and foreign, which violated

Plaintiff's copyright in the *Rear Window* story, and as embodied in the *Rear Window* film, including, but not limited to Spielberg, DreamWorks, UIP, PHE, DHE, Montecito, Cold Spring, UPI, and the Paramount Defendants' affiliates.

145.   The Defendants had knowledge of Plaintiff's rights and interests in the *Rear Window* story, and as embodied in the *Rear Window* film, during the development, production, distribution, and exploitation of *Disturbia*.

146.   All named Defendants obtained a direct financial interest, financial advantage, and/or economic consideration from the infringement in the United States and in foreign territories as a result of their infringing actions in the United States.

WHEREFORE, Plaintiff is entitled to and prays for relief as follows:

147.   A permanent injunction, pursuant to 17 U.S.C. §502, enjoining the Defendants, their officers, agents, employees, licensees, assigns, distributors, and all persons acting in concert with them, from engaging in such further violations of the Copyright Act;

148.   A permanent injunction enjoining the Defendants, their subsidiaries, affiliates, officers, agents, employees, licensees and assigns, distributors, sub-distributors, and all persons acting in concert with them, both domestic and foreign, from engaging in or authorizing the production, copying, distribution and/or exploitation of *Disturbia*;

149.   Recovery from the Defendants of the damages, including pre-judgment interest Plaintiff sustained and will sustain, and any income, gains, profits, and advantages obtained by the Defendants, their subsidiaries, affiliates, and distributors, domestic and foreign, as a result of their wrongful acts committed in the United States and in foreign territories alleged hereinabove pursuant to 17 U.S.C. §504(b), in an amount which cannot yet be fully ascertained, but which shall be assessed at the time of trial;

150.   The maximum statutory damages in the amount of $30,000.00 per infringement, and/or $150,000.00 per willful infringement pursuant to 17 U.S.C. §504(c), or for such other amount as may be proper under 17 U.S.C. §504(c). Plaintiff is further entitled to their attorney's fees and full costs pursuant to 17 U.S.C. §505; and

151.   For such other and further relief and remedies available under the Copyright Act, 17 U.S.C. §§101 et seq., and/or for which the Court may deem just and proper.

## ON ALL CLAIMS FOR RELIEF

152.   For Plaintiff's reasonable costs and attorneys fees;

153.   For interest on all sums awarded Plaintiff; and

154.   For reasonable prevailing party's attorney's fees pursuant to ¶ 9 of the Settlement Agreement.

## JURY TRIAL DEMANDED

Plaintiff hereby requests a trial by jury on each claim for relief alleged in the Second Amended Complaint.

DATED this 26th day of October 2009

Respectfully Submitted,

_____
Clay M. Townsend, Esq.
Florida Bar No.: 363375
Keith R. Mitnik, Esq.
Florida Bar No.: 436127
MORGAN & MORGAN, P. A.
*Appearing Pro Hac Vice*
20 N. Orange Avenue, Suite 1600
Orlando, FL 32802
Ph: (407) 418-2075
Fx: (407) 425-8171
Email: ctownsend@forthepeople.com
          kmitnik@forthepeople.com

Steven M. Hayes, Esq.
New York Bar No.: 2926
HANLY, CONROY, BIERSTEIN,
SHERIDAN, FISHER, HAYES, LLP
112 Madison Avenue
New York, NY 10016-7416
Ph: (212) 784-6414
Fx: (212) 784-6420
Email: shayes@hanlyconroy.com

*Attorneys for Plaintiff*
*The Sheldon Abend Revocable Trust*