UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

THE SHELDON ABEND REVOCABLE TRUST,

        Plaintiff,

    -v-                             No.  08 Civ. 7810 (LTS)(JCF)

STEVEN SPIELBERG et al.,

        Defendants.

-------------------------------------------------------x

APPEARANCES:

HANLY CONROY BIERSTEIN
SHERIDAN FISHER & HAYES, LLP
   By:  Steven M. Hayes, Esq.
112 Madison Avenue
New York, NY 10016

MORGAN & MORGAN, P.A.
   By:  Clay M. Townsend, Esq.
        Keith R. Mitnik, Esq.
20 N. Orange Avenue
Orlando, FL 32801

*Attorneys for Plaintiff The Sheldon
Abend Revocable Trust*

WHITE O'CONNOR FINK &
BRENNER LLP
   By:  Lee S. Brenner, Esq.
       Andrew M. White, Esq.
10100 Santa Monica Boulevard
Los Angeles, CA 90067

LAW OFFICES OF SCOTT
GOLDFINGER
   By:  Scott G. Goldfinger, Esq.
       Allison S. Rohrer, Esq.
225 Broadway
New York, NY 10007

*Attorneys for Defendants Steven Spielberg,
Paramount Pictures Corporation, DW
Studios LLC, Viacom Inc., Paramount Home
Entertainment, Montecito Picture Company
LLC, Cold Springs Pictures LLC and United
International Pictures, B.V.*

LAURA TAYLOR SWAIN, UNITED STATES DISTRICT JUDGE:

OPINION AND ORDER

The Sheldon Abend Revocable Trust ("Plaintiff"), brings this action asserting copyright infringement, contributory infringement, and vicarious copyright infringement pursuant to 17 U.S.C. § 101 et seq. as well as common law breach of contract claims against Defendants Steven Spielberg; DW Studios, LLC; Paramount Pictures Corporation; Viacom, Inc.; NBC Universal, Inc.; Universal Pictures Company, Inc.; Universal City Studios, LLP; United International Pictures, B.V.; and Does 1-10,[1] alleging that the motion picture Disturbia – a film produced by Spielberg, owner of DW Studios, LLC, which is in turn a wholly-owned subsidiary of Paramount Pictures Corporation and its parent company, Viacom, Inc. – infringed upon Plaintiff's copyright in the short story Rear Window and upon the derivative Alfred Hitchcock film of the same name.[2]  On October 27, 2009, Plaintiff filed its Second Amended Complaint, adding defendants Montecito Picture Company LLC, Cold Spring Pictures LLC, and Universal Pictures International, GmbH.  Plaintiff asserted copyright infringement, contributory infringement, and vicarious copyright infringement claims against these new defendants.  The Court has jurisdiction of Plaintiff's copyright claims pursuant to 28 U.S.C. §§ 1331 and 1338.

The case is now before the Court on Defendants' motion for partial summary

---

[1]     Pursuant to Joint Stipulations (docket entry nos. 40, 53), Plaintiff's claims against Defendants NBC Universal, Inc.; Universal Pictures Company, Inc.; and Universal City Studios, LLP were dismissed on December 8, 2008 (Universal Pictures Company, Inc.) and March 30, 2009 (NBC Universal, Inc. and Universal City Studios, LLP).  Because the contract claims in the First Amended Complaint were asserted only against those defendants, those claims, too, have been dismissed.

[2]     Pursuant to a joint stipulation dated May 28, 2009 (docket entry no. 61), Plaintiff's claims premised upon similarity of Disturbia to the film version of Rear Window have been dismissed.

judgment dismissing Plaintiff's copyright infringement claims.  The Court has reviewed

thoroughly and considered carefully all of the parties' submissions.  For the reasons discussed

below, Defendants' motion for partial summary judgment is granted.

B<small>ACKGROUND</small>

The following material facts are undisputed, unless expressly noted.

In 1942, Cornell Woolrich wrote the short story <u>Rear Window</u> (also known as <u>It</u>

<u>Had to be Murder</u> and <u>Murder from a Fixed Viewpoint</u>) ("Short Story"), which was published in

the <u>Dime Detective Magazine</u>.  Plaintiff currently holds the copyright in the Short Story.

In 1953, a predecessor to Defendant Paramount Pictures obtained the motion

picture rights to the Short Story, which was subsequently made into a film of the same title,

directed by Alfred Hitchcock, in 1954.  Plaintiff relies heavily on the film in its claims of

substantial similarity and copyright infringement.

Defendants produced and distributed the motion picture <u>Disturbia</u>; distribution

began in April 2007.  The record before the Court includes a published version of the Short Story

and a DVD copy of <u>Disturbia</u>.

Plaintiff has also submitted thousands of pages of exhibits, including: expert

reports; previous drafts of the screenplay; references to and copies of media articles and film

critics' reviews likening <u>Disturbia</u> to the <u>Rear Window</u> film; and many lists, charts and DVDs

purporting to identify similarities among the Short Story, the <u>Rear Window</u> film, and <u>Disturbia</u>.

Defendants have proffered copies of numerous published works predating the Short Story, in

support of their contention that various elements of the Short Story are not protectable and/or not

original.

<u>DISCUSSION</u>

Summary judgment is appropriate where the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is material "if it 'might affect the outcome of the suit under the governing law,'" and "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  <u>Holtz v. Rockefeller & Co.</u>, 258 F.3d 62, 69 (2d Cir. 2001) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).  The evidence is viewed in the light most favorable to the nonmoving party and all reasonable inferences are drawn in its favor.  <u>Rubens v. Mason</u>, 527 F.3d 252, 255 (2d Cir. 2008) (citing <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962)).

Copyright Infringement

For a plaintiff to prevail in a copyright infringement case, "two elements must be proved: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."  <u>Feist Publ'ns, Inc. v. Rural Telephone Service Co.</u>, 499 U.S. 340, 361 (1991).  The second criterion, copying of original constituent elements, may be proven with either direct or indirect evidence: to prove copying via indirect evidence, a plaintiff must show (1) defendant's access to the allegedly infringed work; (2) actual copying; and (3) unlawful appropriation of copyrightable materials.  <u>See</u> <u>Walker v. Time Life Films, Inc.</u>, 784 F.2d 44, 48 (2d Cir. 1986) ("<u>Walker II</u>"); <u>Denker v. Uhry</u>, 820 F. Supp. 722, 728 (S.D.N.Y. 1992).  For purposes of the instant motion, Defendants have conceded access and actual copying.  Thus, the only questions for resolution are whether there is a genuine dispute of material fact as to whether

Defendants unlawfully appropriated copyrightable (that is, protectable) elements from Plaintiff's

Short Story, and, if there is no such appropriation, whether Defendants are entitled to judgment

dismissing Plaintiff's copyright infringement claims as a matter of law.

        To prove unlawful appropriation of protectible elements, a plaintiff must show

that there is substantial similarity between protectible elements in the two disputed works.

Laureyssens v. Idea Group, Inc., 964 F.2d 131, 139-40 (2d Cir. 1992). The appropriate test for

substantial similarity is "whether an ordinary observer, unless he set out to detect the disparities,

would be disposed to overlook them, and regard [the] aesthetic appeal as the same." Yurman

Design, Inc. v. PAJ, Inc., 262 F.3d 101, 111 (2d Cir. 2001) (citations and internal quotations

omitted); Walker II, 784 F.2d at 51 (noting that Second Circuit generally judges substantial

similarity "by the spontaneous response of the ordinary lay observer").

        Where, as here, a work is an amalgamation of protectible and unprotectible

elements, a "more discerning" ordinary observer test is employed, Knitwaves, Inc. v. Lollytogs,

Ltd., 71 F.3d 996, 1002 (2d Cir. 1995), which requires that the court first filter out from

consideration any non-protectible elements. The remaining, protectible elements are then

analyzed for substantial similarity. Id. ("[W]here [courts] compare products that contain both

protectible and unprotectible elements, [their] inspection must be 'more discerning'; [courts]

must attempt to extract the unprotectible elements from our consideration and ask whether the

protectible elements, standing alone, are substantially similar."). Thus, similarities between

unprotectible elements in the disputed works may not contribute to a determination of substantial

similarity.

        Because questions of substantial similarity often present close questions of fact,

Arnstein v. Porter, 154 F.2d 464, 468-69 (2d Cir. 1946), court have historically been hesitant to grant summary judgment on copyright infringement claims.  See Hoehling v. Universal City Studios, Inc., 618 F.2d 972, 977 (2d Cir. 1980) ("[S]ummary judgment has traditionally been frowned upon in copyright litigation.").  However, "[t]he question of substantial similarity is by no means exclusively reserved for resolution by a jury . . . in certain circumstances, it is entirely appropriate for a district court to resolve that question as a matter of law, 'either because the similarity between two works concerns only non-copyrightable elements of the plaintiff's work, or because no reasonable jury, properly instructed, could find that the two works are substantially similar.'"[3]  Peter F. Gaito Architecture, LLC v. Simone Dev. Corp., 602 F.3d 57, 63 (2d Cir. 2010) (citing Warner Bros. Inc. v. Am. Broad. Co., 720 F.2d 231, 240 (2d Cir. 1983)).  In considering the issue of substantial similarity a court must base its determination on "its considered impressions upon its own perusal" of the disputed works.  Nichols v. Universal Pictures Corporation, 45 F.2d 119, 123 (2d Cir. 1930); Williams v. Crichton, 84 F.3d 581, 583 (2d Cir. 1996).

Substantial Similarity

       A determination of copyright infringement requires a side-by-side comparison of the disputed works themselves.[4]  Williams, 84 F.3d at 583. The elements that should be

---

[3]     Plaintiff, seeking to apply a rule referred to in this Circuit as the inverse ratio rule, argues in its Opposition that Defendants' concession of access and evidence of actual copying lessens plaintiff's burden to prove substantial similarity.  That rule, however, is irrelevant here, as it is applied only in the determination of whether there was actual copying.  Aldon Accessories, Ltd. v. Spiegel, Inc., 738 F.2d 548, 553-54 (2d Cir. 1994).  As noted above, Defendant has conceded copying for purposes of this motion practice.

[4]     The opinions of experts or other third parties are irrelevant to a determination of substantial similarity.  See Laureyssens, 964 F.2d at 140 (while expert opinion may be relevant to the issue of actual copying, it is irrelevant to the question of

considered in analyzing two works for substantial similarity include "such aspects as the total concept and feel, theme, characters, plot, sequence, pace, and setting of the [plaintiff's] books and the [defendants'] works."  Id., at 588.

In considering the similarities between these elements, the proper inquiry is "whether an ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard [the] aesthetic appeal as the same."  Yurman Design, 262 F.3d at 111.  The test does not, however, require the Court to ignore dissimilarities.  However, if the dissimilarities between two works exceed the similarities and the similar elements "are – when compared to the original work – of small import quantitatively or qualitatively, a finding of no infringement is appropriate."  See Rogers v. Koons, 960 F.2d 301, 308 (2d Cir. 1992).  Thus, in considering the question of substantial similarity, an analysis of both the similarities and the differences is appropriate.  The Court has reviewed both works carefully.

---

substantial similarity); Nichols 45 F.2d at 123 (in copyright infringement cases, expert testimony "ought not be allowed at all").  Nor are lists or charts, in any medium, of purported similarities relevant to a determination of substantial similarity.  See Williams, 84 F.3d at 590 (Lists are "inherently subjective and unreliable, particularly where the list emphasizes random similarities scattered throughout the works . . . . Such a scattershot approach cannot support a finding of substantial similarity because it fails to address the underlying issue: whether a lay observer would consider the works as a whole substantially similar to one another.").  Furthermore, because "the Court considers the works as they were presented to the public,"  Walker v. Time Life Films, Inc., 615 F. Supp. 430, 434 (S.D.N.Y. 1985) ("Walker I"), aff'd 784 F.2d 44, 51 (2d Cir. 1986), earlier drafts of a book, manuscript, or screenplay are irrelevant.  Opinions of third parties published in secondary materials are also irrelevant.  Walker I, 615 F. Supp. at 434; see Crane v. Poetic Prods., 593 F. Supp. 2d 585, 595 (S.D.N.Y. 2009).  Accordingly, the Court has focused on the Short Story and the finished film Disturbia, rather than Plaintiff's voluminous submissions of expert reports, similarity comparisons and other materials.  The Court has also found it unnecessary to consider the "prior works" submitted by Defendants.

<u>Summary Overview of Each Work</u>

*Cornell Woolrich's Rear Window*

The Short Story spans four days and depicts, through first-person narrative, protagonist Hal Jeffries' observations of his neighbors' activities which eventually lead him to discover and solve a crime through deductive logic.  It is set in New York City.

At the opening of the Short Story, the reader learns that Jeffries is incapacitated such that he can only move from his bed to a chair near the window of his second floor bedroom. (Brenner Decl., Ex. A., 1.)  The reader learns little of Jeffries' background and personality, as the character is minimally developed.

To pass the time, Jeffries observes from his window the goings-on in several of his neighbors' homes.  He watches a young couple with an active social life, a young widow and her child, and a couple whom he later learns are the Thorwalds.  (<u>Id.</u> 1, 10.)

Mrs. Thorwald, he notices, is in chronic poor health.  (<u>Id.</u> 2.)  At first, her husband, Lars Thorwald ("Thorwald"), appears concerned about her health but, as Jeffries observes the Thorwalds over a period of days, he notices that Mrs. Thorwald has disappeared. (<u>Id.</u> 8.)  Jeffries speculates that Thorwald has murdered her.  (<u>Id.</u>)  He phones his old friend, Detective Boyne, to report his suspicion, and Boyne institutes an investigation.  (<u>Id.</u> 10-11.) Following a lead that Mrs. Thorwald's belongings had been shipped to the countryside, the police encounter a woman who identifies herself as Mrs. Thorwald.  (<u>Id.</u> 14-15.)  Boyne then stops the investigation, to Jeffries' dismay.  (<u>Id.</u>)

Undeterred from the belief that Thorwald murdered his wife, Jeffries enlists the assistance of his faithful servant, Sam, in obtaining proof of the murder.  (<u>Id.</u> 15.)  Sam's

character is also minimally developed.  Jeffries instructs Sam to slip a note that reads "What have you done with her?" beneath Thorwald's door.  (Id.)  Upon receiving the note, Thorwald becomes agitated, and paces his apartment nervously.  (Id. 16.)  His pacing closely parallels that of a realtor showing a newly renovated apartment two floors above Thorwald, but Jeffries does not immediately recognize the significance of this coincidence.  (Id. 16-17.)  Thorwald's reaction to the note, however, convinces Jeffries that Thorwald is, in fact, guilty of murder.  (Id. 16.)

To obtain more concrete evidence of murder, Jeffries phones Thorwald, pretending to be a blackmailer, and convinces Thorwald to meet him in a local park.  (Id. 17-18.)  When Thorwald sets out to pay off his blackmailer, Jeffries dispatches Sam to Thorwald's apartment with instructions to make it appear as if the apartment has been searched, in order to make Thorwald believe that his blackmailer has obtained concrete evidence of the murder.  (Id. 18-19.)  Sam does as he is told.  (Id. 19.)  When Thorwald returns, Jeffries immediately phones him, pretending to have discovered evidence, but Thorwald does not believe him.  (Id. 19-20.)

Thorwald then unexpectedly phones Jeffries, and, hearing his voice, deduces that Jeffries is his blackmailer.  (Id. 21.)  After this phone call, Jeffries suddenly recalls the mirrored movements of Thorwald and the realtor two floors above.  (Id. 22-23.)  He realizes that, when passing from the kitchen to the living room, the realtor's height relative to the window changed while Thorwald's remained the same because, as part of the ongoing renovations to the building, a raised kitchen floor had been poured in concrete for decorative effect.  (Id.)  Jeffries deduces that Thorwald buried his wife's body in the still-wet concrete of the fifth floor apartment, which was under renovation.  (Id. 26.)

Jeffries attempts to phone Inspector Boyne, but the line goes dead: Thorwald has

entered Jeffries' building and severed the telephone line.  (<u>Id.</u> 23.)  Jeffries realizes Thorwald is coming to kill him.  (<u>Id.</u>)  Rendered unable to escape by his cast, Jeffries conceals himself with a rug, and places a bust sculpture upon his shoulder, hoping that in the dark Thorwald would be tricked by the ruse.  (<u>Id.</u> 23-24.)  As Thorwald enters and shoots the bust, Inspector Boyne arrives.  (<u>Id.</u> 24-25.)  Thorwald escapes out the window, climbs to the roof of his own building, then shoots into Jeffries' apartment.  (<u>Id.</u> 24-25.)  Inspector Boyne returns fire and strikes Thorwald, causing him to fall to his death.  (<u>Id.</u> 25.)

From the available information, Jeffries completes his theory of the case for the reader: Thorwald had been poisoning his wife for some time, but killed her outright when she discovered what he was doing; and he concocted a scheme with another woman, likely his lover, to suggest that his wife had gone upstate.  (<u>Id.</u> 26-27.)  The other woman impersonated Mrs. Thorwald when the police investigated, and was going to stage her suicide.  (<u>Id.</u>)  In the closing lines of the story, a doctor arrives to remove the cast and notes, ironically, that Jeffries must have been bored while sitting around.  (<u>Id.</u> 27.)

*Disturbia*

The events depicted in <u>Disturbia</u> span more than a year.  The story's chief protagonist is Kale Brecht, a troubled teenager who, sentenced to house arrest, spies on neighbors to stave off boredom and, after learning of the disappearance of several women in the area, discovers that his neighbor may be to blame.

Kale is introduced to the viewer while on a fishing trip with his father.  In a picturesque wilderness setting, Kale and his father joke and bond.  On the trip home, however, while Kale is driving, a horrific accident occurs and his father is killed.  A year later, Kale has

become a troubled and depressed teenager.  After assaulting a teacher, Kale goes to court and is sentenced to three months of house arrest in suburban California.  His probation officer outfits him with an ankle bracelet that confines him to a 100-yard radius from the receiver in his kitchen.

Kale begins to entertain himself by watching his neighbors live their unrestricted lives.  He observes his new neighbors moving in, and takes particular note of their attractive teenage daughter, Ashley.

Among other things, he notices, almost in passing, Robert Turner, a neighbor who constantly mows his lawn.  After hearing news reports about a missing woman, and of a string of missing women in Texas, Kale recalls that Turner's car matches the description of the suspect's vehicle, right down to a dented fender.  Venturing outside, Kale spies on Turner.  Kale's friend Ronnie joins Kale in his surveillance of Turner and in spying on Ashley.  Eventually, Ashley catches them watching her and confronts them.  Ronnie explains their interest in Turner, and she joins them in the stake-out.  During their stake-outs, a romance develops between Kale and Ashley.

One night, Kale observes Turner escorting a red-haired woman to his home, and then later sees her panicked and trying to escape the house.  A reflection of Kale's video camera alerts Turner to the fact that Kale is watching.  Kale later sees a redhead leaving Turner's house, and reasons that he may have been mistaken (although the viewer later learns that it was, in fact, Turner wearing a wig).  Some time later, at Turner's house, there is a scream and blood spatters across the inside of a window.

Ashley later notices Turner dragging a blood-covered blue bag into his garage.

Kale, Ashley, and Ronnie decide to investigate Turner's garage.  With Ashley acting as a look-out and Kale watching via live-feed video camera, Ronnie finds the blue bag, in which he sees something decomposing.  Ronnie panics, and, fearing for his friend, Kale rushes to Turner's house wielding a baseball bat, triggering his ankle bracelet, and summoning the police.  He tells the police about the blue bag, in which they discover the decomposing carcass of a deer.

Upon reviewing the footage that Ronnie shot while sneaking about Turner's house, Kale notices the face of a dead woman, visible in the basement through a heating grate. At the same time, Kale's mother is attacked by Turner in Turner's home.  Turner then comes to Kale's house and attacks Ronnie and Kale, rendering them unconscious.  Kale awakens, bound with tape.  Turner informs Kale of his plan to frame Kale for murdering his own mother and to stage Kale's suicide.  Ashley arrives at the last moment, however, and in the course of a struggle, Kale and Ashley escape to safety by jumping off Kale's roof and into Ashley's pool.

Kale then returns to Turner's house, armed with hedge clippers, to rescue his mother.  He discovers the body of the dead woman he had seen in Ronnie's video, as well as an operating room filled with gruesome mementos.  Summoned by Kale's ankle bracelet, a police officer arrives at Turner's house, but is killed by Turner.  Meanwhile, while searching the basement of Turner's house for his mother, Kale falls into a pool of water filled with the dead bodies of Turner's previous victims.  Kale locates his mother just as Turner arrives.  Kale, his mother, and Turner fight, culminating in Turner being stabbed and falling into the pool.

The next day, Kale's parole officer removes his ankle bracelet, releasing him from house arrest early for good behavior.  The film ends with Kale and Ashley kissing while Ronnie attempts to videotape them.

<u>Comparison of the Works</u>

*Plot*

It cannot be disputed that both works tell the story of a male protagonist, confined to his home, who spies on neighbors to stave off boredom and, in so doing, discovers that one of his neighbors is a murderer.  The voyeur is himself discovered by the suspected murderer, is attacked by the murderer, and is ultimately vindicated.  Although it is possible to characterize the plots of both works so they appear indistinguishable, such similarity is not, standing alone, indicative of substantial similarity.  The law of copyright only protects an author's particular expression of an idea, not the idea itself.  <u>Arden v. Columbia Pictures Indus., Inc.</u>, 908 F. Supp. 1248 (S.D.N.Y. 1995).

> Upon any work . . . a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out.  The last may perhaps be no more than the most general statement of what the [work] is about, and at times might consist of only its title.  But there is a point in this series of abstractions where they are no longer protected, since otherwise the [author] could prevent the use of his 'ideas,' to which, apart from their expression, his property is never extended.

<u>Nichols</u>, 45 F.2d at 121.  Here, as will be explained in the analysis that follows, the expression of the voyeur-suspicion-peril-vindication plot idea is quite different in the two works.  This broad plot idea, or premise, is not a protectible element.  Similarity at this level of generality is not probative of the question of infringement.

*Characters*

Plaintiff contends that "[c]haracter elements of . . . <u>Disturbia</u> are derivative of (i.e. substantially similar to) <u>Rear Window</u>, notwithstanding some differences."  (<u>See</u> Pl.'s Opp. 24.) "In determining whether characters are similar, a court looks at the 'totality of [the characters']

attributes and traits as well as the extent to which the defendants' characters capture the 'total concept and feel' of figures in [plaintiff's work]."  Hogan v. DC Comics, 48 F. Supp. 2d 298, 309-10 (S.D.N.Y. 1999) (citing  Walker II, 784 F.2d at 50) (internal quotations omitted).  "No character infringement claim can succeed unless plaintiff's original conception sufficiently developed the character, and defendants have copied this development and not merely the broader outlines."  Smith v. Weinstein, 578 F. Supp. 1297, 1303 (S.D.N.Y. 1984), aff'd mem., 738 F.2d 419 (2d Cir. 1984).

   The bar for substantial similarity in a character is set quite high.  For example, in Adrand v. Columbia Pictures Industries, Inc., the protagonists of the two disputed works were both self-centered bachelors in their mid-thirties who pursued love interests and became trapped in a repeating day.  908 F. Supp. 1248, 1261 (S.D.N.Y. 1995).  The district court found that "any similarity between the two characters exists only at a level of abstraction too basic to permit any inference that defendant[s] wrongfully appropriated any 'expression' of plaintiff's ideas."  Id.  In Hogan, the two main characters were both half-human, half-vampires named Nicholas Gaunt; both were young white males with pale skin, a medium build, dark, tired eyes, and dark, scraggly hair; both sought to learn the truth about their origins; both learned about their origins through flashbacks or memories; both faced the choice of pursuing good or evil; and both were indoctrinated into the forces of evil.  48 F. Supp. at 310.  The Hogan Court nonetheless found that the two Nicholas Gaunts were not substantially similar because the similarities were among "unprotectible ideas and themes that do not represent any original elements of plaintiffs' work." Id.

   Because substantial similarity should be determined based on the Court's "considered impressions," Nichols, 45 F.2d at 123, a comparison of some of the disputed

characters is warranted.  The protagonists of the respective disputed works at issue here are not substantially similar.  While Plaintiff correctly points out that both Kale and Jeffries are confined, single men, such generalized similarities are not protectible.  Furthermore, Jeffries' character is far less developed than the Kale character in <u>Disturbia</u>.  Kale Brecht is a troubled teen, struggling to cope with the loss of his father, and is confined to his house on house arrest.  Hal Jeffries is a male of indeterminate age.  Kale has, at least initially, other pastimes to stave off boredom – television, video games, and music – while Jeffries has none.  While Kale consistently finds himself in trouble with a police officer, Jeffries' close friend is a detective.  Any similarities between Kale and Jeffries are too general to be afforded protection under copyright law, and when the "totality of [the characters'] attributes and traits" are considered, <u>Hogan</u>, 48 F. Supp. 2d at 309, the dissimilarities vastly outweigh the similarities, which are qualitatively and quantitatively insubstantial in this regard.  Indeed, the decisions in <u>Arden</u> and <u>Hogan</u> demonstrate that similarities far more numerous can be insufficient to support a finding of substantial similarity.

Nor are the antagonists in Plaintiff's Short Story and Defendants' <u>Disturbia</u> substantially similar.  Turner is a single middle aged man who is suspected – and later is confirmed – to be a serial killer.  Thorwald is a married man, who kills his wife – apparently the first and only woman he murders – to be with another woman.  Plaintiff attempts to demonstrate substantial similarity between the antagonists by characterizing Turner as a neighbor suspected of killing women and Thorwald as a neighbor who murders a woman.  (Compl. ¶ 86.)  The similarity between these two characters ends, however, with their middle age and their position as the protagonist's neighbor: a serial killer is distinguishable from a one-time killer.  These similarities amount to nothing more than age, sex, and status as a personification of evil living

next door – a basic character type – and therefore do not rise to the level of protectible expression of an idea.  See Hogan, 48 F. Supp. 2d at 310 ("A stock character or basic character type, however, is not entitled to copyright protection.").

Plaintiff also asserts that the supporting characters in each work are substantially similar.  Notwithstanding the fact that Ronnie and Ashley are, in fact two people, and Sam is but one, Plaintiff attempts to demonstrate substantial similarity by designating their character types as "the Assistant(s)."  (See, e.g., Compl. ¶ 86.)  The characters of Ronnie and Ashley however, bear no resemblance to Sam, beyond the most generalized level of supporting characters.  Such a basic character type and functional role warrants no copyright protection.  See Hogan, 48 F. Supp. 2d at 310.

*Setting*

Plaintiff contends that there is substantial similarity between settings in the Short Story and Rear Window.  Plaintiff's position cannot withstand scrutiny.  Disturbia is set in a house in suburban California while the Short Story is set in an apartment in New York City.  The setting of the Short Story is Jeffries' bedroom, and more specifically, his chair within that bedroom and the view from that chair.  In contrast, Disturbia's setting encompasses all of Kale's house and much of his yard, as well as a shopping center, a parking garage, Ashley's house and yard, a courthouse, the wilderness, a classroom, and Turner's home.  Furthermore, where Jeffries' room is impersonal – the only detail the author provides is that the books and sculpture in Jeffries' room were left by a previous tenant – Kale's room reflects his personality, and his house is furnished and decorated with personal items and photographs.  Jeffries' world, as expressed in the short story, consists of what he can see from his single bedroom window.  Kale, on the other hand, roams from room to room, utilizes windows throughout his home, and goes

outside.  The role of the windows is similar only at a high level of generalization, and thus is not protectible.  See Walker I, 784 F.2d at 48-49 (citing Warner, 654 F.2d at 208) (The Court must determine "whether the similarities shared by the works are something more than mere generalized idea[s] or themes.").

*"Total Concept and Feel"*

Plaintiff argues principally that Disturbia is, as a whole, substantially similar to the total concept and feel of the Short Story.  The total concept and feel of a work is comprised of the way an author "selected, coordinated and arranged the elements of his or her work," Feist, 499 U.S. at 358.  Where the total concept and feel of the works is markedly different, summary judgment is appropriate.  Denker, 820 F.Supp. at 731.

There is no substantial similarity between the total concept and feel of the Short Story and that of Disturbia.  The main plots are similar only at a high, unprotectible, level of generality.  Where Disturbia is rife with subplots, the Short Story has none.  The setting and mood of the Short Story are static and tense, whereas the setting and mood of Disturbia are more dynamic and peppered with humor and teen romance.  The pace of the two works is dramatically different: the Short Story takes place in just four days, while Disturbia spans more than a year and the main action takes place over an indeterminate period of days or weeks.

The Short Story and Disturbia thus are only similar at very general levels of abstraction.  Their similarities derive entirely from unprotectible elements and the total look and feel of the works is so distinct that no reasonable trier of fact could find the works substantially similar within the meaning of copyright law.  There is, thus, no genuine issue of material fact and Defendants are entitled as a matter of law to summary judgment dismissing Plaintiff's copyright infringement claims.

<u>CONCLUSION</u>

For the foregoing reasons, the Defendants' motion for partial summary judgment is granted.  Plaintiff's claims of copyright infringement, vicarious infringement, and contributory infringement are dismissed.[5]

The opinion resolves docket entry 49.

The Clerk of Court is respectfully requested to close this case.

SO ORDERED.

Dated: New York, New York
       September 21, 2010

                                                      LAURA TAYLOR SWAIN
                                                      United States District Judge

---

[5]     Defendants Dreamworks Home Entertainment, Inc., and Does 1-10 have not joined Defendants' Motion for Summary Judgment.  However, because the Court has determined that there was no copyright infringement as a matter of law, the claims against these Defendants are also dismissed.